## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| MYA BATTON, AARON BOLTON, MICHAEL BRACE, DO YEON IRENE KIM, ANNA JAMES, JAMES MULLIS, THEODORE BISBICOS, and STEVEN EWALD, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. 1:23-cv-15618 <br><br> Honorable Judge Andrea R. Wood |
|  | ) |  |
| Plaintiffs, | ) |  |
| v. | ) ) |  |
| COMPASS, INC.; EXP WORLD HOLDINGS, INC.; REDFIN CORP.; WEICHERT REAL ESTATE AFFILIATES, INC. D/B/A WEICHERT REALTORS; and UNITED REAL ESTATE HOLDINGS, LLC D/B/A UNITED REAL ESTATE GROUP, | ) ) ) ) ) ) ) ) |  |
|  | ) |  |
| Defendants. | ) ) |  |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' JOINT MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION AND BACKGROUND ................................................................................ 1

LEGAL STANDARD ................................................................................................................ 5

ARGUMENT ............................................................................................................................. 5

    I.      Plaintiffs Have Antitrust Standing to Pursue Injunctive Relief ....................................... 6

    II.     This Court Has Personal Jurisdiction ................................................................................ 7

    III.   Plaintiffs Plausibly Allege An Anticompetitive Agreement ........................................... 11

    IV.   Plaintiffs' State Law Claims Are Timely ........................................................................ 17

    V.     Plaintiffs Have Adequately Alleged Each of Their State Law Claims ........................... 22

          A.  Plaintiffs Properly Plead Their Tennessee Claim for Unjust Enrichment .............. 22

          B.  Plaintiffs Can Maintain a Class Action to Enforce the Illinois Antitrust Law and the Montana and South Carolina Consumer Protection Laws ....................................... 23

          C.  Plaintiffs May Bring Antitrust Claims for Damages Under the Laws of Connecticut, Missouri, Maryland, New Hampshire, and Utah. .................................................... 25

          D.  Plaintiffs Preserve Their Arguments Regarding Their Kansas Consumer Protection Claim ...................................................................................................................... 26

          E.  Plaintiffs Properly Plead Their Colorado and Pennsylvania Consumer Protection Claims. .................................................................................................................... 26

          F.  Plaintiffs Allegations Satisfy Florida's, Virginia's. amd Iowa's Consumer Protection Laws. ................................................................................................... 28

    VI.   Plaintiffs Should Be Granted Leave to Amend ............................................................... 31

CONCLUSION ........................................................................................................................ 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alston v. Hormel Foods Corp.*,
  273 Neb. 422 (2007) ................................................................................................. 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................... 5

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................................................... 6

*Associated Press v. United States Tribune Co.*,
  326 U.S. 326 U.S. 1, 19 (1945) ............................................................................... 15

*B.D. by & through Myer v. Samsung SDI Co.*,
  91 F.4th 856 (7th Cir. 2024) ..................................................................................... 8

*Ballagh v. Fauber Enterprises, Inc.*,
  290 Va. 120, 773 S.E.2d 366 (2015) ....................................................................... 30

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*,
  377 F.3d 682 (7th Cir. 2004) ................................................................................... 31

*Batton v. The National Association of Realtors, et al.*,
  No. 1:21-cv-00430, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ...................... passim

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................................. 7, 8

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
  582 U.S. 497 (2017) ................................................................................................. 17

*Cambridge Plating Co. v. Napco, Inc.*,
  991 F.2d 21 (1st Cir. 1993) ...................................................................................... 18

*Cooley v. Pine Belt Oil Co.*,
  334 So. 3d 118 (Miss. 2022) .................................................................................... 19

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  144 S. Ct. 2440 (2024) ........................................................................... 17, 18, 19, 20

*Craft v. Forklift Sys., Inc.*,
  No. M2002-00040-COA-R3CV, 2003 WL 21642767 (Tenn. Ct. App. July 14, 2003) ........... 23

*Creamer v. Monumental Props., Inc.*,
    459 Pa. 450 (1974) ................................................................................. 28

*D.R. Ward Constr. Co. v. Rohm & Haas Co.*,
    470 F. Supp. 2d 485 (E.D. Pa. 2006) ...................................................... 23

*Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*,
    46 F.4th 535 (7th Cir. 2022) .................................................................... 5

*Dubose v. Quinlan*,
    643 Pa. 244 (2017) ................................................................................. 19

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021) ....................................................................... passim

*Freeman Indus., LLC v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005) ................................................................ 22

*Geinosky v. City of Chicago*,
    675 F.3d 743 (7th Cir. 2012) .................................................................. 16

*Gelato, & Panini, LLC v. Simon Property Grp., Inc.*,
    2022 WL 17987098 (S.D. Fla. Mar. 22, 2022) ...................................... 30

*Greene v. Mizuho Bank, Ltd.*,
    169 F. Supp. 3d 855 (N.D. Ill. 2016) ................................................. 9, 10

*Gregg v. Ameriprise Fin., Inc.*,
    245 A.3d 637 (Pa. 2021) ........................................................................ 28

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ......................................................................... 18, 19

*Hendel v. World Plan Exec. Council*,
    705 A.2d 656 (D.C. 1997) ..................................................................... 18

*In re Auto. Parts Antitrust Litig.*,
    29 F. Supp. 3d 982 (E.D. Mich. 2014) .................................................. 23

*In re Auto. Parts Antitrust Litig.*,
    No. 12-MD-02311, 2013 WL 2456612 (E.D. Mich. June 6, 2013) ......... 25

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................. 4, 24

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 510 (N.D. Ill. 2019) .......................................................................... 6, 25

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d 919 (N.D. Ill. 2023) ........................................................................ 16, 24

*In re Dynamic Random Access Memory Antitrust Litig.* ("DRAM"),
   516 F. Supp. 2d 1072 (N.D. Cal. 2007) ................................................................... 25, 26

*In re Fico Antitrust Litig. Related Cases*,
   No. 1:20-CV-02114, 2023 WL 6388247 (N.D. Ill. Sept. 28, 2023) ........................ 21

*In re Generic Pharms. Pricing Antitrust Litig.*,
   368 F. Supp. 3d 814 (E.D. Pa. 2019) ........................................................................ 24

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
   No. CV 16-MD-2687 (JLL), 2017 WL 3131977 (D.N.J. July 20, 2017) ................ 27

*In re MyFord Touch Consumer Litigation*,
   No. 13-cv-03072-EMC, 2016 WL 7734558, 2016 U.S. Dist. LEXIS 179487 (N.D. Cal. Sep. 14, 2016) .................................................................................................................... 24

*In re Opana ER Antitrust Litig.*,
   162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................................... 19, 24

*In re Pre-Filled Propane Tank Antirust Litig.*,
   No. 14-02567-MD-W-GAF, 2019 WL 4796528 (W.D. Mo. Aug. 21, 2019) ......... 20, 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009) ..................................................................... 22

*In re Vanguard Chester Funds Litig.*,
   No. CV 22-955, 2023 WL 8091999 (E.D. Pa. Nov. 20, 2023) .............................. 27, 28

*Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*,
   29 Mass. App. Ct. 215 (1990) .................................................................................. 18

*Kahn v. Walmart Inc.*,
   107 F.4th 585 (7th Cir. 2024) ..................................................................................... 5

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) .................................................................................................. 18

*Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*,
   No. 11-cv-8808, 2023 WL 6065308 (N.D. Ill. Sept. 18, 2023) .............................. 14

iv

*Kronos, Inc. v. AVX Corp.*,
  81 N.Y.2d 90 (1993) ................................................................................................. 19

*Kurt v. Platinum Supp. Ins., Inc.*,
  No. 19 C 4520, 2021 WL 3109667 (N.D. Ill. July 22, 2021) ...................................... 9

*Leeder v. Nat'l Ass'n of Realtors*,
  601 F. Supp. 3d 301 (N.D. Ill. 2022) ........................................................................ 22

*Markle v. Drummond Advisors, LLC*,
  No. 19 Civ. 2789, 2020 WL 777272 (N.D. Ill. Feb. 18, 2020) ..................................... 5

*McKinnon v. Honeywell Int'l, Inc.*,
  977 A.2d 420 (Me. 2009) .................................................................................... 19, 20

*Med James, Inc. v. Barnes*,
  31 Kan. App. 2d 89 (2003) ....................................................................................... 18

*Moehrl v. Nat'l Ass'n of Realtors*,
  492 F. Supp. 3d 768 (N.D. Ill. 2020) .................................................................... 2, 11

*Naples Motorcoach Resort Homeowners Ass'n, Inc. v. JG&M Properties, LLC*,
  363 So. 3d 1184 (Fla. App. 6 Dist. 2023) ................................................................. 29

