# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SCOTT DAVIS, *et al.*,** | | **CIVIL ACTION** |
| **Plaintiffs,** | | |
| | | |
| **v.** | | |
| | | |
| **HANNA HOLDINGS, INC.,** | | **NO.  24CV2374** |
| **Defendant.** | | |

## OPINION

Plaintiffs, a group of individuals who purchased residential real estate throughout the United States, sued Defendant Hanna Holdings, Inc., a real estate brokerage firm and member of the National Association of Realtors, bringing claims under federal and state antitrust laws, state consumer protection statutes, and the doctrine of unjust enrichment on behalf of themselves and two putative classes of similarly situated home buyers.  Plaintiffs allege that Hanna participated in a conspiracy to maintain and enforce anticompetitive rules governing brokerage commissions in real estate transactions, leading to artificially inflated home prices and reduced competition in the market for real estate brokerage services.

Hanna has moved to dismiss Plaintiffs' Amended Complaint on several grounds, including Article III and statutory standing, failure to state a claim, and failure to arbitrate. Before the Court now is Hanna's Motion to Dismiss for Lack of Standing and Mootness.  For the reasons set forth below, Hanna's Motion will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

Except where otherwise noted, the following facts are taken from Plaintiffs' Amended Complaint, well-pleaded allegations from which are taken as true at this stage.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

1

### A.  The Parties and Their Roles in the Market

Defendant Hanna Holdings, Inc. ("Hanna") is the largest privately-held real estate brokerage company in the United States, operating across thirteen states on the East Coast and in the Midwest.  Hanna and its employee-brokers are members of the National Association of Realtors ("the NAR"), a 1.4 million-member trade association that represents residential and commercial real estate brokers, salespeople, property managers, appraisers, and others engaged in the real estate industry across the nation.  The NAR establishes and enforces rules, policies, and practices that govern the activities of realtors belonging to the association's 54 state or territorial associations and its approximately 1,200 local boards.

Each local board operates a database of local property listings called a Multiple Listing Service ("MLS"), and does so in accordance with rules promulgated on the national level by the NAR.  In any particular geographical region of the country, the local MLS serves as the *de facto* marketplace for home listings—brokers working for home sellers ("seller-brokers") list houses on the MLS, and brokers working for home buyers ("buyer-brokers") use the MLS to find potential homes for their clients.  MLSs also serve as the main source for the listings displayed by popular online real estate companies like Zillow, who, in exchange for access to NAR-controlled MLS data, agree not to compete with NAR members by acting as real estate brokers themselves.

Most homes bought each year—nearly 90%, according to NAR figures from 2020—were bought with the assistance of NAR-member brokers, who typically use their local NAR-controlled MLS to find properties for sale.  Without access to the NAR-controlled MLSs, buyer-brokers would be deprived of the most comprehensive and up-to-date information about local home listings and would be unable to effectively compete with brokers who have such access.

The NAR controls a substantial number of MLSs in the United States.

Plaintiffs are individuals who bought homes with the help of an NAR-member broker which utilized an NAR-controlled MLS. They allege that Hanna and non-party coconspirators—other real estate brokerages that are members of the NAR—worked together to promulgate several NAR rules designed to inflate buyer-agent commissions above competitive market rates and stymie competition among real estate brokers. As a result of these rules, Plaintiffs allege that they paid higher prices for their homes and received poorer quality brokerage services than they would have in a competitive market.

### B. The Mechanics of Broker Compensation

As described above, most home purchases that occur in the United States are facilitated by brokers representing buyers and sellers. Both buyer-brokers and seller-brokers are compensated with fees calculated as a percentage of the home's final sale price; these fees are paid to the brokers by the home seller out of the proceeds received from the buyer. The sizes of the brokers' commissions are usually determined at the outset of the business relationship between the seller and their broker, who enter into a listing agreement specifying the total commission fee that will be paid to the seller-broker after the home sells. Using the MLS, the seller-broker then lists the house and makes an offer of compensation to any buyer-broker who can successfully broker the sale.

Suppose, for example, that Sam wants to sell their house. Sam contacts a seller-broker, who agrees to market the house in exchange for a 6% total commission fee. Sam's broker then creates a listing for Sam's house on the MLS and, as part of that listing, unilaterally offers a fee of 3% to any buyer-broker who can find a buyer. Several buyer-brokers show Sam's house to their clients, and a few buyers make offers on the home. Sam decides to accept Blake's offer of

$500,000.  Blake pays $500,000 into an escrow account; from this account, $15,000 is

transmitted to Blake's broker (3% of the sale price, pursuant to the unilateral offer made by

Sam's broker); another $15,000 goes to Sam's broker (the 6% total commission minus the 3%

offered to the buyer-broker); and the rest is sent to Sam.

### C.  The Anticompetitive Conduct and its Effects

Plaintiffs allege that Hanna conspired with other NAR-member brokerages to

promulgate certain rules, policies, and practices, all of which are binding on NAR members and

NAR MLS users, and which have the effect of artificially inflating commission rates for buyer-

brokers and suppressing competition among them.

The first and most central of these rules, which Plaintiffs call the "Buyer-Agent

Commission Rule," is set forth in the NAR's Handbook on MLS Policy as follows:

> In filing a property with [a MLS controlled by the NAR], the
> participant of the service is making blanket unilateral offers of
> compensation to the other MLS participants, and shall therefore
> specify on each listing filed with the service, the compensation
> being offered to the other MLS participants. . . . [MLSs] shall not
> publish listings that do not include an offer of compensation
> expressed as a percentage of the gross selling price or as a definite
> dollar amount, nor shall they include general invitations by listing
> brokers to other participants to discuss terms and conditions of
> possible cooperative relationships.

In lay terms, the Buyer-Agent Commission Rule requires seller-brokers, when listing a house on

an MLS, to offer the same fee to any buyer-broker who successfully finds a buyer for the home,

and forbids them from inviting buyer-brokers to negotiate the fee at this stage of this transaction.

Elsewhere, as a complement to the Buyer-Agent Commission Rule, the Handbook

prescribes what Plaintiffs call the "Commission Filter Rule," which allows buyer-brokers using

an MLS to sort and select "listings they choose to display based only on objective criteria

including . . . compensation offered by listing brokers."  Certain NAR-controlled MLSs even

allow buyer-brokers to set up automated email blasts to their buyer clients which filter out any homes that fall below a certain compensation amount or percentage.

Plaintiffs allege that these rules collectively facilitate a process dubbed "steering," whereby buyer-brokers avoid showing their clients any homes too far below the artificially high market compensation rate—in this case, 3% of the home's final sale price. Buyer-brokers do this to discourage sellers from offering lower fees, with the understanding that if no buyer-broker will show a house listed too far below 3%, then no such home will sell, and seller-brokers will fall in line by offering closer to the 3% fee. Sellers, understanding the *realpolitik* of the market, then inflate their home prices to account for the increased cost of buyer-broker services, resulting in the artificially inflated home prices of which Plaintiffs complain.

Plaintiffs also allege that these rules reduce the quality of services offered by buyer-brokers. When brokers decide which houses to show their clients based on potential payouts, those brokers give short shrift to the buyer's desiderata—location, style, land features, *et cetera*. And since the same compensation fee is offered to all buyer-brokers regardless of skill, experience, or amount of time expended, buyer-brokers need not market themselves to compete along these axes. Making money as a buyer-broker becomes a pure numbers game, and buyers are deprived of the bespoke services they might otherwise receive if their brokers were compensated differently.

Plaintiffs also contend that Hanna and its co-conspirator NAR members have developed a set of rules that conceal from potential buyers the information they would need to resist or detect steering. First and foremost is the "Free Service Rule," under which buyer-brokers are permitted to represent to their buyer clients that their services are "free"—even though, as Plaintiffs allege, the buyer ends up paying for these services through artificially-inflated home prices. Plaintiffs

5

also contend that NAR forbids buyer-brokers from revealing to their clients the total commission rate associated with a property (as determined between the seller and their broker) as well as the commission rate specifically offered to the buyer-broker.  Because buyers believe their brokers are working for free, and because they do not know the commission rates involved in the transaction, they are highly unlikely to attempt to negotiate a lower buyer-broker commission.

But even if a buyer did know the rate their broker was offered, Plaintiffs contend, the buyer would be all but powerless to reduce it.  This is because the buyer-broker's rate is determined by the seller and the seller-broker—not the buyer and the buyer-broker—and the NAR's ethical rules[1] expressly prohibit buyer-brokers from "us[ing] the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation . . . ."  To the extent buyer-brokers are permitted to negotiate their commission rates at all, the NAR requires that such negotiations take place *before* the buyer-broker shows the home in question to a potential buyer, and the seller loses the ability to unilaterally modify the offer of compensation once *any* buyer has placed an offer on the house, leaving a short window of time during which fees have the potential to be modified.  The NAR ethical rules also forbid buyer-agents from urging their clients to attempt fee negotiations directly with the seller, meaning that buyer-agents cannot skirt the NAR's guardrails by encouraging the buyer to act in their own best interest.