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978) .................................................................................................. 12

*NCAA v. Alston*,
  594 U.S. 69 (2021) ............................................................................................. 12, 14

*Penthouse N. Ass'n, Inc. v. Lombardi*,
  461 So. 2d 1350 (Fla. 1984) ..................................................................................... 18

*Prescott v. Adams*,
  627 S.W.2d 134 (Tenn. Ct. App. 1981) ..................................................................... 19

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*,
  61 F.4th 299 (2d Cir. 2023) ........................................................................... 11, 14, 15

*Rennie v. State*,
  171 Vt. 584 (2000) .................................................................................................... 19

*Robles v. City of Chicago*,
  354 F. Supp. 3d 873 (N.D. Ill. 2019) ........................................................................ 16

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,*
    786 F.3d 510 (7th Cir. 2015) ................................................................. 31

*Sandee's Catering v. Agri Stats, Inc.,* No. 20 C,
    2295, 2020 WL 6273477 (N.D. Ill. Oct. 26, 2020)................................ 24

*Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010).............................................................................. 23

*Singer Asset Fin. Co., LLC v. Wyner,*
    156 N.H. 468 (2007) ............................................................................. 19

*Staley v. Gilead Scis., Inc.,*
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ................................................ 24

*State ex rel. Miller v. Vertrue, Inc.,*
    834 N.W.2d 12 (Iowa 2013) .................................................................. 31

*State Farm Mut. Auto. Ins. Co. v. Physicians Inj. Care Ctr., Inc.,*
    427 F. App'x 714 (11th Cir. 2011)........................................................ 30

*Tietsworth v. Harley-Davidson, Inc.,*
    270 Wis. 2d 146 (2004) ........................................................................ 19

*Uhler v. Doak,*
    268 Mont. 191 (1994) ........................................................................... 19

*Vacco v. Microsoft Corp.,*
    793 A.2d 1048 (Conn. 2002) ................................................................ 25

*Wilk v. Am. Med. Ass'n,*
    719 F.2d 207 (7th Cir. 1983) ........................................................ passim

*Wilk v. American Medical Association,*
    895 F.2d 352 (7th Cir. 1990) .......................................................... 12, 13

**Statutes**

15 U.S.C. § 22............................................................................................ 7

28 U.S.C. § 2072(b) ............................................................................ 23, 24

73 Pa. Stat. Ann. §§ 201–1 ..................................................................... 28

740 Ill. Comp. Stat. 10/1 ........................................................................... 9

C.R.S.A. § 6–1–105 ............................................................................................ 4, 27, 28

Fla. Stat. § 475 ................................................................................................................ 30

Fla. Stat. § 475.42 .......................................................................................................... 29

Fla. Stat. § 475.626 ........................................................................................................ 29

Fla. Stat. § 501.201 ........................................................................................................ 26

Fla. Stat. § 501.212 ........................................................................................................ 29

Kan. Stat. Ann. § 50-623 ............................................................................................... 26

Mo. Rev. Stat. § 416.011 ................................................................................................ 26

T.C.A. 28-3-105 .............................................................................................................. 19

Utah Code Ann. § 76-10-3109(1)(a) .............................................................................. 26

Va. Code Ann. § 59.1-199(6) .......................................................................................... 30

**Regulations**

Conn. Legis. Serv. P.A. 18-22 (H.B. 5252) ................................................................. 4, 25

Plaintiffs Mya Batton, Aaron Bolton, Michael Brace, Do Yeon Irene Kim, Anna James, James Mullis, Theodore Bisbicos, and Steven Ewald ("Plaintiffs") respectfully submit this opposition to Defendants'[1] Joint Motion to Dismiss ("MTD"), ECF No. 126 & 126-1.

## INTRODUCTION AND BACKGROUND

This Court is intimately familiar with the facts of this action, in which Plaintiffs allege that Defendants and their co-conspirators, including the National Association of Realtors ("NAR") and some of the nation's largest brokerages, entered into a conspiracy that resulted in homebuyers being forced to pay artificially high broker fees and caused those buyers to pay inflated home prices. Indeed, this Court has already ruled on motions to dismiss substantially similar allegations in the related case, *Batton v. The National Association of Realtors*, *et al.*, No. 1:21-cv-00430 (N.D. Ill.) ("*Batton I*"), against Defendants' co-conspirators and NAR. There, the Court sustained the majority of Plaintiffs' claims following multiple rounds of robust briefing totaling over 120 pages of detailed analysis by highly sophisticated counsel.

Specifically, the Court found that plaintiffs plausibly pleaded the vast majority of their antitrust and consumer protection claims under state law, as well as their unjust enrichment claims, rejecting arguments that plaintiffs' state law claims were untimely, failed to plead deceptive practices, and that plaintiffs did not have standalone unjust enrichment claims, among other arguments. *See Batton I*, 2024 WL 689989, at *6, 8-9, 14. And, undoubtedly recognizing that this Court previously "accept[ed] the existence of a conspiracy" among NAR and its co-conspirator members and held that seller plaintiffs plausibly pleaded that each defendant "participated in an agreement that centralizes control over how real estate brokers are

---

[1] "Defendants" refers to Compass, Inc., eXp World Holdings, Inc., Redfin Corporation, Weichert Realtors, and United Real Estate Group.

compensated with the NAR," the *Batton I* defendants did not even challenge the existence of an agreement. *See Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 779 (N.D. Ill. 2020) (Wood, J.) ("*Moehrl*") (denying motion to dismiss complaint in similar litigation on behalf of homesellers). The Court thus dismissed only Plaintiffs' claim for injunctive relief under federal antitrust law, their Kansas consumer protection claim, their Tennessee antitrust and consumer protection claims, and their claims against a certain group of defendants for lack of personal jurisdiction. *Id*. at *8-13.

As in Batton I, Plaintiffs here allege that Defendants created, promulgated, and enforced a series of rules and policies that enabled Defendants to inflate broker commissions, which in turn inflated the prices of homes that Plaintiffs purchased. ¶¶ 9-12, 60, 62-66, 119.[2] These agreements are contained in NAR's rules governing NAR members. ¶¶ 62-65. Defendants further require their franchisees, brokerages, and individual agents to follow and enforce these anticompetitive rules. ¶ 10. Those rules include, among others, the Buyer Agent Commission Rule, which requires seller brokers using an NAR-affiliated multiple listing service ("MLS") to make a blanket unilateral offer of compensation to the buyer broker, without negotiation or regard for the broker's experience, services, or financial arrangement with the buyer. ¶¶ 67–70. Failure to comply with NAR's rules is punishable by losing access to multiple-listing services ("MLSs") controlled by NAR and its local affiliates. ¶ 5. As this Court aptly summarized, "real estate brokers and individual realtors' access to the MLSs is conditioned on their compliance with the NAR's rules, and given the commercial necessity of MLS access, the brokers have little choice but to comply." *Batton I*, 2024 WL 689989, at *1.

---

[2] "¶" refers to paragraphs in Plaintiffs' Am. Compl., ECF No. 112.

On November 2, 2023, prior to the Court's rulings on defendants' motions to dismiss in *Batton I*, Plaintiffs filed the instant case ("*Batton II*") bringing indirect purchaser claims under various state laws against the Defendants, shortly after homesellers identified the Defendants here during the course of a similar action. *Batton II*, ECF No. 1 (Nov. 2, 2023) ("Complaint"). On April 15, 2024, Defendants filed motions to dismiss Plaintiffs' Complaint for failure to state a claim and for lack of personal jurisdiction as well as a motion to strike Plaintiffs' class allegations.[3] *Batton II*, ECF Nos. 102-104, 106-109. On May 6, 2024, Plaintiffs filed their Amended Complaint ("Am. Compl.") naming one additional plaintiff, adding certain jurisdictional allegations, and adding certain state law claims and removing others. *Batton II*, ECF No. 112. Defendants again moved to dismiss the Am. Compl. *Batton II*, ECF No. 126.

Defendants' motion advances arguments that are either improper to resolve at the motion to dismiss stage, conflict with *Batton I*, or rely on extreme minority positions that conflict with controlling Seventh Circuit or Supreme Court precedent. For example, Defendants' personal jurisdiction arguments completely ignore the controlling case law, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) ("*Ford Motor Co.*"). Defendants direct the Court instead to out-of-district, pre-*Ford Motor Co.* cases, and one more recent case in which the defendant had no franchises or offices in Illinois. MTD at 7. Similarly, ignoring that the Court upheld the existence of an anticompetitive agreement in *Moehrl*, Defendants appear to contend that the fact that "trade associations are not walking conspirac[ies]" also means that membership in a trade association operates as a shield for its members against antitrust liability. MTD at 13. In doing so, Defendants discard this Court's prior ruling that Plaintiffs properly alleged that

---

[3] Plaintiffs' responses to Defendants' personal jurisdiction motions and joint motion to strike are filed concurrently herewith.