With all these rules governing the conduct of NAR-member brokers, why would a buyer not simply find a broker who is not an NAR member?  Because, according to Plaintiffs, the NAR limits access to lockboxes, which contain the keys to enter the homes listed on NAR MLSs, to NAR members.  Since NAR controls so many local MLSs (and, by extension, the keys to the

---

[1] The NAR's ethical rules are codified in its Code of Ethics; local member associations that fail to enforce the Code's rules are subject to expulsion from the national organization.

homes listed thereon), the number of homes a non-member buyer-broker could access would be minimal, rendering them an ineffective broker. The NAR's lockbox policy, then, encourages all buyer-brokers operating in an NAR-dominated market to become NAR members, thereby subjecting all the brokers in the region to the same anticompetitive rules and effectively driving out all non-NAR competition for buyer-broker services.

### D. The Effect of the Anticompetitive Conduct

Plaintiffs contend that home buyers have borne the brunt of the anticompetitive rules and policies laid out above. Higher commission fees for buyer-brokers mean higher home prices, and higher home prices mean buyers have paid more for their homes than they would have in a competitive market. Buyers have also received lower quality brokerage services, since brokers have steered them away from homes that match their purchase criteria in favor of homes offering high commission fees. And buyers are none the wiser, having had the wool pulled over their eyes by brokers representing their services as "free." Meanwhile, brokers operating outside the NAR-controlled conspiracy are literally locked out of the market. Buyers, then, have neither the information they would need to negotiate better rates or services, nor any real ability to search for a home beyond the conspiracy's reach.

Plaintiffs contend that this conspiracy has inflated buyer-broker rates to artificially high levels for decades, even as technological changes in the industry have lowered costs for brokerage services and rendered the buyer-broker's role less instrumental in the home-buying process. The digitalization of real estate databases and the ubiquity of instantaneous communication methods for transmitting offers has reduced the amount of time it takes for a broker to find houses for their client and make offers on their behalf. What's more, the rise of online public real estate marketplaces like Zillow has changed the *modus operandi* of home-

7

buying; buyers increasingly locate the homes they are interested in on their own, and retain a

broker only to coordinate a showing or to help put in an offer.  Plaintiffs allege that the

conspiracy engineered by Hanna and other NAR members is the only reason these cost-savings

and diminishing demand have not resulted in lower fees for buyer-brokers.

## II.    LEGAL STANDARDS

Hanna's Motion to Dismiss implicates Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  To the extent Hanna argues that Plaintiffs lack Article III standing and that Plaintiffs'

claim for injunctive relief is moot, such arguments are properly brought under Rule 12(b)(1),

which provides that a claim may be dismissed for "lack of subject matter jurisdiction."  Fed. R.

Civ. P. 12(b)(1); *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012).  On the

other hand, Hanna's arguments that Plaintiffs lack statutory standing to bring certain antitrust,

consumer protection, and unjust enrichment claims are properly brought under Rule 12(b)(6).

*See Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 269-73 (3d Cir. 2016) (holding that

antitrust standing should be treated "not as an Article III jurisdictional issue, but rather as a

merits issue, and thus should [be] resolved . . . under Rule 12(b)(6)"); *In re Generic Pharms.*

*Pricing Antitrust Litig.*, 368 F. Supp.3d 814, 831 (E.D. Pa. 2019) (applying the rubric of 12(b)(6)

to state consumer protection and unjust enrichment claims in an antitrust case).

### A.  Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) allows a defendant to move to dismiss a complaint for "lack of subject-

matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  A motion to dismiss for want of Article III

standing is properly brought pursuant to Rule 12(b)(1) because Article III provides

"jurisdictional limitation[s]" that implicate "the Court's power to hear" claims.  *Potter v. Cozen*

*& O'Connor*, 46 F.4th 148, 154-57 (3d Cir. 2022); *Ballentine v. United States*, 486 F.3d 806, 810

8

(3d Cir. 2007).

In evaluating a Rule 12(b)(1) motion, a court must first determine whether the movant presents a facial or factual attack. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A facial attack "contests the sufficiency of the pleadings." *In re Schering*, 678 F.3d at 243. As the adjective suggests, such an attack considers a complaint on its face and asserts that "it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). A factual attack, on the other hand, "concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (cleaned up). So, for instance, "while diversity of citizenship might have been adequately pleaded by the plaintiff, the defendant can submit proof that, in fact, diversity is lacking." *Aichele*, 757 F.3d at 358. Regardless of the type of attack at issue, "the plaintiff bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996) (citation omitted).

Here, Hanna's jurisdictional arguments take both facial and factual forms. Where Hanna argues that Plaintiffs' Amended Complaint lacks sufficient factual allegations to establish that they have standing to bring injunctive claims under the Sherman Act and damages claims under the statutes of thirteen states in which no Plaintiff resides, such arguments are properly understood as facial attacks. *See In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846

F.3d 625, 632-33 (3d Cir. 2017).  Because facial attacks "rel[y] solely on the pleadings," they are

analyzed under "the same standard of review [used] when assessing a motion to dismiss for

failure to state a claim" under Rule 12(b)(6).  *Finkelman v. NFL*, 810 F.3d 187, 194 (3d Cir.

2016).

By contrast, Hanna relies on "evidence outside the pleadings"—namely, a declaration

and settlements in two similar antitrust suits—in support of its argument that Plaintiffs' Sherman

Act claim for injunctive relief is moot, making that argument a factual attack.  *Const. Party*, 757

F.3d at 358; *see also Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673

F.2d 700, 711 (3d Cir. 1982) (construing an attack on standing as factual where, as here, "[the

defendant's] motion was supported by a sworn statement of facts" controverting plaintiff's

factual representations).  In evaluating a factual attack, "no presumptive truthfulness attaches to

[a] plaintiff's allegations," and "the trial court is free to weigh the evidence" presented by both

parties to "satisfy itself as to the existence of its power to hear the case."  *Mortensen*, 549 F.2d at

891.

### B.  Federal Rule of Civil Procedure 12(b)(6)

The foregoing principles will guide the analysis of Hanna's Article III arguments.

Hanna's antitrust standing arguments, as well as its arguments concerning Plaintiffs' consumer

protection and unjust enrichment claims, will be analyzed according to the standards governing

motions under Rule 12(b)(6).  *See Hartig*, 836 F.3d at 269-73; *In re Generic Pharms.*, 368 F.

Supp.3d at 831.

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The plaintiff is obliged to provide something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, "[t]he court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff," *In re Schering,* 678 F.3d at 243 (citing *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)), with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief," *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted).  Crucially, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," *Neitzke v. Williams*, 490 U.S. 319, 327 (1989), and well-pleaded claims can survive a motion to dismiss even if "it may appear on the face of the pleadings that a recovery is very remote and unlikely," *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  *See also Twombly*, 550 U.S. at 555 (citing *Neitzke* and *Scheuer*).

## III.   DISCUSSION

Plaintiffs' Amended Complaint brings claims under: (1) the Sherman Act, 15 U.S.C. § 1 *et seq.*, seeking injunctive relief; (2) antitrust statutes of twenty-four states and the District of Columbia,[2] seeking damages; (3) consumer protection statutes of twenty-two states and the

---

[2] These statutes are: Ariz. Rev. Stat. §§ 44-1401, *et seq.*; Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*; Conn. Gen. Stat. §§ 35-24, *et seq.*; D.C. Code Ann. §§ 28-4501, *et seq.*; Haw. Rev. Stat. § 480-3, *et seq.*; 740 Ill. Comp. Stat. Ann. 10/7, *et seq.*; Iowa Code §§ 553.1, *et seq.*; Kan. Stat. Ann. §§ 50-101, *et seq.*; Me. Rev. Stat. Ann. tit. 10, § 1104(1), *et seq.*; Md. Com'l Law Code Ann. § 11-204, *et seq.*; Mich. Comp. Laws Ann. §§ 445.771, *et seq.*; Minn. Stat. Ann. § 325D.57, *et seq.*; Neb. Code Ann. §§ 59-801, *et seq.*; Nev. Rev. Stat. Ann. §§ 598A, *et seq.*; N.H. Rev. Stat. § 356:1, *et seq.*; N.M. Stat. Ann. § 57-1-1, *et seq.*; N.Y. Gen. Bus. L. §§ 340, *et seq.*; N.C. Gen. Stat. §§ 75-1, *et seq.*; N.D. Cent. Code § 51-08.1-01, *et seq.*; Or. Rev. Stat. §§ 646.705, *et seq.*; R.I. Gen. Laws §§ 6-36-4, *et seq.*; Utah Code 76-10-3101, *et seq.*; Vt. Stat. Ann. tit. 9, § 2453 *et seq.*; W. Va. Code § 47-18-1,

District of Columbia,[3] seeking damages; and, (4) the equitable doctrine of unjust enrichment, seeking disgorgement and restitution. Hanna's Motion challenges Plaintiffs' jurisdictional and statutory standing to bring claims in each of these four categories. Because a District Court must assure itself of its subject matter jurisdiction in every case, *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016), Hanna's Article III challenges will be considered first, followed by its statutory arguments.

## A. Article III Challenges

Article III of the United States Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. This means that federal courts cannot opine on legal questions in a vacuum; instead, courts "can entertain actions only if they present live disputes, ones in which both sides have a personal stake." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009)).