NAR and its co-conspirators enforce their anticompetitive agreements by conditioning access to essential MLSs on compliance, *Batton I*, 2024 WL 689989, at *1, and that allegations that association members created guidelines sanctioning anticompetitive conduct plead an agreement, *Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 230 (7th Cir. 1983) (*Wilk I*). Likewise, Defendants argue that Plaintiffs' claims should be dismissed as untimely despite this Court's rejection in *Batton I* of defendants' state-specific statute of limitations arguments in which this Court explicitly held that it is "irregular" to dismiss claims on statute of limitations grounds at the pleading stage. *Batton I*, 2024 WL 689989, at *6. Regardless, they offer no reason to depart from the traditional accrual rule that antitrust injury occurs each time plaintiffs sustain damage (*i.e.*, each time a plaintiff bought a home), which governs antitrust claims like Plaintiffs' here.

Defendants' state law arguments are equally faulty. For instance, their argument to dismiss Plaintiffs' Tennessee claim ignores that plaintiffs need not plead exhaustion of other remedies if doing so would be futile, as well as this Court's prior holding that Plaintiffs sufficiently plead a Tennessee unjust enrichment claim. 2024 WL 689989, at *8. With respect to certain state class action bars, Defendants decline to offer any substantive *Shady Grove* analysis and instead cherry-pick two cases and use them to suggest courts uniformly find these provisions to preclude class claims in federal court. MTD at 33-34. They conveniently leave out that courts differ on this point and that the more recent case law in this District holds that state class action bars are procedural only and that such claims can proceed in federal court. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817–18 (N.D. Ill. 2017). Defendants also claim Connecticut has no *Illinois Brick* repealer even though it clearly does (Conn. Legis. Serv. P.A. 18-22 (H.B. 5252), and they claim that Colorado requires plaintiffs to plead deceptive conduct when it clearly does not. *See* C.R.S.A. § 6–1–105(1)(rrr) (prohibiting "knowingly or recklessly

engag[ing] in any **_unfair, unconscionable_**, deceptive, deliberately misleading, false, or fraudulent act **_or_** practice.") (emphasis added). Defendants further attempt to dismiss certain of Plaintiffs' state claims on the grounds that those states exempt real estate transactions, but do not even attempt to provide any evidence that they are entitled to those exemptions, leaving a factual question inappropriate for resolution at the pleading stage.

In light of the Court's prior rulings, Defendants should have answered the complaint or at the very least substantially limited their briefing to discrete issues left unresolved in _Batton I_ that are in good faith unique to the Defendants here. Their motion should be denied.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." _Ashcroft v. Iqbal_, 556 U.S. 662, 678 (2009). At the motion to dismiss stage, courts must "draw every factual inference in the plaintiff's favor." _Kahn v. Walmart Inc._, 107 F.4th 585, 593 (7th Cir. 2024); _see also Markle v. Drummond Advisors, LLC_, No. 19 Civ. 2789, 2020 WL 777272, at *2 (N.D. Ill. Feb. 18, 2020) ("[T]his Court must construe the complaint in the light most favorable to Plaintiff, accept as true all well-pleaded facts, and draw reasonable inferences in their favor."). Courts should not permit defendants to seek dismissal based on a "misconstrued" understanding of the complaint. _Dean v. Nat'l Prod. Workers Union Severance Tr. Plan_, 46 F.4th 535, 550 (7th Cir. 2022).

## ARGUMENT

## I.      Plaintiffs Have Antitrust Standing to Pursue Injunctive Relief[4]

In order to determine whether a plaintiff has antitrust standing to pursue injunctive relief, courts must consider four factors: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury[.]" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 532 (N.D. Ill. 2019). Only the fourth prong was challenged in *Batton I* and is addressed here. A plaintiff's injuries are direct where the injury is "inextricably intertwined with the injury the conspirators sought to inflict," on the relevant market. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538-39 (1983).

Plaintiffs here, all homebuyers, suffered direct injuries because the anticompetitive conduct at issue forced them to pay artificially inflated commissions and artificially inflated prices for their homes, as well as prevented them from discovering or negotiating broker commissions (even though the commission rates were known to sellers). ¶¶ 67-89. These rules—especially the rule concerning concealment of commissions—uniquely harm buyers, who are at an information disadvantage to homesellers and who are the ones who actually select whether a buyer-broker is involved or not in the transaction, who that buyer-broker is, and the reasons they were chosen.

---

[4] Plaintiffs acknowledge that this Court has dismissed substantially similar federal antitrust claims in *Batton I*. Plaintiffs oppose this argument here to preserve the issue.

## II.     This Court Has Personal Jurisdiction

It is clear from Plaintiffs' complaint that this Court has personal jurisdiction over Defendants.[5] As Defendants concede, MTD at 5, Plaintiffs' federal antitrust claims would allow Plaintiffs to rely on Section 12 of the Clayton Act, 15 U.S.C. § 22, to establish personal jurisdiction. As discussed above, should those federal antitrust claims proceed, personal jurisdiction would exist pursuant to Section 12 of the Clayton Act. But even setting aside the Clayton Act, Plaintiffs have alleged specific personal jurisdiction over Defendants.

Specific personal jurisdiction exists over a defendant where, "the defendant has purposefully directed his activities at residents of the forum" and "the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). In the main MTD, ECF No. 126-1, Defendants tellingly do not challenge the fact that they directed their activities at Illinois residents, perhaps because examination of their purposeful targeting of the Illinois real estate market demonstrates precisely how Plaintiffs' injuries relate to those contacts.

A defendant purposefully directs its activities at a forum if it "deliberately reached out beyond its home—by, for example, exploiting a market in the forum state or entering a contractual relationship centered there." *Ford Motor Co.*, 592 U.S. at 359 (cleaned up). Defendants here did *both*. They entered into contractual relationships with franchisees in Illinois and/or created offices in Illinois that had the primary purpose and concrete effect of exploiting the Illinois real estate market to reap benefits from their conspiracy. ¶¶ 28-35. In the process of doing so, they mandated

---

[5] Plaintiffs more fully address personal jurisdiction in their separate memorandum of law responding to certain Defendants' motions to dismiss based on a lack of personal jurisdiction. Plaintiffs focus here on the jurisdictional argument contained in the MTD, ECF No. 126-1.

that all their brokers nationwide join NAR, an Illinois-based company, and implement the agreed-upon set of anticompetitive rules.

The fact that these contacts extended the conspiracy's reach to capture more and more Illinois real estate purchases firmly establishes that this "litigation results from [Plaintiffs'] alleged injuries that arise out of or relate to those activities." *Burger King*, 471 U.S. at 472. Under the Supreme Court's recent decision in *Ford Motor Co.*, "a defendant's contacts with the forum may 'relate to' the plaintiff's claims even in the absence of a 'strict causal relationship' between the contacts and claims." *B.D. by & through Myer v. Samsung SDI Co.*, 91 F.4th 856, 862 (7th Cir. 2024) (quoting *Ford Motor Co.*, 592 U.S. 351).

*Ford Motor Co.* (as well as its Seventh Circuit progeny) is conspicuously absent from Defendants' briefs, but it establishes personal jurisdiction here. There, the Supreme Court rejected a requirement that "the plaintiff 's claim came about because of the defendant's in-state conduct." *Ford Motor Co.*, 592 U.S. at 361. Instead, it found personal jurisdiction over products-liability claims in a state where Ford franchisees sold cars, even though the "cars at issue" were "originally sold" and "manufactured" "outside the forum States," *id*. at 357, with other "*consumers* later selling them to the States' residents," *id.* at 366 (emphasis added). Under this analysis, all that is needed is "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the state's regulation." *Id.* at 359.