At the outset of litigation, a plaintiff bears the burden of showing that the dispute before the court is a "live" one, *id.*, by demonstrating "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

---

*et seq.*; and Wis. Stat. §§ 133.03, *et seq.*

[3] These statutes are: Ariz. Rev. Stat. §§ 44-1521, *et seq.*; Cal. Bus. and Prof. Code §§ 17200, *et seq.*; Colo. Rev. Stat §§ 6-1-105, *et seq.*; Conn. Gen. Stat. §§ 42-110A, *et seq.*; D.C. Code §§ 28-3901, *et seq.*; Fla. Stat. §§ 501.201, *et seq.*; Iowa Code §§ 714H.1, *et seq.*; Mass. Gen. Laws ch. 93A, § 9 *et seq.*; Mich. Comp. Laws Ann. § 445.901, *et seq.*; Mo. Stat. §§ 407.010, *et seq.*; Mont. Code Ann. § 30-14-101, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; Nev. Rev. Stat. §§ 598.0903, *et seq.*; N.H. Rev. Stat. § 358:1, *et seq.*; N.J. Stat. Ann. § 56:8-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. §§ 75-1.1, *et seq.*; Or. Rev. Stat. §§ 646.605, *et seq.*; 73 Pa. Stat. Ann. §§ 201-1 *et seq.*; R.I. Gen Laws § 6-13.1-1, *et seq.*; S.C. Code Ann. § 39-5-140(a), *et seq.*; Va. Code §§ 59.1-196, *et seq.*; and Wisc. Stat. § 100.18, *et seq.*

(2014)).  Furthermore, standing must be demonstrated on a claim-by-claim basis; it "is not

dispensed in gross." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting

*Davis v. Federal Election Comm'n*, 554 U. S. 724, 734 (2008)).  If a court determines that a

plaintiff has not made the proper showing for a certain claim, that claim must be dismissed.

*Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (citing *Storino v.*

*Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003)).

> ### i.    *Plaintiffs Lack Standing to Pursue Injunctive Relief Under the Sherman Act*

In Count I of the Amended Complaint, Plaintiffs seek an injunction "preventing and

restraining" Hanna from continuing the anticompetitive behavior in which it is alleged to have

participated.  This relief is sought under Section 26 of the Sherman Act, which enables private

parties to secure an injunction to guard "against threatened loss or damage by a violation of the

antitrust laws . . . ."  15 U.S.C. § 26.  In this sense, the relief Plaintiffs seek in Count I is forward-

looking.

"When, as in this case, prospective relief is sought, the plaintiff must show that he is

'likely to suffer future injury' from the defendant's conduct."  *McNair v. Synapse Grp., Inc.*, 672

F.3d 213, 223 (3d Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

Further, the threatened injury must be "'sufficiently real and immediate;'" injuries that are

merely "'conjectural or hypothetical'" will not suffice "[t]o establish a present case or

controversy," *Roe v. Operation Rescue*, 919 F.2d 857, 864 (1990) (quoting *Lyons*, 461 U.S. at

101-03), even if those injuries have "an objectively reasonable likelihood of occurring," *Clemens*

*v. ExecuPharm Inc.*, 48 F.4th 146, 153 (3d Cir. 2022) (quotations omitted).

Hanna argues that, because Plaintiffs have not specifically pleaded that they plan to

purchase another home with the help of an NAR-member broker in the future, they cannot

demonstrate that they face a "sufficiently real and immediate" threat of suffering future injury as a result of the alleged antitrust violations.  Plaintiffs counter that, because "most people purchase homes more than once in their lifetime"—and often for "unexpected" reasons like "job loss, a new job out of town, [or] a need to move nearer to an ill or aging family member"—"[t]here should be no need for a [P]laintiff to specifically state 'I plan to purchase another home' to plausibly allege that he or she is at risk of being overcharged in a future home purchase transaction."

Precedent counsels otherwise.  In reviewing a district court's dismissal of a federal antitrust case brought against New Jersey title insurers, the Third Circuit determined that a group of insurance purchasers did not have Article III standing to sue for injunctive relief because they "did not assert that they intend to re-purchase title insurance" in the future.  *In re N.J. Title Ins. Litig.*, 686 F.3d 451, 461 (3d Cir. 2012).  Like Plaintiffs here, the insurance purchasers tied standing to their allegation that "home owners generally relocate," and thus purchase new title insurance, "every seven years."  *Id.*  But that type of argument-by-probability was insufficient to "raise [the insurance purchasers'] claims above the speculative level" there, and Plaintiffs' similar argument that "most people purchase homes more than once" is likewise insufficient here.[4]  *Id.*; *see also Clemens*, 48 F.4th at 153 ("While plaintiffs are not required to demonstrate that it is literally certain that the harms they identify will come about, a possible future injury—even one with an objectively reasonable likelihood of occurring—is not sufficient." (quotations

---

[4] Plaintiffs represent that "[c]ourts evaluating virtually the same factual allegations" have not dismissed for lack of standing.  *See, e.g., Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp.3d 768 (N.D. Ill. 2020); *Nosalek v. MLS Prop. Info. Network, Inc.*, 575 F. Supp.3d 199, 205 (D. Mass. 2021); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp.3d 903, 911 (W.D. Mo. 2019).  But none of these opinions even discuss Article III standing, and even if they did, this Court is bound by the Third Circuit's ruling in *In re New Jersey Title Insurance Litigation*.  *See A.A. v. Exeter Twp. Sch. Dist.*, 485 F. Supp.2d 587, 591 (E.D. Pa. 2007) ("It is axiomatic that a district court is bound to apply its appellate court's precedent.").

omitted)).

Instead, Plaintiffs must plead something more specific and concrete to establish "actual or imminent injury-in-fact under Article III." *In re N.J. Title Ins. Litig.*, 686 F.3d at 461 (quotations omitted). Because they have failed to do that here, Plaintiffs' claim for injunctive relief under Count I will be dismissed for lack of Article III standing.[5] This dismissal, however, will be without prejudice, and Plaintiffs will be granted leave to amend and refile (contingent, of course, on the Court's forthcoming dispositions of Hanna's remaining Motions to Dismiss).[6]

---

[5] Hanna also argues that Plaintiffs' Sherman Act claim is moot "because of a settlement between [the] NAR and a nationwide class of home sellers eliminating the same [NAR] guidelines that Plaintiffs challenge." See Corrected Settlement Agreement at 27-31, *Sitzer v. Nat'l Ass'n of Realtors*, No. 4:19-cv-00332 (W.D. Mo. Apr. 19, 2024), Dkt. No. 1458-1 at Ex. A. In that settlement, the NAR agreed to eliminate, among other rules, the Buyer-Agent Commission Rule; rules enabling the concealment of buyer-broker commission rates from buyers; rules permitting buyer-brokers to represent their services as "free;" and rules authorizing buyer-brokers to filter out home listings based on compensation offers.

Without reaching the merits of Hanna's argument, it does not carry the day here because not all the NAR rules Plaintiffs challenge in their Amended Complaint have been changed by the *Sitzer* settlement. For example, the NAR's policy of limiting lockbox access to NAR members appears intact, as do its prescriptions governing modifications to commission offers. As pleaded in the Amended Complaint, the lockbox and commission modification policies play a role in enabling the anticompetitive conspiracy Plaintiffs allege, and Plaintiffs pray for these policies to be enjoined. This is enough to doom Hanna's mootness challenge, because "as long as the parties have a concrete interest, *however small*, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984) (emphasis added); *see also Knox v. SEIU, Local 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant *any effectual relief whatever* to the prevailing party.") (internal quotations omitted and emphasis added).

Plaintiffs also point to a Statement of Interest filed by the Department of Justice regarding one of these settlements which raises the concern that, though the NAR may have agreed to eliminate certain rules, the NAR rules as changed still leave room for the type of anticompetitive behavior which Plaintiffs raise in their Amended Complaint. *See* Statement of Interest of the United States, *Burnett et al. v. Nat'l Ass'n of Realtors et al.*, No. 4:19-cv-00332 (W.D. Mo. Nov. 14, 2024), Dkt. No. 1603 at 4 (requesting that the District Court clarify that any "approval [of the settlement] does not address whether the proposed settlement prevents and restrains current antitrust violations, remedies past violations, or contains revised policies and practices that comply with the antitrust laws"). It is also worth noting that the settlement in question is currently being appealed. For all these reasons, Hanna has not met its "formidable burden" of showing that there is no longer a live controversy remaining between the parties. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

[6] Hanna argues that this dismissal should be with prejudice because Plaintiffs "were on notice of their [original] complaint's failure to allege standing for injunctive relief based on Hanna Holdings' initial motion to dismiss"— which motion raised the same argument raised here—and yet Plaintiffs failed to "resolve this deficiency" in their Amended Complaint "and have provided no explanation for that failure." To allow an amendment here, argues Hanna, would be "inequitable," which is a ground for dismissal with prejudice. *See Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (explaining that "a district court has the discretion" to withhold leave to amend "if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the

> ### ii. Plaintiffs Have Standing to Bring Class Claims Under State Antitrust Laws

Hanna's second jurisdictional challenge is aimed at certain of Plaintiffs' state law claims. Hanna argues that, because "[n]one of the named [P]laintiffs resides or purchased a home in California, Hawaii, Kansas, Michigan, Montana, Nebraska, New Hampshire, New Jersey, North Dakota, Pennsylvania, Rhode Island, Utah or Vermont," and because each of these state laws allegedly provides a remedy only for parties injured in or residing in the respective state, "no named Plaintiff has Article III standing to bring claims under the laws of those states." Although the named Plaintiffs do not seek relief under these state statutes *for themselves*, they do plead these claims in their Amended Complaint, as they hope to eventually certify a multi-state class of similarly situated home buyers who might recover under those laws.[7]

It must be noted at the outset that the Third Circuit has not explicitly addressed "how to

---

amendment would be futile, or (3) the amendment would prejudice the other party."); *see also In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 564 F. App'x 672, 673 (3d Cir. 2014) ("Denial of leave to amend a complaint is especially appropriate where a party has already been given the opportunity to amend the complaint." (citing *Lake*, 232 F.3d at 374)); *Krantz v. Prudential Investments Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002) ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them.").