Here, as in *Ford*, the Defendants maintained franchises and offices in Illinois to exploit its market. ¶¶ 28 – 33. Through those offices and franchise agreements, Defendants "required franchisees, brokerages, and individual realtors to join in and implement NAR's anticompetitive agreements as a condition of receiving the benefits of each Defendant's brand, brokerage,

infrastructure, and other support." ¶10. Those unlawful, contractual requirements are indisputably subject to Illinois regulation, not least because they violate its antitrust statute, 740 Ill. Comp. Stat. 10/1 *et seq.*

Plaintiff Steven Ewald's injuries clearly relate to this illegal activity under *Ford*. The Defendants' unlawful combination with other large real estate companies throughout Illinois was necessary to maintain the anticompetitive conspiracy, inflating broker commissions and home sales prices. The Defendants seem to argue that personal jurisdiction requires a strict privity requirement, criticizing Ewald's claims for using a non-party as his buyer-agent. But that overly strict requirement cannot withstand *Ford Motor Co.*'s relaxed requirement that the Defendant's actions merely "relate to" or have "an affiliation" or nexus with the Plaintiff's injuries. *Ford Motor Co.*, 592 U.S. at 361 (a "causation-only approach finds no support in [the] requirement of a 'connection' between a plaintiff's suit and a defendant's activities").

Only one of the cases that Defendants cite from this District, *Kurt v. Platinum Supp. Ins., Inc.*, No. 19 C 4520, 2021 WL 3109667, at *6-7 (N.D. Ill. July 22, 2021), post-dates *Ford Motor Co.* and even mentions that decision. *Kurt* does not support Defendants because in that case the plaintiffs' injuries and the unlawful conduct all occurred in Kansas and Iowa, and the relevant defendant was an Iowa company. *Id.* at *6. Unlike here and in *Ford Motor Co.*, the defendant in *Kurt* did not establish franchises or offices in Illinois for the purpose of exploiting its market, it did not mandate its employees to join and follow the rules of an Illinois corporation, and no plaintiff's injuries had any connection to Illinois. *Id.*

Nor does *Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855 (N.D. Ill. 2016)—a pre-*Ford* case—require dismissal. In that case, the court found that California had jurisdiction over the Japanese defendant because it "knowingly accepted a deposit from a California branch from

9

somebody it knew to be a California resident"—even though the plaintiff was an account holder at a California Wells Fargo branch—not the defendant Japanese bank. *Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 862–63 (N.D. Ill. 2016). Here, the suit-based relationship between the Defendants and Illinois is far stronger than the relationship between the Japanese bank and California. In *Greene*, the Japanese bank made only a passive contact with California by accepting a transfer from a California resident's California Wells Fargo branch. It did not direct its unlawful activity specifically at "California as opposed to, say, Nebraska or North Carolina," but the court still found personal jurisdiction in that state. *Id.* at 863. Here, Defendants each purposefully directed their unlawful conspiracy at the Illinois housing market, and that unlawful combination injured Illinois homeowners, including Ewald.

To be sure, *Greene* also found Illinois lacked jurisdiction because none of "Mizuho's suit-related conduct occurred at" a branch it operated there. *Id.* at 865. But that fact is markedly different from this case where Defendants' suit-related conduct is precisely the basis of Plaintiffs' claims. After all, Defendants contractually "required [their] franchisees, brokerages, and individual realtors" in Illinois to "join in, implement," and enforce the unlawful, suit-based conduct "as a condition" of those relationships, which included mandating all their agents nationwide to join and follow the rules of an Illinois company perpetuating anticompetitive conduct. ¶ 10.

The only difference between the jurisdictional basis here and the valid California jurisdictional basis in *Greene* is the arguable privity between the California resident and the Japanese bank based on the bank's acceptance of the plaintiff's wire transfer. That privity, however, is irrelevant under *Ford Motor Co*. In fact, the *Ford* plaintiffs there did not buy their cars from Ford directly or even indirectly through its franchisees—they purchased the cars through

10

other "consumers later selling them" to the plaintiffs. *Ford Motor Co.*, 592 U.S. at 366. In light of this, it does not matter whether Ewald was in privity with Defendants because his injury bears a nexus to their unlawful conspiracy that targeted prices in the Illinois real estate market. Indeed, Defendants do not (and cannot) cite a single case requiring contractual privity between the plaintiff and the defendant.

## III.    Plaintiffs Plausibly Allege An Anticompetitive Agreement

Plaintiffs have adequately alleged the existence of an anticompetitive agreement here, they previously did in *Batton I* and others did in *Moehrl*. Plaintiffs allege that Defendants and their co-conspirators, including NAR and other brokerages, entered into horizontal agreements—codified in NAR's handbook and Defendants' own rules and procedures—to abide by NAR rules. ¶¶ 62 – 66. This Court has already held that allegations just like these plausibly allege an agreement under the antitrust laws. *See Moehrl*, 492 F. Supp. 3d at 778 ("Perhaps most importantly, Plaintiffs point to the allegation that each of the Corporate Defendants requires its franchisees, affiliates, and realtors to comply with the NAR's allegedly anticompetitive restraints . . . by requiring their franchisees and realtors to join the NAR and follow the NAR's Handbook and Code of Ethics, including the Buyer-Broker Commission Rules."); *see also* ¶¶ 112-13. These rules were intended to and did enable Defendants to effectuate their conspiracy, with the result of inflating commissions and home prices and reducing the quality of broker services offered to homebuyers. ¶ 66. Plaintiffs' allegations plead a classic horizontal agreement to restrain trade. *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307 (2d Cir. 2023) (finding that association's rules eliminating competition were direct evidence of a horizontal agreement between association members), cert. denied, 144 S. Ct. 1391 (2024); *see also Moehrl*, 492 F. Supp. 3d at 778 ("[T]he purported anticompetitive restraints here are a product of written

rules issued by the NAR that each Corporate Defendant expressly imposes upon their franchisees and realtors. That suggests that each Corporate Defendant has reviewed, understood, and ultimately agreed to the NAR's rules, including the Buyer-Broker Commission Rules.").

Defendants appear to argue that their unlawful restraints on trade must be legal because they are laundered through a trade association. The Supreme Court rejected this same excuse in a case similar to this one. *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), involved a trade "association's canon of ethics prohibiting competitive bidding by its members." *Id.* at 681. The Court found the "agreement among competitors to refuse to discuss prices with potential customers" reflected in the canon of ethics was so obvious that "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *Id.* at 692. The Court declared the defendant's "attempt to [justify the restraints] on the basis of the potential threat that competition poses to the public safety and the ethics of its profession is nothing less than a frontal assault on the basic policy" of antitrust. *Id.* at 695. More recently, the Supreme Court reiterated the impropriety of laundering unlawful restraints on trade through associations in *NCAA v. Alston*, 594 U.S. 69, 95 (2021) (discussing *Nat'l Soc. Prof. Eng'rs* in rejecting the NCAA's bid to escape antitrust liability).

Defendants' reliance on *Wilk v. American Medical Association*, 895 F.2d 352 (7th Cir. 1990) (*Wilk II*), is odd considering that it held that the "AMA's [actions] constituted an unreasonable restraint of trade" when it promulgated rules amounting to a boycott of chiropractors. *Id.* at 362. To be sure, *Wilk II* rejected a claim against a separate trade organization that accredited hospitals, but it did so because "no antitrust injury occurred as a result" of that association's accreditation rule. *Id.* at 374. It also rejected the plaintiff's argument that the accreditation organization joined the AMA conspiracy because the district court had considered

the evidence and rightfully concluded otherwise. *Id.* at 375. Notably, the accreditation association was not an AMA member and did not force its members to follow AMA rules—to the contrary, the AMA was a member of the accreditation association. Furthermore, in discussing this third professional organization, the Seventh Circuit held that it could not be liable because it "never adopted the AMA's Principles . . . and never required its members to subscribe to those principles." *Id.* at 376.

This was not mere dicta—it reflected the Court's explicit holding years earlier in *Wilk I*. In that decision, the Seventh Circuit instructed that "a court may find that members of an association promulgating guidelines sanctioning conduct in violation of § 1 participated in an agreement to engage in an illegal refusal to deal." *Wilk I*, 719 F.2d 207, 230. The court even explicitly held that one AMA member's actions "by adopting the AMA Principles of Medical Ethics and by embodying the Principles in its own policy manual . . . provided sufficient footing for liability." *Id.* at 233.

Defendants' actions here similarly provide sufficient footing for liability (especially at the pleading stage) because each Defendant joined the conspiracy through their participation in NAR during the course of the unlawful conspiracy and their requirements for their brokers and franchisees to perpetuate and enforce the unlawful restraints. ¶¶ 10, 35, 62-63. Further, this Court has already found that Plaintiffs allege a coercive enforcement mechanism that requires Defendants and other NAR members to abide by the anticompetitive rules, explaining that brokers have little choice but to comply with NAR rules because NAR requires them to comply in order to gain access to essential MLSs. *Batton I*, 2024 WL 689989, at *1. These allegations sufficiently plead an agreement under *Wilk I* and *Wilk II*, *National Association of Professional Engineers*, and *NCAA v. Alston*.