However, the same authorities that Hanna cites make it abundantly clear that "[a] district court has 'substantial leeway in deciding whether to grant leave to amend.'" *In re Avandia*, 564 F. App'x at 673 (citing *Lake*, 232 F.3d at 373). Here, leave to amend is appropriate for two reasons. First, as the Third Circuit has made clear, "[a] dismissal for lack of jurisdiction is plainly not a determination of the merits of a claim;" so, "[o]rdinarily, such a dismissal is without prejudice." *See Korvettes, Inc. v. Brous*, 617 F.2d 1021, 1024 (3d Cir. 1980) (internal quotations omitted). Second, Hanna has not adequately demonstrated that it would be inequitable to allow amendment, or that Hanna would be prejudiced thereby. As Plaintiffs point out, Hanna's "initial motion to dismiss (totaling 41 pages) contained just one sentence arguing that Plaintiff Davis lacked standing for his injunctive relief claim because he did not allege that he intended to buy a new home in the future." Indeed, when asked at oral argument whether Hanna even made such an argument in its initial motion to dismiss, counsel for Hanna could not recall whether or not it had. While this single sentence may have been enough to put Plaintiffs on notice in a technical sense, Hanna has not adequately explained why it would be "inequitable" to allow Plaintiffs to amend in spite of that scant notice. Furthermore, as Plaintiffs point out, this case is still in "the early stage of the litigation (before any meaningful discovery)," and Hanna has not demonstrated how it would be prejudiced if Plaintiffs were allowed to re-plead their injunctive claim. For these reasons, Plaintiffs will have leave to amend on this issue.

[7] Plaintiffs seek to certify a "Damages Class" that includes "[a]ll persons who, since December 1, 1996 through the present, purchased in [certain states] residential real estate that was listed on an NAR MLS."

evaluate Article III and class standing at the motion to dismiss stage where putative class representatives assert claims arising under the laws of states where they neither reside nor allege to have suffered injury."[8]  *In re Generic Pharms.*, 368 F. Supp.3d at 829 (quoting *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *14 (D. Mass. Aug. 14, 2015)).  Even the Supreme Court has recognized the difficulty of this sort of question without resolving it one way or the other.  *See Gratz v. Bollinger*, 539 U.S. 244, 263 (2003) (noting that, when the facts of a named plaintiff's injury vary from the facts of absent class members', "there is a question whether the relevance of this variation . . . is a matter of Article III standing at all or whether it goes to the propriety of class certification pursuant to Federal Rule of Civil Procedure 23(a)").

Against this backdrop, courts within this District have reached opposing conclusions about whether state law class claims brought by out-of-state named plaintiffs run afoul of the principles of Article III standing.[9]  *Compare In re Niaspan Antitrust Litigation*, 42 F. Supp.3d 735, 758-59 (E.D. Pa. 2014) (dismissing such claims for lack of standing because "the named plaintiffs may bring suit only under the laws of states in which they reside or [were injured]"); *In*

---

[8] Although there is no Third Circuit case directly on point, in *Neale v. Volvo Cars of America, LLC*, the Third Circuit squarely held that "unnamed, putative class members need not establish Article III standing."  794 F.3d at 362.  Both parties cite *Neale* as supporting their positions, but that case does not dictate the outcome of the issue before the Court.  *Neale*'s holding only addresses the question of whether or not *unnamed class members* must demonstrate standing—not the separate question of what a *named plaintiff* must do to properly invoke a federal court's jurisdiction over claims it brings solely on behalf of putative class members.  *Id.*  As it relates to the latter question, "*Neale* did not disturb the well-settled proposition[s] that at least one named plaintiff must have Article III standing in order to assert claims on behalf of absent class members," nor "the requirement that plaintiff[s] must establish standing individually with respect to each *claim* asserted."  *In re Niaspan Antitrust Litigation*, 2015 WL 8150588, at *3 (citing *Neale*, 794 F.3d at 359, 364, 366) (emphasis added).  It is these principles, not anything novel in *Neale*, that will guide the analysis here.

[9] Circuit Courts that have addressed this question, though, have specifically rejected the argument Hanna advances here.  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 48-51 (1st Cir. 2018); *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93-96 (2d Cir. 2018); *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 133-134 (4th Cir. 2021); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011).

*re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp.3d 665, 694 (E.D. Pa. 2014) (same); *with In re Generic Pharms.*, 368 F. Supp.3d at 827-31 (allowing such claims to proceed past a motion to dismiss under Rule 12(b)(1) because, where "the state law claims of the named [plaintiffs] largely parallel those of the putative class members, it is both proper and more efficient to consider whether they may pursue their claims on behalf of the unnamed class members in the context of the class certification analysis"); *Suber v. Liberty Mut. Ins. Grp.*, 650 F. Supp.3d 282, 292 (E.D. Pa. 2022) (same).

Here, Plaintiffs have met their burden such that the Court is convinced of its jurisdiction over all of their state law claims, even those brought under the laws of states in which no named Plaintiff resides or was injured. This is a product of two showings they have made. First, the parties agree that the named Plaintiffs have standing to pursue state law claims under the states where they *do* live or where they *were* injured. Plaintiff Scott Davis, for example, purchased a home in North Carolina and alleges that he paid too much for it because of Hanna's anticompetitive behavior. Hanna does not argue that Davis lacks standing to seek redress for this harm under the antitrust laws of North Carolina, or that any other named Plaintiff lacks standing to sue under the laws of the state in which they reside or were injured. In this sense, each named Plaintiff has individually satisfied the threshold requirements that they "allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent," *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotations omitted and emphasis added), and that their injuries are likely redressable by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (outlining the "irreducible constitutional minimum" of injury, causation, and redressability); *see also Neale*, 794 F.3d at 364 ("Named plaintiffs are the individuals who seek

to invoke the court's jurisdiction and they are held accountable for satisfying jurisdiction.").

Second, Plaintiffs have argued—and Hanna has not disputed—"that, assuming a proper class is certified, success on the claim under one state's law will more or less dictate success under another state's law." *Suber*, 650 F. Supp.3d at 293 (quoting *In re Asacol Antitrust Litig.*, 907 F.3d at 48). In other words, it has been established (for purposes of the standing analysis, at least) that the state laws under which the named Plaintiffs seek to personally recover are similar enough to the state laws they plead on behalf of absent class members that the Plaintiffs still have a sufficiently "'personal stake in the outcome of the controversy to assure concrete adverseness.'"[10] *Id.* And as the Supreme Court has made clear, "adverseness" is the watchword of the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) ("At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.").

Hanna argues that Article III requires Plaintiffs to go one step further—that they must demonstrate that at least one of them has a chance of recovering under each state law they plead. But it is simply not a constitutional requirement that the named plaintiffs in a class action prove a chance of personal recovery under every statute they plead on behalf of a purported class, because "'class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate.'" *Mayor of Baltimore v. Merck Sharp & Dohme Corp.*, 2023 WL 8018980, at *10 (E.D. Pa. Nov. 20, 2023) (quoting *Langan v. Johnson & Johnson Consumer*

---

[10] To the extent Hanna would like to raise arguments like this one later on, it may, of course, do so at the class certification stage. *See Neale*, 794 F.3d at 368 ("[Defendant's] arguments related to the differences between claims among the separate statewide classes . . . demonstrate that [they] may have legitimate Rule 23 challenges. Rather than shoehorn these questions into an Article III analysis, we will continue to employ Rule 23 to ensure that classes are properly certified.").

*Cos., Inc.*, 897 F.3d 88, 95 (2d Cir. 2018)). Hanna's argument confuses the requirements of Article III with the "the question of who is authorized to bring an action under a statute;" the latter "is one of statutory interpretation," not of "Article III or jurisdiction." *Woodman's Food Market, Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)); *see also Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 270 (3d Cir. 2016) ("A lack of 'statutory standing' means the absence of a valid cause of action under a statute, but it 'does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case.'" (quoting *Lexmark*, 572 U.S. at 128 n.4)).

The named Plaintiffs have adequately pleaded that they have standing to sue under the laws of the states in which they reside or were injured. This showing, coupled with their argument that success under the laws of these states "will more or less dictate success under" the laws of the states where no named Plaintiff resides or was injured, *Suber*, 650 F. Supp.3d at 293, are sufficient to ensure the Court of its competency to hear the state law claims under Article III. *See In re Generic Pharms.*, 368 F. Supp.3d at 827-31 (allowing similar claims to proceed because, where "the state law claims of the named [plaintiffs] largely parallel those of the putative class members, it is both proper and more efficient to consider whether they may pursue their claims on behalf of the unnamed class members in the context of the class certification analysis"); *Suber*, 650 F. Supp.3d at 292 (same); *Mayor of Baltimore*, 2023 WL 8018980, at *10 (same); *Jones v. CVS Health Corp.*, 2024 WL 4643514, at *8 (E.D. Pa. Oct. 31, 2024) (same).