13

Defendants' portrayal of their compliance with NAR's rules as mere "parallel conduct" absent some additional agreement between Defendants to follow the rules at issue here is incorrect because "the adoption of a binding association rule designed to prevent competition is direct evidence of concerted action" and "[n]o further proof is necessary." *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 307 (2d Cir. 2023) (emphasis in original); *accord Wilk I*, 719 F.2d 207, 230 ("adopting the AMA Principles of Medical Ethics and by embodying the Principles in its own policy manual . . . provided sufficient footing for liability"). Here, Plaintiffs have alleged that Defendants were members of NAR, agreed to be bound by NAR's rules, and required their agents, franchisees, and employees to follow NAR's rules. ¶¶ 10, 62-63, 111-13. That is all that is required.

The cases that Defendants cite, MTD at 13, do not help them because those cases only stand for the proposition that belonging to a trade association is not itself violative of the antitrust laws, and because those cases did not address mandatory trade association rules like the ones alleged here. ¶¶ 9-10, 62-65. For instance, while *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, No. 11-cv-8808, 2023 WL 6065308 (N.D. Ill. Sept. 18, 2023), did state that voluntarily adopting trade association guidance did not itself establish an agreement, it found an antitrust conspiracy where the trade group developed supply-reducing initiatives, implored members to "play along," and "the competing companies adopted and participated in them, nearly in unison." *Kraft Foods Glob., Inc.*, 2023 WL 6065308, at *13. Plaintiffs' allegations here are even stronger because they allege mandatory rules that Defendants agreed to comply with and that they in turn mandated their agents to follow, ¶¶ 9-10, 62-65, not mere suggestions.

Defendants' hub-and-spoke argument fares no better because it relies on the same misreading of the both the case and the law. Just because trade associations are not "walking

14

conspirac[ies]," it does not follow that "[c]ompetitors" can "avoid antitrust liability by hiding behind or acting through" such associations. *Relevent Sports, LLC*, 61 F.4th at 306. Plaintiffs do not allege individual agreements between NAR and each Defendant and each NAR MLS. Rather, Plaintiffs allege that NAR, all Defendants here, and all of the NAR MLSs agreed to and were required to follow NAR's anticompetitive rules aimed at preventing price competition and, as a result, artificially inflating the price that homebuyers had to pay to purchase homes. ¶ 66.

An association's rule prohibiting members from competing on price is an agreement under the antitrust laws, especially where Plaintiffs have alleged—and this Court has found— that the rule was subject to coercive enforcement. *Wilk I*, 719 F.2d 207, 230; *see also Batton I*, No. 21-CV-00430, 2024 WL 689989, at *1 (N.D. Ill. Feb. 20, 2024) ("given the commercial necessity of MLS access, the brokers have little choice but to comply"). In this context, Plaintiffs do not need to demonstrate that Defendants "agree[d] to agree" to the anticompetitive rules; the rule plus Defendants' "surrender[ ] . . . to the control of" NAR is sufficient. *Relevent Sports, LLC*, 61 F.4th at 309 (quoting *Associated Press v. United States Tribune Co.*, 326 U.S. 1, 19 (1945); *see also Wilk I*, 719 F.2d 207, 230 ("a court may find that members of an association promulgating guidelines sanctioning conduct in violation of § 1 participated in an agreement"). Nor are Defendants saved by the existence of MLSs that, in some cases, may be distinct from Defendants themselves (MTD at 15-16)—all Defendants are NAR members and have agreed to be bound by NAR's rules. *See Relevent Sports, LLC*, 61 F.4th at 310 ("[T]he FIFA Council's decisions bind the various national associations, which in turn bind their respective leagues and teams . . . those leagues and teams would otherwise compete with each other . . . but dodge competition because FIFA and the national associations enforce the 2018 Policy[.]").

In light of the above, Defendants' arguments concerning group pleading are similarly misplaced because Plaintiffs have alleged that each Defendant[6] was a member of NAR and agreed to be bound by its rules, including the Commission Rule and related rules limiting price competition. ¶¶ 10, 35, 39, 41-42, 62-66. "This is not a case where the allegations of the complaint leave the defendants in the dark about what they are alleged to have done." *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019) ("There is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations against defendants collectively[.]"); *see also Wilk I*, 719 F.2d at 230 ("a court may find that members of an association promulgating guidelines sanctioning conduct in violation of § 1 participated in an agreement").[7]

---

[6] Defendants' argument that one statement regarding Redfin's business model exculpates Redfin here is incorrect. First, Plaintiffs allege that Redfin was an NAR member and agreed to be bound by the anticompetitive rules at issue here. ¶¶ 10, 35, 41-42, 62-66. Plaintiffs further allege that Redfin's CEO, Glenn Kelman, served on the NAR committee responsible for reviewing and reissuing the MLS rules and that Redfin partially owned the MRED MLS on which Plaintiff Ewald's home was listed. ¶¶ 116, 118. Additionally, the Court should disregard the Comments that Defendants cited for this argument. MTD, at 17 n.6. Plaintiffs cited this document once in the Am. Compl. to support a statement concerning average home prices; the document is not "critical to the complaint" and is not appropriately considered here. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Further, these Comments of Stephen Brobeck from the Consumer Foundation of America do not provide any evidence that Redfin did not follow and enforce NAR's rules. At most they raise factual issues to be resolved after discovery.

[7] Defendants also argue in a footnote that Plaintiffs fail to allege plausible product or geographic markets. However, as Defendants concede, the Court ruled in *Batton I* that it is inappropriate to determine whether to apply a *per se*, quick look, or rule of reason analysis at this stage of the proceedings and, in any event, Plaintiffs plausibly plead a relevant market at the pleading stage. *Batton I*, 2024 WL 689989, at *5. Accordingly, Defendants' arguments are premature. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 979 (N.D. Ill. 2023) (definition of relevant product and geographic markets are a fact question usually requiring expert testimony).

## IV.    Plaintiffs' State Law Claims Are Timely

In June 2024, the Supreme Court explained that under the "traditional" or "standard rule for limitations periods," "a cause of action accrues 'on [the] date that damage is sustained and not [the] date when causes are set in motion which ultimately produce injury.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2451 (2024) (quoting Black's Law Dictionary). In this case, the Plaintiffs sustained damage when they purchased their homes, not the date when the Defendants first adopted the unlawful business practices that they wielded to inflict harm on Plaintiffs' home purchases. Consequently, Plaintiffs' causes of action did "not become complete and present" and "d[id] not *accrue*" for limitations purposes, "until the plaintiff [could] file suit and obtain relief." *Id.* at 2451.

This accrual rule for statutes of limitations focusing on a plaintiff's injury differs from "statutes of repose [that] begin to run on the date of the last culpable act or omission of the defendant." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017). The Defendants utterly fail to appreciate this difference. Instead, they would turn state statutes of limitations into statutes of repose without any of the ironclad "clear terms" or "emphatic form" that courts require before determining that a time bar is a statute of repose rather than limitations. *Id.* at 505 (statute of repose because it said "in no event" could an action be brought beyond the time limit and noted "defendant's last culpable act"); *California Pub. Employees' Ret.*, 582 U.S. at 505 ("emphatic form" of statutes of limitations differs from "fairly simple language" in statutes of limitations).

In the antitrust context, the so-called "continuing violation" doctrine is a faithful application of this "standard rule" for statutes of limitations—not an anomalous exception to it. It recognizes that a continuing antitrust violation like price-fixing injures consumers each time they

17

pay a supracompetitive price. In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), the Court held that the plaintiff could bring claims for injuries recently suffered even though the alleged misconduct began *decades* beforehand. *Id.* at 502 n.15. The Court held that even though the plaintiff "could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955" for new injuries that it continued to suffer. *Id.* Since *Hanover Shoe*, the Court has hewed to the traditional rule that "each overt act that is part of the violation and that injures the plaintiff, *e.g.*, *each sale to the plaintiff*, starts the statutory period running again" for the new sale. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (emphasis added).