## B. Statutory Challenges

In antitrust cases, even after a plaintiff has established Article III standing, they must also demonstrate that they are one of "those individuals whose protection is the fundamental purpose

of the antitrust laws." *Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 505 (3d Cir. 1976). Although this requirement is dubbed "antitrust *standing*," it does not "implicat[e] a court's subject matter jurisdiction" like Article III standing does. *Hartig*, 836 F.3d at 269 (emphasis added); *see also In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 269 (3d Cir. 2018) ("['Antitrust standing'] is something of a misnomer."). Instead, its solicitude is statutory in nature, asking whether a litigant "falls within the class of plaintiffs whom [a legislature] has authorized to sue" under its antitrust laws.[11] *Lexmark*, 572 U.S. at 127-28.

Here, Hanna argues that Plaintiffs lack antitrust standing to bring their damages claims under state law.[12] It also contends that some of the same considerations that deprive Plaintiffs of antitrust standing likewise foreclose relief under certain state consumer protection laws and the doctrine of unjust enrichment. Each of these arguments is considered below.

### i. As Pleaded, Plaintiffs Have Antitrust Standing to Pursue All Their State Antitrust Claims

As described above, the doctrine of antitrust standing works to distinguish, out of all the parties whose injuries "'might conceivably be traced to an antitrust violation,'" which of those parties have recourse under antitrust law. *In re Processed Egg Prods.*, 881 F.3d at 268-69 (quoting *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 262 n.14 (1972)). Here, Hanna argues that Plaintiffs lack antitrust standing to bring any of their state law antitrust claims.[13]

[11] It is for this reason that Hanna's antitrust standing arguments are analyzed under the rubric of Rule 12(b)(6), not 12(b)(1). *See Hartig*, 836 F.3d at 272-73.

[12] Hanna also argues that Plaintiffs lack antitrust standing to pursue injunctive relief under the Sherman Act, but since that claim will be dismissed for lack of Article III standing, this subsection focuses on Plaintiffs' state law damages claims.

[13] Hanna separately argues that Plaintiffs lack standing to bring an antitrust class action on behalf of indirect purchasers under Illinois law. Both parties agree that Illinois gives its Attorney General the exclusive right "to maintain a class action in any court of this State for indirect purchasers asserting claims under" the state's antitrust

21

To understand the exact contours of Hanna's argument, a slight detour into Supreme Court caselaw will prove elucidating.  In *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977), the Supreme Court laid down a bright-line prohibition against recovery of damages under federal antitrust law by indirect purchasers—i.e., parties who purchased illegally-priced goods or services not *directly* from the alleged antitrust violator themselves, but rather *indirectly* from a middleman, wholesaler, or other intermediary.  *Id.* at 736.  The rationale for reserving recovery to direct purchasers only is based primarily in policy; the Court reasoned that, although indirect purchasers may indeed suffer from overcharges passed on to them by direct purchasers,

---

statute.  740 Ill. Com. Stat. Ann. 10/7 (2024).  Hanna argues that this class action bar applies in federal court too.

"[D]istrict courts across the country have wrestled with whether the Illinois statute's limitation on indirect purchaser class action suits also bars such suits in federal court," and they have reached different conclusions as to whether it does.  *In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*, 2023 WL 2182046, at \*4-5 (D.N.J. Feb. 23, 2023) (collecting cases).

This question implicates the Supreme Court's decision in *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)."  *Id.* at \*4.  In that case, the Court was called upon to determine whether a New York state class action bar conflicted with Federal Rule of Civil Procedure 23 and, if so, which rule bound the federal courts.  The Court did not issue a majority opinion.  Instead, writing for the plurality, Justice Scalia reasoned that "it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the federal Rule"—and, finding that Rule 23 was a valid procedural rule, held that Rule 23 applied in federal court instead of the New York class action bar.  Justice Stevens, writing a concurrence, reached the same conclusion as to which rule applied but got there by a different route, reasoning that "properly enacted federal rules generally apply in federal court, unless the federal rule 'would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right.'"  *In re Vascepa*, 2023 WL 2182046 at \*4 (quoting *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring)).  As it applies to the case at bar, under Scalia's view, Plaintiffs may bring a class action under Illinois law.  Under Stevens' view, the outcome depends on whether the Illinois class action bar "is so intertwined with a state right or remedy that it functions to define the scope of the state-created right," which is open for debate.  *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring).

Although the Third Circuit has not definitely declared its allegiance to either *Shady Grove* approach, it has applied the Scalian framework thrice and the Stevens framework only once.  *See Knepper v. Rite Aid Corp.*, 675 F.3d 249, 265 (3d Cir. 2012) (applying both); *Landsman & Funk PC v. Skinder-Strauss Associates*, 640 F.3d 72, 91, 91 n.27 (3d Cir. 2011) (applying Scalian framework); *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 303 (3d Cir. 2012) (applying Scalian framework).  Put differently, the Third Circuit has applied the Scalian framework every time it has done the *Shady Grove* analysis.  With these prior decisions in mind, it is likely that the Third Circuit would side with Justice Scalia here and hold that indirect purchasers may bring class actions in federal court under the Illinois antitrust law, because Rule 23, "as a properly enacted federal procedural rule, controls the availability of the class action mechanism in federal court, not Section 7(2) of the Illinois Antitrust Act."  *In re Vascepa*, 2023 WL 2182046 at \*5.

permitting both direct and indirect purchasers to sue the antitrust violators "would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers," an endeavor which "would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness." *Id*. at 737.

Some years after *Illinois Brick*, the Supreme Court set forth a separate set of considerations intended to guide courts in determining "whether [a] plaintiff is a proper party to bring a private antitrust action"—in other words, whether or not a plaintiff has antitrust standing. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("*AGC*"). *AGC* did not disturb *Illinois Brick*'s holding that indirect purchasers may not recover damages under federal antitrust law. *Id.* at 544-46. Rather, recognizing "that the question whether [a plaintiff] may recover for the injury it allegedly suffered . . . cannot be answered simply by reference to the broad language of [the antitrust statutes]," the Supreme Court effectively incorporated *Illinois Brick* and other earlier antitrust caselaw by gleaning from those earlier cases a set of "factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy" to a would-be antitrust plaintiff. *Id.* at 537.

In this sense, *AGC* does not set forth any sort of "bright-line test" prescribing who has antitrust standing and who does not. *In re Processed Egg Prods.*, 881 F.3d at 269. Instead, the case lays out several considerations concerning the nature of the injury alleged and the role of the plaintiff in the allegedly anticompetitive marketplace; from these considerations, the Third Circuit has distilled the following five factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that

23

harm, with neither factor alone conferring standing;

(2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;

(3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

(4) the existence of more direct victims of the alleged antitrust violations; and

(5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993). Although the fourth and fifth *AGC* factors—"the existence of more direct victims" and "the potential for duplicative recovery or complex apportionment of damages"—do incorporate the Supreme Court's concerns regarding recovery by indirect purchasers as set forth in *Illinois Brick*, *Illinois Brick* and *AGC* still present "analytically distinct aspects of antitrust standing" that a plaintiff must satisfy when seeking relief under the federal antitrust laws. *McCarthy v. Recordex Serv.*, 80 F.3d 842, 851 n.13 (3d Cir. 1996).

Returning to the case at bar with *Illinois Brick* and *AGC* in mind, the Court notes a few places where the parties agree *vis-à-vis* the antitrust standing inquiry. As a factual matter, both parties agree that Plaintiffs are indirect purchasers of buyer-broker services, as it is home *sellers*, not home *buyers*, who directly pay the buyer-broker's commission.[14] As a legal matter, the parties also agree that federal courts hearing state antitrust claims must look to state law antitrust principles to determine whether a plaintiff has antitrust standing. *See D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp.2d 485, 494 (E.D. Pa. 2006). Likewise, the parties agree that, of

---

[14] Hanna explicitly argues that Plaintiffs are indirect purchasers, and Plaintiffs do not contest this characterization. Indeed, at oral argument, counsel for Plaintiffs conceded as much.

all the tests a state could use to analyze antitrust standing, the federal *AGC* test is the most restrictive and difficult to satisfy for a would-be antitrust plaintiff.

But this is largely where the agreement ends; on all the crucial questions that remain to be determined, the parties are at loggerheads. The parties disagree, for example, on which tests the various state courts would actually apply if called upon to determine whether Plaintiffs have antitrust standing. Hanna contends that the most restrictive test—*AGC*—would be applied by almost every state's high court, while Plaintiffs argue that the states would either apply a less stringent version of *AGC* (modified to lighten constraints on indirect purchasers like Plaintiffs) or a different, less restrictive test peculiar to a given state. And since Plaintiffs sue under the laws of twenty-five different jurisdictions, this argument—which may appear to be one single choice-of-law battle—is really twenty-five different skirmishes.

Even putting aside which test is to be applied, the parties also disagree on how Plaintiffs' status as indirect purchasers should affect the antitrust standing analysis. Hanna argues that, under the law of every state considered here, Plaintiffs' hopes of establishing antitrust standing are all but doomed from inception because home sellers—the more direct purchasers in the relevant market—have already brought antitrust suits against NAR-member brokers like Hanna and its alleged coconspirators. Plaintiffs, on the other hand, argue that whatever test a given state may apply, Plaintiffs will satisfy it, regardless of their role as indirect purchasers seeking to remedy antitrust violations already being litigated by their direct purchaser counterparts.