Defendants have identified no precedent recognizing that any state departs from this "traditional accrual rule." *Corner Post*, 144 S. Ct. at 2452. In order to prove a departure, the defendants must identify something in the statutory text or a state supreme court decision providing "indication that it begins to run before the plaintiff has a complete and present cause of action"—including injury and damages. *Id.* Yet Defendants utterly fail to identify any indication in the statutory texts or in state supreme court precedent to demonstrate departure from what is "unquestionably the traditional rule." *Id.*

If Defendants had researched the accrual rule for the statutes they cite in Appendix A to their complaint, they would have discovered that state precedent bars their argument. For every state claim that they wrongly claim is time-barred, state precedent establishes that limitations periods begin to run on the date a plaintiff suffers injury, not the date a conspiracy is hatched.[8]

---

[8] *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 660 (D.C. 1997) ("a claim accrues at the time that the plaintiff suffers the alleged injury"); *Penthouse N. Ass'n, Inc. v. Lombardi*, 461 So. 2d 1350, 1352 (Fla. 1984) ("A cause of action does not accrue until someone has been damaged by the acts complained of."); *Med James, Inc. v. Barnes*, 31 Kan. App. 2d 89, 99 (2003) ("does not accrue until [plaintiff] has suffered an actual loss"); *Cambridge Plating Co. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir. 1993) ("accrual of a [Massachusetts] chapter 93A claim typically occurs at the time injury results from the assertedly unfair or deceptive acts") (citing *Int'l Mobiles Corp. v.*

Rather than identify any supporting precedent or statutory text to support their anomalous rule, Defendants have cherry-picked just two district court cases that erroneously disparage the Supreme Court's antitrust jurisprudence for departing from the traditional rule in cases alleging a "continuing violation" and "continuing and accumulating harm." *Hanover Shoe*, 392 U.S. at 502 n.15. Contrary to this misinterpretation, the Court's precedent is a faithful application of the traditional accrual rule that starts a limitations period on the "date that damage is sustained and not [the] date when causes are set in motion which ultimately produce injury." *Corner Post*, 144 S. Ct. at 2451.

Though neither district court opinion controls, it is worth examining their errors in greater detail. *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704 (N.D. Ill. 2016), confused the accrual rule that starts a limitations clock with a separate rule that pauses or "toll[s] the statute of limitations" clock that is already running. *Id.* at 725. This mix-up explains why *Opana* reached the contrary and unsupported conclusion that Supreme Court's approach "has received mixed treatment by state courts deciding antitrust claims." *Id.* To support this erroneous assertion, *Opana* identified just one case, *McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420 (Me. 2009).

---

*Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 221 (1990)); *Cooley v. Pine Belt Oil Co.*, 334 So. 3d 118, 126 (Miss. 2022) ("cause of action accrues only when . . . when the right to sue becomes vested"); *Uhler v. Doak*, 268 Mont. 191, 196 (1994) ("cause of action accrues when all elements of the claim or cause exist or have occurred"); *Alston v. Hormel Foods Corp.*, 273 Neb. 422, 431 (2007) ("statute of limitations runs from the time of the last injury"); *Singer Asset Fin. Co., LLC v. Wyner*, 156 N.H. 468, 477–78 (2007) (claim accrues when "plaintiff was damaged"); *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993) ("The Statute of Limitations does not run until there is a legal right to relief."); *Dubose v. Quinlan*, 643 Pa. 244, 258 (2017) ("Statutes of limitations begin to run when the cause of action accrues, which is usually the time a plaintiff is injured."); *Prescott v. Adams*, 627 S.W.2d 134, 138 (Tenn. Ct. App. 1981) ("under T.C.A. s 28-3-105, the cause of action accrues at the time the injury occurs"); *Rennie v. State*, 171 Vt. 584, 586 (2000) ("cause of action shall be deemed to accrue as of the date of the discovery of the injury"); *Tietsworth v. Harley-Davidson, Inc.*, 270 Wis. 2d 146, 158 (2004) (claim "does not accrue[] unless the plaintiff has suffered actual damage").

But that case espoused the traditional accrual rule and "defined the time of accrual as the time the plaintiff sustains a judicially cognizable injury." *Id.* at 424. Consistent with this rule, the court set accrual on the date the "purchases occurred in 1986," *id.* at 425, not 1968 when the defendant first began its anticompetitive conduct, *id.* at 423. *McKinnon* correctly rejected the plaintiff's tolling argument that it could use a non-actionable "New Hampshire purchase" to "revive the cause of action based on the 1986 purchases in Maine" in "2004 . . . twelve years beyond the expiration of Maine's statute of limitations." *Id.* at 425. *McKinnon*'s sound reasoning obviously does not apply here where the Plaintiffs seek to recover on their timely home purchases—not for older purchases it hopes to "revive."

Contrary to *Corner Post*, *California Public Employees' Retirement System*, and even *McKinnon*, the Defendants' remaining case *In re Pre-Filled Propane Tank Antirust Litig.*, No. 14-02567-MD-W-GAF, 2019 WL 4796528 (W.D. Mo. Aug. 21, 2019), applied the erroneous presumption that statutes of limitations accrue at the moment that the defendants first create an antitrust conspiracy. But under *Corner Post*, a "limitations period [that] begins to run before a plaintiff can file a suit" is an "odd result" that courts should "not infer . . . in the absence of any such indication in the text" (or from a state supreme court). 144 S. Ct. at 2451. *Propane Tank* flipped this presumption on its head, assuming that the claims accrued "when the alleged agreement" between the defendants commenced, and refusing to apply the traditional rule unless there was an ironclad guarantee in statutory text or state supreme court precedent to the contrary. 2019 WL 4796528 at *4.

The consequences of this backwards presumption litter *Propane Tank*'s analysis of the state limitations laws. Even where state statutes or state courts indicated that state law should be interpreted in harmony with federal law generally or federal antitrust law specifically, the court

20

*still* found the plaintiffs' claims time-barred. *Propane Tank*, 2019 WL 4796528 at *8 – 14. While it is impractical to address every error flowing from this erroneous presumption head on, the discussion of Kansas law highlights this error. In that case, Kansas enacted a statute providing that its "restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law," but *Propane Tank* still found the claims untimely because it thought that the so-called "continuing violations doctrine" was dicta—ignoring the Supreme Court's long precedent dating back to *Hanover Shoe*—and presuming that Kansas would not follow it. *Id.* at *9.

Apart from *Corner Post*, this Court should also follow its decision in *Batton I*, 2024 WL 689989. In that decision, this Court recognized that because the statute of limitations is an "affirmative defense" where the defendant bears the burden, it is "irregular to dismiss a claim as untimely under Rule 12(b)(6)." *Id.* at *6. The Defendants have failed to establish the burden because they have identified nothing in the text of the statutes or state precedent. Even for purchases outside the statutes of limitations, Defendants have failed to establish that Plaintiffs should have known that the Defendants' conspiracy caused their injuries until the last few years. *See In re Fico Antitrust Litig. Related Cases*, No. 1:20-CV-02114, 2023 WL 6388247, at *6 (N.D. Ill. Sept. 28, 2023) (where a "conceivable set of facts, consistent with the complaint, that would defeat the statute-of-limitations defense" exists, "the limitations defense cannot be resolved at this pleading stage").

The Defendants have also failed to rebut Plaintiffs' allegation that the doctrine of fraudulent concealment applies because Defendants committed affirmative acts to conceal their conduct and because Defendants' acts were inherently self-concealing. Defendants were encouraged to represent that their buyer-agent services were free. *Batton I*, 2024 WL 689989 at

*7. Defendants' conduct was also self-concealing because Plaintiffs allege that the NAR MLSs are "prohibit[ed] . . . from disclosing to prospective buyers the amount of commission that the buyer-agent will earn if the buyer purchases a home listed on the MLS" and because NAR rules "allow[ed] buyer-agents to misrepresent to buyers that a buyer-agent's services are free." ¶ 140.

## V.    <u>Plaintiffs Have Adequately Alleged Each of Their State Law Claims</u>

### A.   Plaintiffs Properly Plead Their Tennessee Claim for Unjust Enrichment[9]

Defendants argue that Plaintiffs' unjust enrichment claims under Tennessee law must be dismissed because Plaintiffs do not allege that they first exhausted their purported remedies against home sellers or buyer brokers. MTD at 44. As Defendants' cited authority holds, however, "a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 526 (Tenn. 2005). Plaintiffs here allege that Defendants and their co-conspirators, including NAR and various brokerages and/or real estate firms, conspired to inflate broker commissions and home prices, not sellers and individual buyer-brokers. *See, e.g.*, ¶¶ 10-11. Indeed, this Court held in *Batton I* that for the co-conspirator exception to apply, "the home seller would have to be in on the conspiracy *and Leeder does not allege that to be the case.*" Leeder v. Nat'l Ass'n of Realtors, 601 F. Supp. 3d 301, 311 (N.D. Ill. 2022) (emphasis added). Neither do Plaintiffs here.Where there is no allegation that these individuals with whom plaintiffs directly dealt were involved in the conspiracy, futility is "self-evident." *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1193 (N.D. Cal. 2009) (upholding indirect purchasers' Tennessee unjust enrichment claim); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1027 (E.D. Mich. 2014) (same).

---

[9] Plaintiffs voluntarily dismiss their Tennessee antitrust and consumer protection claims.