In summary, the parties agree that Plaintiffs are indirect purchasers. They also agree that state law applies when analyzing whether Plaintiffs have antitrust standing to pursue their damages claims. But they disagree as to *which* test should apply in each state and *how* that test should be conducted, given Plaintiffs' status as indirect purchasers.

It would require a state-by-state analysis to settle the parties' disagreements. And since every state has unique caselaw and statutory text to consider, such an analysis would be no small task. To understand what such an analysis would entail, consider that Plaintiffs seek relief under the antitrust statutes of twenty-five states: Arizona, California, Connecticut, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, Utah, Vermont, West Virginia, and Wisconsin. Unlike federal antitrust law, the laws of these states *do* allow indirect purchasers to sue for damages, either by the terms of a statutory provision allowing such suits (which are often referred to as '*Illinois Brick* repealer' statutes) or by virtue of state court precedent holding the same. Both parties agree, then, that Plaintiffs, as indirect purchasers, do not face a *per se* bar against recovery of antitrust damages under the law of these states.

Hanna argues, however, that the antitrust laws of all these states require, like federal law does, that a would-be antitrust plaintiff demonstrate they have antitrust standing, and further, that almost all of them would apply the *AGC* test in determining whether a plaintiff has made that demonstration. Hanna derives this position from a few different sources. Of the twenty-five states listed above, sixteen have enacted federal harmonization provisions that, in more or less demanding terms, require or allow their state antitrust laws to be interpreted in accordance with federal antitrust precedent.[15] *Compare* Ariz. Rev. Stat. Ann. § 44-1412 ("[I]n construing this article, the courts *may* use as a guide interpretations given by the federal courts to comparable

---

[15] *See* Ariz. Rev. Stat. Ann. § 44-1412; D.C. Code Ann. § 28-4515; Haw. Rev. Stat. § 480-3; 740 Comp. Ill. Stat. § 10/11; Iowa Code Ann. § 553.2; Kan. Stat. Ann. § 50-163(b); Md. Code Ann. Com. Law § 11-202(a)(1)(2); Mich. Comp. Laws § 445.784(2); Neb. Rev. Stat. Ann. § 59-829; N.H. Rev. Stat. Ann. § 356:14; N.M. Stat. Ann. § 57-1-15; Or. Rev. Stat. § 646.715(2); R.I. Gen. Laws Ann. § 6-36-2(b); Utah Code Ann. § 76-10-3118; Vt. Stat. Ann. tit. 9, § 2453a(c); W. Va. Code Ann. § 47-18-16.

federal antitrust statutes." (emphasis added); *with* Haw. Rev. Stat. § 480-3 ("This chapter *shall* be construed in accordance with judicial interpretations of similar federal antitrust statutes." (emphasis added)).  These states are Arizona, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maryland, Michigan, Nebraska, New Hampshire, New Mexico, Oregon, Rhode Island, Utah, Vermont, and West Virginia.  In order to faithfully apply the law of these states, a federal court would have to consider the precise text of the harmonization provision (as well as the state antitrust statute meant to be harmonized) and exhaustively survey state caselaw to determine whether the courts of that state have definitely indicated how they would conduct the antitrust standing analysis.  If the state courts have not indicated as much, the federal court must then refer back to the harmonization provision, the antitrust statute itself, and any comparable state court precedent in order to make an educated guess as to how that state's highest court would proceed.

Of the remaining nine states, only one has explicitly rejected *AGC*—Minnesota.[16]  The courts of the other eight states—California, Connecticut, Maine, Nevada, New York, North Carolina, North Dakota, and Wisconsin—have either applied *AGC* or a test like it in analyzing antitrust standing.[17]  So, in order to faithfully apply these states' laws, a federal court would have

---

[16] The Minnesota Supreme Court has explicitly rejected the *AGC* test; nonetheless, "[s]tanding under Minnesota antitrust law" is still "defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007).  At this stage, Plaintiffs have antitrust standing to pursue their claim under Minnesota law substantially for the same reasons that they have standing under *AGC*, as set forth *infra* in the following subsections.

[17] *See, e.g., Vinci v. Waste Mgmt., Inc.*, 36 Cal. App.4th 1811, 1814 (Cal. Ct. App. 1995) (applying *AGC*); *Tremont Pub. Advisors, LLC v. Conn. Res. Recovery Auth.*, 217 A.3d 953, 966 (Conn. 2019) (applying an *AGC*-like test that requires a plaintiff to show "it has suffered an antitrust injury and that it is an efficient enforcer of the antitrust act"); *Knowles v. Visa U.S.A., Inc.*, 2004 WL 2475284, at *6 (Me. Super. Oct. 20, 2004) (applying *AGC*); *Nevada Recycling & Salvage, Ltd. v. Reno Disposal Co., Inc.*, 423 P.3d 605, 607 (Nev. 2018) (applying *AGC*); *Ho v. Visa U.S.A. Inc.*, 787 N.Y.S.2d 677 (NY Sup. Ct. 2004) (applying *AGC*), *aff'd*, 16 A.D.3d 256 (NY App. Div. 2005); *Crouch v. Crompton Corp.*, 2004 WL 2414027, at *2 (N.C. Super. Oct. 28, 2004) (applying *AGC*); *Beckler v. Visa U.S.A., Inc.*, 2004 WL 2115144, at *3 (N.D. Dist. Aug. 23, 2004) (citing *AGC*); *Strang v. Visa U.S.A., Inc.*, 2005 WL 1403769, at *3 (Wis. Cir. Ct. Feb. 8, 2005) (applying *AGC*).

to embark on a similarly exhaustive survey of each state's caselaw, attempting to divine from sometimes conflicting state court opinions how the highest court of each state would conduct the antitrust standing analysis.

With the recognition that this kind of state-by-state analysis may be called for in other cases, it is not necessary to embark on that "back-breaking labor" here. *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp.2d 1085, 1097 (N.D. Cal. 2007). This is because, assuming *arguendo* that *AGC*—concededly the most restrictive test on offer—would be applied under the law of all twenty-five of these states (as Hanna argues), Plaintiffs' allegations suffice to establish antitrust standing under that test. *See, e.g., D.R. Ward*, 470 F. Supp.2d at 502 (applying *AGC* for the sake of argument and finding that indirect purchasers satisfied it); *In re Suboxone*, 64 F. Supp.3d at 697 (same). An analysis of the *AGC* factors follows.

        a.  <u>Causal Connection, Improper Motive, and Directness of Injury</u>

The first *AGC* factor concerns two things: first, "the causal connection between the antitrust violation and the harm to the plaintiff," and second, "the intent by the defendant to cause that harm, with neither . . . alone conferring standing." *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165. Relatedly, the third factor investigates "the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims." *Id.* Because the question of directness can "absorb[] the question of causal connection," courts sometimes consider these factors together. *Id.* at 1168.

Here, Hanna argues that the connections between the NAR rules in question and Plaintiffs' alleged injuries—higher home prices and lower quality buyer-broker services—are both too remote and too speculative to ground antitrust standing. Specifically, Hanna draws attention to: (1) the "independent decisions of both individual real estate brokers and individual

home sellers" which sever the causal chain between the rules in question and the injuries alleged (which goes to factor one); and, (2) the "variety of market and personal factors" that weigh in the calculus of home pricing and which would render speculative any analysis of how home prices are affected by commission rates (which goes to factor three).

But Hanna's arguments ignore the procedural posture of their own Motion to Dismiss. The Third Circuit has made clear that Rule 12(b)(6) is the "proper vehicle" for defendants moving to dismiss a complaint for lack of antitrust standing. *Hartig*, 836 F.3d at 272. And, "in deciding a Rule 12(b)(6) motion" like this one, "a court . . . consider[s] only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Further, it is the facts pleaded by Plaintiffs in their Amended Complaint which control the analysis—not the facts as stated by Hanna in its briefing. *Fowler*, 578 F.3d at 210-11. Crucially, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke*, 490 U.S. at 327. Instead, Plaintiffs' well-pleaded claims can survive a motion to dismiss even if "it may appear on the face of the pleadings that a recovery is very remote and unlikely." *Scheuer*, 416 U.S. at 236. *See also Twombly*, 550 U.S. at 555 (citing *Neitzke* and *Scheuer*).

With these standards in mind, a review of the Amended Complaint demonstrates that Plaintiffs have sufficiently pleaded causality and directness at this stage. As regards "the causal connection between the antitrust violation and the harm to the plaintiff," *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165, Plaintiffs allege throughout their Amended Complaint that they, as home buyers, paid supracompetitive home prices and received lower quality buyer-broker services as a direct result of the NAR rules and guidelines in question. As another court

considering the same alleged conspiracy has put it, "it is easy to understand how [the NAR rules in question] could plausibly result in inflated commission rates." *Moehrl*, 492 F. Supp.3d at 784. It is also easy to understand how inflated commissions would result in inflated home prices—as Plaintiffs allege in their Amended Complaint, "[i]nflated total commissions are incorporated into the home purchase price, thereby causing buyers to pay higher prices for homes." And as for "the intent by the defendant to cause th[e] harm," *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165, Plaintiffs allege that Hanna and its coconspirators "intentionally and wrongfully" worked together to adopt these rules in order to stifle competition in the market for brokerage services and reap greater profits.