Defendants also argue that Plaintiffs cannot pursue their Tennessee unjust enrichment claims where their Tennessee antitrust and consumer protection claims would fail. MTD at 33. This argument ignores this Court's prior ruling that Plaintiffs "may bring a standalone unjust enrichment claim under Tennessee law." *Batton I*, 2024 WL 689989, at *8 (citing *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 506 (E.D. Pa. 2006)). *Craft v. Forklift Sys., Inc.*, No. M2002-00040-COA-R3CV, 2003 WL 21642767, at *3 (Tenn. Ct. App. July 14, 2003), cited by Defendants (MTD at 33), is inapposite. That case was a "pure contract action" in which the remedies available to plaintiff were entirely dictated by contract law. *Id* (explaining, "[t]he rights of the parties are to be determined from the contracts into which they entered and the consequences of those contracts and not from some generalized concepts of equity."). This is not a breach of contract case and Plaintiffs have pleaded remedies not only in law, but in their standalone unjust enrichment claim, which this Court has already determined is available to them. Defendants' argument should be rejected.

### B. Plaintiffs Can Maintain a Class Action to Enforce the Illinois Antitrust Law and the Montana and South Carolina Consumer Protection Laws

Defendants next argue that Plaintiffs cannot maintain their consumer protection claims as a class action under Illinois, Montana, and South Carolina law. MTD at 33-34. In *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), the Supreme Court held that Rule 23 applies in federal court unless it "abridge[s], enlarge[s] or modif[ies] any substantive right" under the Rules Enabling Act, 28 U.S.C. § 2072(b). Accordingly, a federal rule like Rule 23 "cannot govern a particular case in which the rule would displace a state right or remedy that is procedural in the ordinary sense of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id.* The question then is whether Illinois', Montana's, and South Carolina's class action bars are procedural or substantive.

District courts differ on whether these class action bars are procedural or substantive for purposes of *Shady Grove. See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817–18 (N.D. Ill. 2017) (declining to dismiss Illinois claim). Defendants' own authority acknowledges this. *See In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 844 (E.D. Pa. 2019) ("There is no controlling authority or a consensus among the District Courts that have considered the effect of these class action bars", including those contained in the Montana and South Carolina consumer protection laws); *In re Opana ER Antitrust Litig.,* 162 F. Supp. 3d at 723 (dismissing Illinois antitrust claim based on Shady Grove).[10]

However, this District has more recently held that "whether such plaintiffs may bring a class action does not affect their substantive rights." *See Broiler Chicken,* 290 F. Supp. 3d at 818, 820 – 21 (permitting plaintiffs to pursue their Illinois antitrust and Montana and South Carolina consumer protection claims); *see also, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 989 (N.D. Ill. 2023) (upholding Illinois antitrust claim and South Carolina consumer protection claim); *Sandee's Catering v. Agri Stats, Inc.*, No. 20 C 2295, 2020 WL 6273477, at *11 (N.D. Ill. Oct. 26, 2020) (upholding South Carolina consumer protection claim); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (same).

The Court should reach the same conclusion here, particularly as Defendants offer no *Shady Grove* analysis to demonstrate otherwise. *See In re Auto. Parts Antitrust Litig.*, No. 12-

---

[10] Defendants also cite the out-of-circuit decision *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 626 (N.D. Cal. 2020). MTD at 34. In dismissing plaintiffs' Illinois antitrust claim, that court specifically declined to follow this District's analysis in *Broiler Chicken*, choosing instead to follow Ninth Circuit precedent. *Id.* ("The Court finds Judge Orrick's analysis in *United Food* more persuasive than the analysis in *Broiler Chicken Antitrust*. This is especially true given this Court's take on Shady Grove as articulated in *In re MyFord Touch Consumer Litigation*, No. 13-cv-03072-EMC, 2016 WL 7734558, 2016 U.S. Dist. LEXIS 179487 (N.D. Cal. Sep. 14, 2016)). Here, *Broiler Chicken*, the in-circuit precedent, should govern.

MD-02311, 2013 WL 2456612, at *30 (E.D. Mich. June 6, 2013) (defendants did not meet their burden to show dismissal was required where they failed to provide a *Shady Grove* analysis or any post-*Shady Grove* support, and more recent authority upheld plaintiffs' claims).

### C. Plaintiffs May Bring Antitrust Claims for Damages Under the Laws of Connecticut, Missouri, Maryland, New Hampshire, and Utah.

Contrary to Defendants' arguments, Plaintiffs may bring a claim for damages under Connecticut's antitrust law. First, Defendants inexplicably claim that Connecticut has not passed an *Illinois Brick* repealer statute. MTD at 35. On May 29, 2018, however, Connecticut passed its *Illinois Brick* repealer act. Conn. Legis. Serv. P.A. 18-22 (H.B. 5252) ("In any action brought under subsection (c) of section 35-32 or seeking treble damages under section 35-35, a defendant: (1) May not assert as a defense that the defendant did not deal directly with the person on whose behalf the action is brought . . . ."). Defendant's cited authority, *Vacco v. Microsoft Corp.*, 793 A.2d 1048, 1061 (Conn. 2002), pre-dates Connecticut's repealer by 16 years, and is therefore inapposite. Accordingly, Plaintiffs' Connecticut antitrust claim should be upheld.

Defendants do not dispute that Plaintiffs may bring antitrust claims for damages under the laws of Utah, Maryland and New Hampshire, only whether these states' repealer statutes apply retroactively. MTD at 35-36. In *In re Dynamic Random Access Memory Antitrust Litig. ("DRAM")*, 516 F. Supp. 2d 1072, 1109-1110 (N.D. Cal. 2007), defendants' made a similar argument regarding Hawaii's repealer statute. In that case, Hawaii's statute was enacted after defendants' violative conduct was alleged to have ended. *Id.* The *DRAM* court held that the language of the Hawaii repealer statute, which stated that indirect purchasers "may bring an action," indicated the statute applied to when a complaint could be filed, as opposed to the period for which they could recover. *Id.* The Utah and Maryland statutes at issue here have nearly identical language. *See* Utah Code Ann. § 76-10-3109(1)(a) (indirect purchasers "may bring an

action for injunctive relief and damages"); Md. Code Ann. § 11-209(b)(2)(i) (2017) ("A person .
. . may maintain an action for damages . . . regardless of whether the person maintaining the
action dealt directly or indirectly with the person who has committed the violation."). Thus,
under the reasoning of *DRAM*, Plaintiffs' Utah and Maryland antitrust claims are viable with
respect to conduct both before and after the enactment of the repealer statutes.

In the alternative, Plaintiffs limit their Maryland antitrust claims to damages incurred
after May 27, 2017, and their Utah antitrust claim to damages incurred after May 1, 2006.

Plaintiffs limit their New Hampshire antitrust claim to damages incurred after January 1,
2008, because it does not appear the New Hampshire repealer statute applies to past damages.
Plaintiffs withdraw their claim under the Florida antitrust statute, Fla. Stat. §§ 501.201, *et seq*,
and the Missouri antitrust statute. Mo. Rev. Stat. §§ 416.011, *et seq*.

### D.  Plaintiffs Preserve Their Arguments Regarding Their Kansas Consumer Protection Claim

This Court has previously dismissed Plaintiffs' Kansas Consumer Protection Act
("KCPA"), Kan. Stat. Ann. § 50-623 *et seq*. on the grounds that Plaintiffs did not sufficiently
allege fraud or deception. *Batton v. Nat'l Ass'n of Realtors,* No. 21-CV-00430, 2024 WL
689989, at *9 (N.D. Ill. Feb. 20, 2024). Plaintiffs oppose this claim again here to preserve this
issue for the same reasons that Plaintiffs articulated in Batton I. *See Batton I*, ECF No. 98 at 18-
19.

### E.  Plaintiffs Properly Plead Their Colorado and Pennsylvania Consumer Protection Claims.

With regard to Plaintiffs' Colorado and Pennsylvania consumer protection allegations,
Plaintiffs sufficiently allege claims for relief. Colorado's "catch-all" provision prohibits conduct
that includes "knowingly or recklessly engag[ing] in any unfair, unconscionable, deceptive,
deliberately misleading, false, or fraudulent act or practice." C.R.S.A. § 6–1–105(1)(rrr). To state

26

a claim under the CSRA, plaintiffs must allege that Defendants engaged in an (1) unfair or deceptive practice, (2) in the course of its business, (3) impacting the public as actual or potential customers, (4) the plaintiff suffered an injury to a legally protected interest, and (5) the practice caused injury. *In re Liquid Aluminum Sulfate Antitrust Litig*., No. CV 16-MD-2687 (JLL), 2017 WL 3131977, at *26 (D.N.J. July 20, 2017). Here, Plaintiffs allege that Defendants engaged in an anticompetitive conspiracy during the course of their business that injured homebuyers as a result. Such allegations sufficiently plead an unfair or deceptive practice under Colorado's consumer protection law. *Id.* (upholding indirect purchasers' Colorado consumer protection claim where they alleged "unfair trade practices [] in the form of price-fixing and customer allocation . . . during the course of Defendants' business" and that plaintiffs "suffered injury as end use purchasers" as a result).