Considering the foregoing allegations, Plaintiffs have sufficiently pleaded that Hanna and its coconspirators' conduct has caused them antitrust injuries. "Although," as Hanna has argued, facts about the real estate market which are "external to the complaint . . . carry the potential to impact the causation analysis, these facts are irrelevant to the resolution of [Hanna's Motion to Dismiss], which relies entirely upon what the [Amended Complaint] states." *D.R. Ward*, 470 F. Supp.2d at 502. Based on the allegations contained therein, the first *AGC* factor weighs in Plaintiffs' favor. *See, e.g., McCarthy v. Recordex Serv.*, 80 F.3d 842, 856 (3d Cir. 1996) (finding that plaintiffs, who were indirect purchasers of allegedly overpriced medical records, could still demonstrate that they were harmed in a way "proximately resulting from the alleged antitrust violation" where the overcharge was passed on to them by their attorneys); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000) (citing *McCarthy* for the same proposition).

The same goes for the "all-important" directness factor. *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1168. Although, as the parties agree, Plaintiffs are not the direct *purchasers* of the

overpriced buyer-broker services, they are the direct *recipient* of those services, and they

separately allege that the prices of homes—which they *do* directly purchase—are artificially

inflated to cover the increased cost of those services.  In this regard, Plaintiffs allegations suggest

that they "have suffered the greatest, if not the most direct, injury of alleged antitrust

conspiracy," *D.R. Ward*, 470 F. Supp.2d at 503, since they received worse services and paid

higher prices than they otherwise would, while sellers came out even after passing on the

supracompetitive fees.

Here too, Hanna's only argument against a finding of directness relies on information

outside the pleadings—namely, the myriad of "market and personal factors" that sellers consider

when pricing their homes and determining which offers to accept or reject.  But those "factors"

are not among the facts before the Court at this juncture.  Instead, the Court is bound to accept

Plaintiffs' allegations as pleaded in the Amended Complaint, among which is the proposition that

"[i]nflated total commissions are incorporated into the home purchase price, thereby causing

buyers to pay higher prices for homes."  That injury is direct enough for antitrust standing, so the

third *AGC* factor weighs in Plaintiffs' favor too.[18]  *See Batton v. Nat'l Ass'n of Realtors*, 2024

WL 689989, at *8 (N.D. Ill. Feb. 20, 2024) (considering the same alleged antitrust conspiracy

and finding that "it is not difficult to trace the path of the overcharge" paid by home buyers);

*D.R. Ward*, 470 F. Supp.2d at 503 (finding directness where "plaintiffs allege[d] that they paid

an inflated price for plastics additives due to defendants' price-fixing agreement," even though

---

[18] Hanna argues that "the Supreme Court has consistently emphasized the difficulty in calculating how market forces work on the different purchasers and sellers in an economic system," *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 93 (3d Cir. 2011), and that this observation applies with equal gravity to the real estate market.  Maybe so; but the difficulty of charting "the complicated interplay between market forces" in the abstract does not excuse the Court of its obligation, in deciding a motion brought under Rule 12(b)(6), to take Plaintiffs' well-pleaded allegations as true.  *Id.*; *Fowler*, 578 F.3d at 210-11.  Here, Plaintiff has made allegations sufficiently specific and detailed to obviate recourse to the kind of economic augury that the Supreme Court has warned against.

plaintiffs did not purchase directly from defendants).

### b. Nature of Injury in Relation to Purpose of Antitrust Statutes

Hanna does not dispute that Plaintiffs' injuries, which flow from an alleged conspiracy to restrain competition, are "of the type for which the antitrust laws were intended to provide redress." *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165; *see also Philadelphia Taxi Ass'n v. Uber Techs.*, 886 F.3d 332, 338 (3d Cir. 2018) ("Competition is at the heart of the antitrust laws; it is only anticompetitive conduct, or 'a competition-reducing aspect or effect of the defendant's behavior,' that antitrust laws seek to curtail." (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990))). Accordingly, the second *AGC* factor weighs in Plaintiffs' favor as well.

### c. Existence of More Direct Victims and Potential for Duplicative or Complex Damages

The fourth *AGC* factor asks whether there exist "more direct victims of the alleged antitrust violations" than Plaintiffs, and the fifth considers the "potential for duplicative recovery or complex apportionment of damages." *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165-66. As described previously, these two factors work to "incorporate[] . . . the principles of *Illinois Brick*" into *AGC*'s analysis; however, *Illinois Brick* and *AGC* still present "analytically distinct aspects of antitrust standing," such that a plaintiff's inability to recover damages under federal law as an indirect purchaser under *Illinois Brick* does not automatically mean they lack antitrust standing, under *AGC*, to seek damages under state law.[19] *See McCarthy*, 80 F.3d at 851.

---

[19] Furthermore, when *AGC* is employed to evaluate antitrust standing under the laws of states where, as here, *Illinois Brick* has been repealed, some federal courts have found that these factors "lose[] relevance"—if not entirely, then at least to such a degree that these factors, alone or in tandem, should not automatically disqualify indirect purchasers from bringing suit. *See D.R. Ward*, 470 F. Supp. at 503-04; *see also In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp.3d 187, 255-65 (S.D.N.Y. 2019) (addressing antitrust standing under the law of states that have repealed *Illinois Brick*—Maine, for example—and finding that *AGC*'s directness and remoteness factors

Hanna makes arguments implicating both the fourth and fifth *AGC* factors.  First, with regard to the fourth factor, Hanna points to the plain fact that Plaintiffs are not the most "direct" victim of the alleged conspiracy.  This argument is well-taken, as there arguably does exist a more "direct" victim here—namely the home seller, who pays the total premium for the overinflated brokerage costs out of the funds they receive from the sale of the home.  But Hanna's attempt to explain why this factor should tilt the *AGC* balance toward dismissal for lack of antitrust standing is not persuasive.

Hanna's argument has two basic premises.  First, it quotes the Supreme Court in *AGC* for the proposition that the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party" to sue.  *AGC*, 459 U.S. at 542.  Next, as an instantiation of this general principle, Hanna argues that because home sellers *are in fact* seeking the same relief as Plaintiffs in other litigation, Plaintiffs should be barred from seeking damages here.[20]  In support, Hanna points to the opinion of the Northern District of Illinois in *Leeder v. National Association of Realtors*, where the District Court held that a home buyer, as an indirect purchaser, lacked antitrust standing to seek antitrust relief when home sellers were already

---

would not preclude antitrust standing for indirect purchasers due, in part, to the fact that those states had repealed *Illinois Brick*).  Put differently, because allowing these factors alone to determine the outcome of the antitrust standing would, as Plaintiffs put it, "virtually always lead to a finding of no standing for indirect purchaser claims (for which there are necessarily more direct victims and the potential of duplicative recovery)," some courts choose to give these factors less weight in their analysis than they would if the claims were brought under federal law.

While recognizing the difficulty of this puzzle—whether and how to adapt the *AGC* test to vindicate a state's decision to repeal *Illinois Brick*—the Court need not attempt to solve it here.  This is because Plaintiffs have standing under *AGC* even if the fourth and fifth factors are given their full weight.

[20] For the home seller actions, *see Gibson v. Nat'l Ass'n of Realtors*, No. 4:23-cv-00788 (W.D. Mo.); *1925 Hooper LLC v. Nat'l Ass'n of Realtors*, No. 1:23-cv-05392 (N.D. Ga.); *QJ Team, LLC v. Tex. Ass'n of Realtors*, No. 4:34-cv-01013 (E.D. Tex.); *Martin v. Tex. Ass'n of Realtors, Inc.*, No. 4:23-cv-01104 (E.D. Tex.); *Burton v. Nat'l Ass'n of Realtors*, No. 7:23-cv-05666 (D.S.C.); *Moehrl v. Nat'l Ass'n of Realtors*, No. 1:19-cv-01610 (N.D. Ill.).

engaged in substantially similar litigation.  *See* 601 F. Supp.3d 301, 313-14 (N.D. Ill. 2022).

Implicit in Hanna's argument is a wide-sweeping proposition: that, wherever a direct purchaser is actively suing to enforce the antitrust laws, any similar suit by an indirect purchaser is automatically doomed.  But it seems more consistent with the Third Circuit's interpretation of *AGC*—as setting forth a "case-by-case . . . balancing" test, *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1166—to conclude that the mere presence of a more directly-injured market participant, even if they are also litigating a similar case, does not automatically command pre-discovery dismissal.  To do so would be to treat the fourth factor as an element, not as one factor among several to be weighed.  *Cf. id.* ("The *AGC* opinion does not assign specific weight to its factors, individually, collectively or relatively.").[21]  For this reason, the fourth *AGC* factor will not be interpreted to bar Plaintiffs' claims outright, as Hanna would have it.  Instead, it will simply weigh against finding that Plaintiffs have antitrust standing.  *See D.R. Ward*, 470 F. Supp. at 503-04.