*In re Vanguard Chester Funds Litig.*, No. CV 22-955, 2023 WL 8091999, at *1 (E.D. Pa. Nov. 20, 2023) is also instructive. There, plaintiffs satisfied C.R.S.A. § 6–1–105(1)(rrr) by alleging that Vanguard changed an aspect of its mutual fund rules, ultimately resulting in some investors suffering surprise capital gains taxes. *Id.* According to the plaintiffs, Vanguard knew that their decision would subject investors to unexpected taxes. *Id*. at *15. Based on these allegations, the Court upheld plaintiffs' Colorado consumer protection clam under C.R.S.A. § 6–1–105(1)(rrr).

Like in *Vanguard*, Plaintiffs here allege that Defendants created and enforced rules that they knew (indeed, intended) would cause homebuyers to pay more without them ever knowing. ¶ 66 (alleging Defendants engaged in concerted action to lead to higher prices and lower quality services for homebuyers). Specifically, Plaintiffs allege that Defendants "instituted a series of rules ensuring commission concealment from buyers," including prohibiting the disclosure to

27

prospective buyers of the total commission before agreeing to purchase a property at a particular price. ¶¶ 88; 8, 65, 87, 89, 136. As a result, the buyer-agent commission is concealed from homebuyers until it is too late, with the result that Plaintiffs pay an inflated home price as a result of the inflated commission, among other aspects of Defendants' conspiracy that harm them unknowingly, such as steering. Id. at ¶ 88. As in *Vangaurd*, homebuyers are subjected to a surprise "tax" on their homes as a result of Defendants' policies. As in *Vanguard*, these allegations are sufficient to satisfy C.R.S.A. § 6–1–105(1)(rrr).

Plaintiffs' allegations also satisfy Pennsylvania's consumer protection statute, 73 Pa. Stat. Ann. §§ 201–1 et seq. Pennsylvania outlaws "[u]nfair methods of competition" and "unfair or deceptive acts or practices." 73 Pa. Stat. Ann. §§ 201–1. These practices include "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). Plaintiffs allege that Defendants instituted rules that were designed to and did conceal from buyers what they were actually paying and into believing that buyer-broker services were free at the time when they agreed to purchase a home and at what price. Am. Compl. ¶¶ 8, 55, 65 87-89. No more is required. *See Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021) (noting the consumer protection law "is to be construed liberally with the object of preventing unfair or deceptive practices"); *Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 457 (1974) ("The Legislature sought by the Consumer Protection Law to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices[.]").

### F. Plaintiffs Allegations Satisfy Florida's, Virginia's, and Iowa's Consumer Protection Laws.

Defendants move to dismiss Plaintiffs' Florida, Virginia, and Iowa consumer fraud claims not because the allegations fail to state a claim for relief, but because they claim entitlement to certain statutory exemptions involving real estate. But Defendants either misread

the statute, or fail to point to allegations in Plaintiffs' complaint establishing entitlement to the exemptions.

For example, Defendants point to Fla. Stat. § 501.212, providing that the Florida Deceptive and Unfair Trade Practices act "does not apply to . . . (6) An act or practice involving the sale, lease, rental, or appraisal of real estate by a person licensed, certified, or registered pursuant to chapter 475, which act or practice violates s. 475.42 or s. 475.626." FL ST § 501.212(6) (emphasis added). On its face, this exemption applies only to allegations of violations of FL ST. § 475.42 or 475.626. Plaintiffs do not seek relief under these two statutes nor allege violations of them. Sections 475.42 and 475.626 together enumerate 15 prohibit practices. None of them relate to entering, creating, promulgating, and implementing anticompetitive rules and policies. Tellingly, Defendants' cited support, *Naples Motorcoach Resort Homeowners Ass'n, Inc. v. JG&M Properties, LLC*, 363 So. 3d 1184, 1189 (Fla. App. 6 Dist. 2023), involved collecting a commission fee as a broker without a license, which is a violation of FL ST. 475.42(1)(a)—not a scheme to artificially inflate commissions and home prices via anticompetitive agreements not to compete. And even if this language did arguably exempt Defendants' conduct from liability, the Court would still need to resolve the question "by looking to the activity which is the subject of the lawsuit, and whether that activity is subject to the regulatory authority of" the regulatory body at issue. *State Farm Mut. Auto. Ins. Co. v. Physicians Inj. Care Ctr., Inc.*, 427 F. App'x 714, 723 (11th Cir. 2011), rev'd in part on other grounds, *State Farm Mut. Auto. Ins. Co. v. Williams*, 824 F.3d 1311 (11th Cir. 2014). Plaintiffs do not allege on the face of their complaint that the conduct about which they complain was subject to Florida regulation or covered by Florida's licensing requirement, and Defendants provide no evidence to the contrary.

29

To the extent Florida's exemption otherwise applies, Defendants also do not demonstrate that they themselves were "licensed, certified, or registered pursuant to chapter 475." It may be the case that Defendants' subsidiary company or licensee is the only entity registered. *See generally Café, Gelato, & Panini, LLC v. Simon Property Grp., Inc.*, 2022 WL 17987098, at *8 (S.D. Fla. Mar. 22, 2022). Plaintiffs do not themselves allege that Defendants were registered in Florida pursuant to Fla. Stat. § 475, *et seq.*

Defendants' argument with respect to the Virginia consumer fraud claim likewise fails because it only exempts "real estate who are licensed under Chapter 21 (§ 54.1–2100 et seq.) of Title 54.1." Va. Code Ann. § 59.1-199(6). Plaintiffs do not allege that Defendants were licensed under this code and Defendants offer no proof otherwise. Moreover, courts should interpret this exemption similarly to Florida's, wherein it exempts liability only for conduct that is otherwise regulated. Any interpretation to the contrary simply creates a black-hole in which businesses are free to conspire and harm indirect purchasers with no remedy or oversight in state law and contrary to the Virginia Supreme Court's that the Virginia Consumer Protected Act is remedial legislation and that Virginia "construe[s] remedial legislation liberally, in favor of the injured party. *Ballagh v. Fauber Enterprises, Inc.*, 290 Va. 120, 125, 773 S.E.2d 366, 368 (2015). It is far from clear at this point whether all of the activity alleged by Plaintiffs was subject to approval by Virginia regulatory bodies.

Defendants' argument with respect to Plaintiffs' Iowa consumer fraud claim for the same reasons. It too only exempts claims against "[p]ersons or facilities licensed, certified, or registered" under 543B, which governs real estate brokers and salespersons. Plaintiffs do not allege that Defendants themselves were licensed in Iowa pursuant to this chapter, and Defendants offer no evidence to the contrary. This exemption should also be read narrowly to only cover

conduct that is otherwise regulated in Iowa, because the Iowa Consumer Fraud Act "is a remedial statute, and accordingly, the courts] are bound to give it a liberal interpretation, not an illusory one. *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 32 (Iowa 2013). As with Florida and Virginia, Plaintiffs do not plead that all of their allegations against Defendants were subject to regulation in Iowa, and Defendants offer no evidence otherwise to make that determination at this time.

## VI.     <u>Plaintiffs Should Be Granted Leave to Amend</u>

"Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004).

Although Plaintiffs have previously amended their complaint, Defendants advance some limited new arguments for the first time that have yet to be ruled upon by the Court. *E.g.*, MTD at 9-15. Accordingly, to the extent that the Court grants Defendants' MTD, Plaintiffs respectfully request leave to amend their complaint to address any pleading deficiencies identified.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

Dated: August 5, 2024

*/s/ Vincent Briganti*
Vincent Briganti (pro hac vice)
Christian Levis (pro hac vice)
Noelle Forde (pro hac vice)
**LOWEY DANNENBERG, P.C.**

44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
clevis@lowey.com
nforde@lowey.com

George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Michael E. Klenov (Ill. Bar No. 6300228)
Carol O'Keefe (Ill. Bar No. 6335218)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
mklenov@koreintillery.com
cokeefe@koreintillery.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

Dated: August 5, 2024                                                  /s/ _Noelle Forde_