Concerning the fifth *AGC* factor—"the potential for duplicative recovery or complex apportionment of damages," *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165-66, Hanna argues that the existence of parallel litigation by home sellers renders the likelihood of duplicative recovery "very real," which weighs against finding that Plaintiffs have antitrust standing to pursue their damages claims.  While duplicative recovery may indeed be a concern here, Hanna has not demonstrated that these home sellers have already recovered, or that they are sure to do so.  Without something more concrete, the specter of duplicative recovery alone is not enough to

---

[21] Indeed, the Supreme Court reasoned in *AGC* that "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement *diminishes*," as opposed to 'destroys' or 'eliminates,' "the justification for allowing a more remote party" to sue.  459 U.S. at 542 (emphasis added).

doom Plaintiffs' claims; indeed, the Third Circuit has specifically cautioned against finding a lack of antitrust standing at the motion to dismiss stage solely because "it *might* be difficult to ascertain damages" accurately and fairly at a later stage of the litigation. *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1169 (emphasis added); *see also In re Suboxone*, 64 F. Supp.3d at 698.

Furthermore, as described above, Plaintiffs have specifically pleaded that home sellers pass on their inflated broker fees to buyers by raising the prices of the homes they sell. If this allegation is taken as true—which it must be, at this stage—then the damages potentially recoverable by Plaintiffs would not be truly "duplicative" of whatever damages home sellers may recover, as sellers and buyers would recover different amounts depending on how much of the alleged overcharge they can demonstrate they have paid. For these reasons, although the potential for duplicative recovery may weigh against a finding of antitrust standing for Plaintiffs' state law damages claims, it does not, for now, do so with fulsome force.

### d. Conclusion

In sum, assuming for the sake of argument that *AGC* applies to all of Plaintiffs' state law antitrust claims, the considerations of that balancing test net in favor of a finding that Plaintiffs have antitrust standing. And since the parties agree that *AGC* is the most restrictive test a state court could apply in analyzing antitrust standing, if the Plaintiffs can beat *AGC*, they beat any other test the twenty-five state courts might apply. Hanna's motion to dismiss Plaintiffs' state law claims for lack of antitrust standing will therefore be denied. However, because the foregoing analysis relied in such substantial part on the strictures of Rule 12(b)(6) and the specific factual allegations made by Plaintiffs in their Amended Complaint, this denial shall not prejudice Hanna's ability to raise the issue of antitrust standing again after the benefit of discovery.

### *ii.    Plaintiffs' State Consumer Protection Claims May Proceed*

In addition to their claims brought under certain state antitrust laws, Plaintiffs also bring

claims under the consumer protection laws of twenty-two states and the District of Columbia.

Hanna challenges only six of these state consumer protection claims, arguing that "all Plaintiffs

other than Davis lack standing to bring [consumer protection] claims under the laws of Arizona,

Connecticut, Massachusetts, North Carolina, South Carolina, and Washington D.C. because

those states require at least a business relationship if not privity between the plaintiff and

defendant," and because "no Plaintiff other than Davis had any business relationship" with

Hanna or its affiliates.  It argues further that, because "Davis only has standing to raise a claim in

North Carolina"—the state where he resides and was allegedly injured—"the claims under

Arizona, Connecticut, Massachusetts, South Carolina, and Washington D.C. law must be

dismissed entirely and the claim under North Carolina law must be dismissed as to all Plaintiffs

but Davis."

Assuming *arguendo* that these states do require a 'business relationship' between

plaintiff and defendant—and Plaintiffs dispute that they do—this argument fails for the same

reasons as Hanna's argument that Plaintiffs lack standing to sue under the antitrust laws of states

where they neither reside nor were injured.  Then as now, Hanna does not challenge that: (1) the

named Plaintiffs have standing to bring consumer protection challenges under their own state's

laws; and, (2) "assuming a proper class is certified, success on the claim under one state's law

will more or less dictate success under another state's law."  *Suber*, 650 F. Supp.3d at 293

(quoting *In re Asacol Antitrust Litig.*, 907 F.3d at 48).  The fact that Plaintiffs could not

*themselves* recover under certain state consumer protection laws is not fatal here, because the

class as pleaded contains individuals who have the 'business relationship' Hanna suggests these

36

statutes require.  For these reasons, "it is both proper and more efficient to consider whether [the named Plaintffs] may pursue their claims on behalf of the unnamed class members in the context of the class certification analysis," not at the motion to dismiss stage.  *In re Generic Pharms.*, 368 F. Supp.3d at 827-31.  Accordingly, Plaintiffs claims under the consumer protection laws of Arizona, Connecticut, Massachusetts, North Carolina, South Carolina, and Washington D.C. may proceed.

Hanna separately argues that "Plaintiffs lack standing to pursue consumer protection claims in Missouri and New York because," as indirect purchasers of the buyer-broker services, "their injuries are too indirect" to support a claim.  For the reasons set forth below, these arguments fail too.

Hanna contends that "Missouri prohibits indirect purchasers from using a consumer-protection claim as an 'end-run around the state's prohibition of antitrust claims by indirect purchasers,'" citing, in support, a single case from within this District where a court dismissed a Missouri consumer protection claim on these grounds.  *See In re Suboxone*, 64 F. Supp.3d at 701-02.  But several other courts, including multiple within this District, have examined Missouri caselaw at length and reached the opposite conclusion.  *See, e.g., In re Generic Pharms.*, 368 F. Supp.3d at 841 ("*Illinois Brick* does not bar [indirect purchaser plaintiffs'] claim[] under the . . . Missouri Merchandising Practices Act . . . ."); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp.2d 380, 414-15 (E.D. Pa. 2010) (same); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp.3d 1033, 1079-80 (S.D. Cal. 2017) (same).  This Court is persuaded by the careful reasoning of the latter courts, and will join them in allowing Plaintiffs' Missouri consumer protection claim to proceed.

With regard to New York, Hanna contends that courts in that state "have dismissed

claims by indirect purchasers as 'too remote' to support a consumer protection claim," citing to two cases in support. *See State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, 42 A.D.3d 301 (N.Y. App. Div. 2007); *City of New York v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834 (N.Y. 2009). These cases reinforce the settled proposition that New York General Business Law § 349 withholds relief from parties whose alleged losses "arise[] solely as a result of injuries sustained by another party." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1145 (N.Y. 2004). But Plaintiffs do not fall within this prohibition; as discussed at length above, Plaintiffs have alleged that *they themselves* have suffered direct injuries by being forced to overpay for their homes and to receive brokerage services of a poorer quality from Defendant and its coconspirators, all while being told that their brokers worked for them 'for free.' Since these allegations must be taken as true at this stage, Plaintiffs have demonstrated that their injuries do not "arise[] sole as a result of injuries sustained by another party." *Id.* Their claims under New York's consumer protection statute may therefore proceed.

### iii.    Plaintiffs' Unjust Enrichment Claims under Illinois, Missouri, and Florida Law May Proceed

Count IV of Plaintiffs' Amended Complaint seeks disgorgement and restitution from Hanna under the doctrine of unjust enrichment. Hanna argues that Plaintiffs lack standing to pursue these claims under Florida, Illinois, and Missouri law because those states have purportedly adopted *Illinois Brick*'s indirect purchaser bar, and "[a]llowing indirect purchasers to recover and recoup a benefit from the defendant under an unjust enrichment theory would circumvent the policy choice of *Illinois Brick*." *In re Flonase Antitrust Litig.*, 692 F. Supp.2d 524, 542 (E.D. Pa. 2010).

With regard to Illinois, it is simply incorrect to say that state has "adopted *Illinois Brick*." The Illinois antitrust statute specifically states that "[n]o provision of this Act shall deny any

person who is an indirect purchaser the right to sue for damages." 740 Ill. Comp. Stat. Ann. 10/7. This statutory language directly gainsays *Illinois Brick*. For this reason alone, Hanna's argument fails with regard to Illinois law.

Regarding Missouri and Florida—states which do not permit antitrust suits by indirect purchasers—Hanna's argument falters for a different reason. As Hanna itself notes, courts that have rejected unjust enrichment claims by indirect purchasers suing under the laws of states that have adopted *Illinois Brick* have done so when those indirect purchasers would *also* be barred from bringing a claim under those states' consumer protection statutes. *See, e.g.*, *In re Niaspan*, 42 F. Supp.3d at 763 ("[T]he vast majority of courts have held that indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust *and consumer-protection statutes*, absent a showing that the common law of the state in question expressly allows for such recovery." (emphasis added)). But that is not the case here. As discussed above, Plaintiffs have standing to pursue their consumer protection claim under Missouri law, and Hanna has not challenged Plaintiffs' standing to bring their claim under Florida's consumer protection statute. So, since Plaintiffs' consumer protection claims under Missouri and Florida law may proceed despite their status as indirect purchasers, neither state has the "policy" of forbidding any recovery by indirect purchasers that Hanna claims they do.

For these reasons, Plaintiffs' unjust enrichment claims under Florida, Illinois, and Missouri law may proceed.[22]

---

[22] Hanna also argues that Plaintiffs' unjust enrichment claims should be dismissed because they are not pleaded with sufficient specificity. Since Hanna has more fulsomely presented this same argument in a separate Motion to Dismiss for Failure to State a Claim, it will be considered when the Court rules on that Motion at a later juncture.

## IV.    CONCLUSION

For the foregoing reasons, Hanna's Motion to Dismiss for Lack of Standing and

Mootness will be granted in part and denied in part.  The injunctive relief claim pleaded in Count

I of Plaintiffs' Amended Complaint will be dismissed without prejudice for lack of Article III

standing.  In all other respects, the Motion will be denied.

An appropriate order follows.


**BY THE COURT:**


_____

**WENDY BEETLESTONE, J.**