**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MYA BATTON, AARON BOLTON,
MICHAEL BRACE, DO YEON IRENE KIM,
ANNA JAMES, JAMES MULLIS,
THEODORE BISBICOS, and STEVEN
EWALD, individually and on behalf of all
others similarly situated,

       Plaintiffs,

v.

COMPASS, INC.; EXP WORLD
HOLDINGS, INC.; REDFIN
CORPORATION; WEICHERT REAL
ESTATE AFFILIATES, INC. d/b/a
WEICHERT REALTORS; and UNITED
REAL ESTATE HOLDINGS LLC d/b/a
UNITED REAL ESTATE GROUP,

       Defendants.

Case No. 23 C 15618

Hon. LaShonda A. Hunt

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about a defining aspect of the "American Dream"—buying a home. The century-old national ethos has escaped the grasp of many Americans in recent years. Plaintiffs[1] contend that is because Defendants[2] engaged in an anticompetitive conspiracy to restrain trade that artificially raises the price of housing stock across the country. They bring this putative class action

---

[1] Plaintiffs Mya Batton, Aaron Bolton, Michael Brace, Do Yeon Irene Kim, Anna James, James Mullis, Theodore Bisbicos, Steven Ewald, James Lutz, Scott Davis, Niall Adams, Jason Boomsma, Thomas Braun, Timothy Caruso, Sabrina Clark, Colleen Duval, James Edwards, Ryan Eisner, Carson Fairbourn, John Garrett, Brennon Groves, Darin Hendry, Jordan Kullmann, Daniel Parsons, Joshua Putt, John Sannar, Robert Sayles, Ben Shadle, Lisa Shankus, Brent Strine, Christine Van Woerkon, and Sherrie Wohl are collectively referred to as "Plaintiffs."

[2] Defendants Compass, Inc. ("Compass"), eXp World Holdings, Inc. ("eXp"), Redfin Corporation ("Redfin"), Weichert Real Estate Affiliates, Inc. ("Weichert"), and United Real Estate Holdings LLC ("UREH") d/b/a United Real Estate Group are collectively referred to as "Defendants."

on behalf of themselves and other homebuyers seeking an injunction under § 1 of the Sherman Act, 15 U.S.C. § 1 and monetary damages under the antitrust statutes of 25 different states, consumer protection statutes of 24 states; and a theory of unjust enrichment. Before the Court are Defendants' joint motion to dismiss (Dkt. 126) and to strike class allegations (Dkt. 127), in addition to individual motions to dismiss for lack of personal jurisdiction filed by Defendants UREH (Dkt. 122), eXp (Dkt. 123), and Weichert (Dkt. 125). For the reasons that follow, Defendants' joint motion to dismiss is granted in part and denied in part. All other motions are denied.

## **<u>BACKGROUND</u>**

When selling a home, real estate brokers generally use a Multiple Listing Service ("MLS") to share information about properties listed for sale in a particular geographic area. (2d Am. Compl. ¶ 3, Dkt. 163). The vast majority of homes sales in the United States involve an MLS. (*Id.*). There are two sides to the transaction: (1) a seller-broker who lists their client's home on an MLS; and (2) the buyer-agent of the home buyer who uses the MLS to locate homes for purchase for their clients. (*Id.*). The standard practice in the residential real estate industry once a home is sold is to compensate seller-brokers and buyer-agents with commissions that are calculated as a percentage of the home's sale price. (*Id.* ¶ 73). In short, "[i]n order to effectively market properties to buyers [and get paid], seller-brokers must list their clients' properties on an MLS." (*Id.* ¶ 3).

Defendants are all large real estate brokerage companies that are allegedly involved with the National Association of Realtors ("NAR"). (*Id.* ¶¶ 1, 52-57). NAR is a 1.4-million-member trade association that engages in advocacy for the interests of real estate brokers. (*Id.* ¶ 5). Each Defendant plays an active role in NAR and has required their franchisees, brokerages, and individual realtors to join. (*Id.* ¶ 10). NAR membership allegedly comes with benefits integral to

the real estate industry, such as access to MLSs that are controlled by local NAR associations ("NAR MLSs"). (*Id.* ¶¶ 2, 5). Defendants, NAR, and other third parties allegedly possess market power in the market for buyer-agent services because the NAR MLSs are the dominant MLSs in the United States and essential to buying and selling homes. (*Id.* ¶¶ 78-83).

However, NAR membership comes with strings attached. Members must agree to follow NAR's rules, policies, and practices. (*Id.* ¶ 8). These include requirements that sellers set aside a portion of the purchase price for buyer-agent commissions, prohibitions on modifying the buyer-agent commission or disclosing the total commission (for both the seller-broker and buyer-agent) for any listing on a NAR MLS, permitting buyer-agents to tell buyers that their services are free, permitting buyer-agents to filter MLS listings based on the commissions offered to them and exclude lower-commissioned homes from consideration, restricting a broker's ability to modify the buyer-agent commission, and limiting access to lockboxes that provide entry to homes for sale. (*Id.*). The rules, policies, and practices allegedly have been adopted and enforced by NAR members, amounting to agreements among competing real estate brokers. (*Id.* ¶ 9). Defendants are allegedly part of the rule promulgation and enforcement. Defendants review and reissue NAR's rules at yearly NAR meetings and serve on boards and committees that enforce compliance with its rules. (*Id.* ¶ 11).

Plaintiffs (and putative class members), on the other hand, are home buyers who purchased their homes on NAR MLSs. (*Id.* ¶ 4). The typical process Plaintiffs and other buyers went through to buy a home is as follows. First, a homeowner enters into a contract with a seller-broker agreeing to pay the broker 6% in total commissions in exchange for facilitating the sale of the home. (*Id.* ¶ 76). The seller-broker then makes a blanket offer of 3% commission to every buyer-agent when it lists the home on the NAR MLSs. (*Id.*). A buyer-agent then would show the property to

their clients (*i.e.*, like each Plaintiff), who buy the homes. (*Id.*). The buyer-client then puts the purchase price into an escrow account where the escrow company transmits the seller-broker's commission (typically, 3% of the sale price) to the seller-broker and does the same for the buyer-agent's commission (also 3% of the sale price). (*Id.*). Plaintiffs were all subjected to these commissions when they purchased their homes. (*Id.* ¶ 155).

Plaintiffs allege that Defendants' issuance and enforcement of certain NAR rules, as discussed above, inflate buyer-agent commissions nationwide, including in areas where the NAR MLSs operate. (*Id.* ¶ 19). In fact, but-for the NAR rules, Plaintiffs allege that brokerage fees in the United States would be half the amount—3% rather than 6%. (*Id.* ¶ 149).

On November 2, 2023, Plaintiffs Mya Batton, Aaron Bolton, Michael Brace, Do Yeon Irene Kim, Anna James, James Mullis, and Theodore Bisbicos, filed a class action complaint against Defendants. (Dkt. 1). They filed an amended class action complaint on May 6, 2024. (Dkt. 112). After Defendants moved to dismiss the amended complaint, those Plaintiffs filed the operative complaint—the second amended class action complaint—adding 25 of the 32 Plaintiffs to this case on November 26, 2024. (2d Am. Compl., Dkt. 163). Plaintiffs seek relief under the Sherman Act, state antitrust statutes, state consumer protection statutes, and for unjust enrichment. (*Id.* ¶¶ 173-200). In response, Defendants have moved to dismiss the complaint on multiple grounds and to strike the class allegations.[3] These motions are fully briefed.

## **DISCUSSION**

Plaintiffs' second amended complaint brings claims under: (1) the Sherman Act, 15 U.S.C. § 1 *et seq.*, seeking injunctive relief (Count I); (2) antitrust statutes of twenty-four states and the

---

[3] Even though Defendants' responsive pleadings addressed here were filed before the second amended complaint, the parties have stipulated that Defendants' responsive pleadings (Dkts. 122, 123, 125, 126, 127) apply in full to the operative complaint. (*See* Min. Entry, Dkt. 162).

District of Columbia, seeking damages (Count II); (3) consumer protection statutes of twenty-three states and the District of Columbia, seeking damages (Count III); and, (4) the equitable doctrine of unjust enrichment, seeking disgorgement and restitution (Count IV). (*See* 2d Am. Compl. ¶¶ 173-200). Defendants' joint motion challenges Plaintiffs' standing to bring its Sherman Act claim, argues that the Court lacks personal jurisdiction over Defendants, and that Plaintiffs have failed to state a claim on all counts. (*See* J. Mot., Dkt. 126). Defendants eXp, UREH, and Weichert filed individual motions that challenge personal jurisdiction as well. (Def. eXp's Mot., Dkt. 123; Def. UREH's Mot., Dkt. 122; Def. Weichert's Mot., Dkt. 125). Defendants also filed a joint motion to strike the class allegations in the complaint. (*See* Mot. Strike, Dkt. 127). The Court will first consider Defendants' standing challenge, followed by their other arguments.

## I.     <u>Antitrust Standing (Count I)</u>

Differing from Article III standing, antitrust standing refers to the various doctrines governing "whether the plaintiff is the proper party to bring a private antitrust action." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480–481 (7th Cir. 2002) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 n.31 (1983)). To establish antitrust standing, a plaintiff must "demonstrate a direct link between the antitrust violation and the antitrust injury." *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 926–927 (7th Cir. 1995) (quotes omitted). That inquiry "involves a case-by-case analysis of the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 927 (quotes omitted). In *AGC*, the Supreme Court set out six factors courts should consider in the analysis:

> (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment.

*Loeb*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at 537–545).

Here, Defendants incorporate by reference their arguments made in a related case, *Batton v. Nat'l Ass'n of Realtors*, No. 21-cv-00430, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) (Wood, J.) ("*Batton I*"). (J. Mot., at 1478).[4] In *Batton I*, Judge Wood[5] dismissed the plaintiffs' claim for injunctive relief under § 16 of the Clayton Act because of the analogous claims by home-seller plaintiffs in *Moehrl v. The National Association of Realtors*, No. 19-cv-01610 (N.D. Ill.) and *Burnett v. National Association of Realtors*, 4:19-cv-00332-SRB (W.D. Mo.). *Batton I*, 2024 WL 689989 at *10. Specifically, the court found that "because people typically buy homes only a few times in their life, [plaintiffs] failed to show that homebuyers faced 'a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.'" *Id.* (Wood, J.) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969)). And "[t]o the extent a putative class member faces a significant threat of injury from Defendants' alleged antitrust violations in their capacity as a buyer, they would likely be simultaneously exposed to injury as a seller too—*i.e.*, they would be threatened with the same injury as that suffered by the home seller class certified in *Moehrl* and *Burnett*." *Id.* Finding that "circumstance further underscores that the home sellers are best situated to seek injunctive relief," the court dismissed the plaintiffs' claim for injunctive relief. *Id.*

Plaintiffs do not attempt to distinguish this case from *Batton I*. Instead, they "acknowledge that this Court has dismissed substantially similar federal antitrust claims in *Batton I*," and only "oppose [Defendants'] argument . . . to preserve the issue." (Opp'n J. Mot., at 1632, n.4, Dkt. 133).

---

[4] Unless otherwise noted, page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document, not other page numbers in the header or footer.

[5] *Batton I* and the related cases were reassigned to Judge Hunt on September 5, 2024. (Dkt. 148).

6

The Court sees no reason not to adopt and follow that well-reasoned analysis. Plaintiffs' claim for injunctive relief under § 1 of the Sherman Act (Count I) is therefore dismissed without prejudice for the reasons stated in *Batton I*.

**II.     Dismissal for Lack of Personal Jurisdiction**

Next, Defendants argue that the Court lacks personal jurisdiction to adjudicate the claims brought by Plaintiffs. (J. Mot., at 1478-1483; Def. UREH's Mot., at 1080-1084; Def. eXp's Mot., at 1100-1105; Def. Weichert's Mot., at 1117-1123). A motion to dismiss under Rule 12(b)(2) "tests whether a federal court has personal jurisdiction over a defendant." *United Airlines, Inc. v. Zaman*, 152 F. Supp. 3d 1041, 1045 (N.D. Ill. 2015). "The plaintiff need not include facts alleging personal jurisdiction in the complaint, but once the defendant moves to dismiss the complaint . . . for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (quotes omitted). When a court rules on a Rule 12(b)(2) motion based on the parties' submission of written materials without holding an evidentiary hearing, as here, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (quotes omitted). "When affidavits regarding the issue of personal jurisdiction are submitted, the district court may weigh the affidavits." *Curry*, 949 F.3d at 393. However, any well-pleaded facts alleged in the complaint are taken as true and any factual disputes in the affidavits are resolved in favor of the plaintiffs. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).

Personal jurisdiction refers to the "court's power to exercise control over the parties." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). "As a procedural matter, federal courts look to state law in determining the bounds of their jurisdiction over a party." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (citing Fed. R. Civ. P. 4(k)(1)(A)). Because "the Illinois long-

arm statute permits [a] court to exercise jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment," *id.* (citing 735 ILC 5/2-209(c)), "the state statutory and federal constitutional requirements merge." *Id.* (citing *Tamburo*, 601 F.3d at 700). In fact, the Seventh Circuit instructs that "there is no operative difference between Illinois constitutional and federal constitutional limits on personal jurisdiction." *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015) (quotes omitted).

"The Due Process Clause of the Fourteenth Amendment limits the power of a court to render a judgment over nonresident defendants." *Brook*, 873 F.3d at 552 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). Thus, personal jurisdiction is only proper if the defendant has sufficient minimum contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)) While the defendant's physical presence in the forum State is not required, there must be sufficient minimum contacts such that one "should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

Personal jurisdiction can be established through general or specific jurisdiction. *Tamburo*, 601 F.3d at 701. General jurisdiction refers to the forum in which a party, either a person or corporation, is "essentially at home." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). Specific jurisdiction, on the other hand, covers those cases where a party is not "at-home" in the forum state but has sufficient "minimum contacts" with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 621 (7th Cir. 2022). The Court will analyze specific jurisdiction since Plaintiffs do not argue that general jurisdiction is present.

8

Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotes omitted). "[T]he defendant's contacts with the forum state must directly relate to the challenged conduct or transaction." *Tamburo*, 601 F.3d at 702. In a putative class action, like this one, the specific jurisdiction inquiry is evaluated only with respect to the named plaintiffs. *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 445, 448 (7th Cir. 2020); *see also Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 866 (N.D. Ill. 2016) ("Specific personal jurisdiction can arise only from the claims of the named plaintiffs, not those of absent class members.").

"The proper exercise of specific jurisdiction also requires that the defendant's minimum contacts with the forum state be 'suit-related.'" *Curry*, 949 F.3d at 400; *see also Ford*, 592 U.S. at 359 (the plaintiffs' claims must "arise out of *or relate to* the defendant's contacts with the forum"). That is, "[t]here must be a connection between the forum and the specific claims at issue." *Curry*, 949 F.3d at 400 (quotes omitted). "[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 931 n.6 (2011)). Yet, where a corporation has "continuously and deliberately exploited a State's market, it must reasonably anticipate being haled into that State's courts to defend actions based on products causing injury there." *Ford*, 592 U.S. at 364 (quotes omitted). The Seventh Circuit has articulated the following test for determining whether a district court has specific personal jurisdiction over a defendant:

> [S]pecific personal jurisdiction requires that (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in the state; (2) the alleged injury arises out of or relates to the defendant's forum-related activities; and (3) any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.

*Rogers v. City of Hobart*, 996 F.3d 812, 819 (7th Cir. 2021).

Defendants UREH, eXp, and Weichert each argue that they have not purposefully availed themselves of conducting business in Illinois. (Def. UREH's Mot., at 1080-1084; Def. eXp's Mot., at 1100-1105; Def. Weichert's Mot., at 1117-1123). And Defendants jointly contend that "Plaintiffs fail to meet the second requirement," *i.e.*, they purportedly failed to allege injuries arising out of Defendants' forum-related activities. (Reply J. Mot., at 1685-1689, Dkt. 142).[6]

Plaintiffs allege that they all utilized a buyer-agent to purchase their homes on a NAR MLS at inflated prices because the purchases were subject to the NAR rules at the crux of this case, which were purportedly promulgated and enforced by Defendants. (2d Am. Compl. ¶¶ 20-51). Plaintiffs do not allege that they purchased these homes directly from any Defendant. What they do allege is that "the means by which [Defendants'] conspiracy is adopted and enforced" is through NAR which "is headquartered in this District" and that Defendants and their agents "committed substantial acts in furtherance of [this conspiracy] in this District," which caused Plaintiffs' injuries. (*Id.* ¶ 17). Plaintiffs also allege that NAR and the NAR MLSs are co-conspirators. (*Id.* ¶¶ 58-62). In short, Plaintiffs rely on the so-called conspiracy theory doctrine of personal jurisdiction.

### A.     Applicability of the Conspiracy Theory Doctrine

"The idea behind [the conspiracy] theory [doctrine] is that personal jurisdiction is proper over an out-of-state defendant in a forum where one of his co-conspirators has acted as the defendant's agent in furtherance of the conspiracy." *Smith v. Jefferson Cty. Bd. of Educ.*, 378 F. App'x 582, 585 (7th Cir. 2010). Several Illinois and Seventh Circuit cases question whether more or less *automatic imputation* of a co-conspirator's actions on a defendant comports with due

---

[6] No Defendant argues that exercise of personal jurisdiction would not comport with traditional notions of fair play and substantial justice.

10

process. *See e.g., id.* at 585-586 ("Even if [the conspiracy theory of jurisdiction] were viable, the theory would not permit a plaintiff to draw a defendant into court in Illinois simply by alleging a conspiracy that includes some Illinois defendants and some out-of-state defendants, while making no effort to connect the two."); *Ploense v. Electrolux Home Prods., Inc.*, 882 N.E.2d 653, 667 (Ill. App. Ct. 2007) (noting that, in a previous case questioning the constitutional validity of the conspiracy theory of jurisdiction, the Supreme Court of Illinois "was concerned that the conspiracy theory of jurisdiction would allow the exercise of personal jurisdiction over a nonresident defendant who had no minimum contacts with the forum state"). These cases consistently support the premise that personal jurisdiction always requires minimum contacts with the forum. *Cf. In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 234 (S.D.N.Y. 2015) (finding that "membership [in a committee involved in the conspiracy] alone cannot constitute the necessary purposeful availment" of the forum and that plaintiffs needed to "allege and have facts supporting [the defendant] taking specific actions or being a participant in a particular meeting . . . in which the unlawful conspiracy was furthered in some manner").

The Seventh Circuit has made clear that there is not "an independent federal 'civil co-conspirator' theory of personal jurisdiction." *Davis v. A & J Electronics*, 792 F.2d 74, 76 (7th Cir. 1986). Thus, whether personal jurisdiction can be obtained under a state's long-arm statute on a conspiracy rationale is a question of state law. *Id.*

Defendants argue that "Plaintiffs' reliance on conspiratorial conduct to support jurisdiction is misplaced and must be rejected" in accordance with the Court's ruling in *Batton I*. (Reply J. Mot., at 1689). In that case, the plaintiffs attempted to rely on the conspiracy theory of personal jurisdiction to establish jurisdiction over a defendant. *Batton I*, 2024 WL 689989, at *13 (Wood, J.). The court acknowledged that this theory has been recognized in Illinois, citing the Seventh

Circuit's opinion in *Davis*, 792 F.2d 76 and the Supreme Court of Illinois' decision in *Green v. Advance Ross Electronics Corp.*, 86 Ill. 2d 431, 427 N.E.2d 1203, 1208 (Ill. 1981). *Batton I*, 2024 WL 689989, at \*13. However, it rejected the plaintiffs' argument due to an unpublished Seventh Circuit decision that questioned whether the conspiracy theory of personal jurisdiction remains valid in Illinois. *Id.* (citing *Smith*, 378 F. App'x at 585). Noting *Smith*'s "nonprecedential status," the court also identified other courts in this District that have rejected the theory. *Id.* (citing *Menzies v. N. Tr. Corp.*, No. 15-CV-3403, 2021 WL 170738, at \*4 (N.D. Ill. Jan. 19, 2021); *Bovinett v. HomeAdvisor, Inc.*, No. 17 C 6229, 2018 WL 1234963, at \*3 (N.D. Ill. Mar. 9, 2018); *In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 873 (N.D. Ill. 2015)). As such, whether the conspiracy theory of personal jurisdiction is a viable doctrine necessarily involves analyzing *Smith*.[7]

Significantly, in *Smith*, the Seventh Circuit did not declare the doctrine invalid. Citing two Illinois appellate court decisions, *Ploense* and *Knaus*, it merely stated that "the theory may not be valid in Illinois." *Smith*, 378 F. App'x at 585-586 (citing *Ploense*, 882 N.E.2d at 666; *Knaus v. Guidry*, 906 N.E.2d 644, 659-661 (Ill. App. Ct. 2009)).[8] Relevant here, the Illinois appellate court expounded upon the reach of *Ploense* in *Khan v. Gramercy Advisors, LLC*, 61 N.E.3d 107 (Ill. App. Ct. 2016). *Khan*, a case decided six years after *Smith*, held that the conspiracy theory doctrine of personal jurisdiction is proper in Illinois under certain circumstances.

---

[7] The district court cases cited in *Batton I* all rely on *Smith*. As such, the Court does the same.

[8] *Smith* referenced *Ploense*, 882 N.E.2d at 666, which stated that the Supreme Court of Illinois "effectively scuttl[ed]" the theory. *See also id* at 667 ("Thus, we must infer, our supreme court was concerned that the conspiracy theory of jurisdiction would allow the exercise of personal jurisdiction over a nonresident defendant *who had no minimum contacts with the forum state*."). It also mentioned *Knaus v. Guidry*, 906 N.E.2d 644, 659-661 (Ill. App. Ct. 2009), which, relying on *Ploense*, stated that "in any event, conduct sufficient to subject a foreign defendant to jurisdiction of a particular forum must involve, at the very least, an act purposefully directed at the forum state . . . ." *Id.* at 662.

12

In *Khan*, the plaintiffs accused the defendants—four corporations and one individual person—of fraudulent misrepresentation and engaging in a civil conspiracy after the defendants sold and implemented illegal tax shelters to plaintiffs through the plaintiffs' Illinois-based accounting firm, BDO. *Id.* at 112, 144. The defendants argued that the court exercising personal jurisdiction over them would not comport with due process because they are not citizens of Illinois. *Id.* at 112. The Illinois appellate court found that only two of the defendants—the individual and the business he owned—made minimum contact with Illinois. *Id.*

Those *Khan* defendants—Gramercy Advisors and its owner, Mr. Johnston—contended that exercising jurisdiction over them would constitute an improper application of the conspiracy theory of personal jurisdiction. *Id.* at 144. The *Khan* court rejected this argument and clarified its earlier decision in *Ploense*, stating that "[a]s we explained in *Ploense*, the problem with the conspiracy theory of jurisdiction is that it 'would allow the exercise of personal jurisdiction over a nonresident defendant who had no minimum contacts with the forum state.'" *Id.* (citing *Ploense*, 882 N.E.2d at 667). The court used the following scenario to illustrate where application of the theory is improper:

> For example, *A* and *B* could enter into a civil conspiracy in Indiana, and then *B*, unilaterally and without *A*'s knowledge, could go to Texas and commit a wrongful act there in furtherance of the conspiracy. If the conspiracy theory of jurisdiction were constitutionally valid, *B*'s contacts with Texas would be automatically attributed to *A*—even if *A* never intended, never wanted, and never expected *B* to go to Texas and do anything in that state. Attributing *B*'s Texas contacts to *A* simply because they had entered into a conspiracy in Indiana, without their having reached any agreement or having had any discussion regarding Texas, would dispense with the constitutional requirement that *A* purposefully make minimum contacts with Texas before that state exercised personal jurisdiction over him.

*Id.* at 144-145 (citations omitted and emphasis in original).

Notably, *Khan* rejected any argument that the conspiracy theory of personal jurisdiction is categorically unconstitutional as "a *non sequitur*." *Id.* at 145 (emphasis in original). The court

13

emphasized that "minimum contacts do not have to be direct. A person can purposefully make minimum contacts with the forum state through someone else." *Id.* (citing *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 112 (1987)); *see also Ford*, 592 U.S. at 361-362 (finding that a defendant's contacts with the forum may "relate to" the plaintiff's claims even in the absence of a "strict causal relationship" between the contact and claims).

The court determined that personal jurisdiction existed because the plaintiffs' injuries resulted from the alleged conspiracy to sell Gramercy and Mr. Johnston's illegal tax shelter product through BDO in states including Illinois. *Khan*, 61 N.E.3d at 145. That is because they "reasonably should have anticipated being haled into an Illinois court if the distressed debt strategies caused harm." *Id.* The *Khan* court thus concluded that the conspiracy theory applies under the Illinois long-arm statute when a defendant purposefully makes minimum contacts with Illinois before the state exercises personal jurisdiction over them.

Here, the analysis is similar to those two defendants in *Khan*. Plaintiffs allege that Defendants and their co-conspirators, including NAR, entered into a conspiracy *in Illinois* when they constructed the NAR rules. (2d Am. Compl. ¶ 17). The conspiracy continued as the conspirators agreed to promulgate and enforce the NAR rules in Illinois and throughout the country. (*Id.*). Defendants and their co-conspirators then harmed Plaintiffs by applying these allegedly anticompetitive rules to Plaintiffs' home purchases both inside and outside of Illinois. (*Id.* ¶¶ 19-62). Stated another way, like the *Khan* defendants, Defendants partnered with an Illinois organization to implement an allegedly illegal scheme in Illinois, harming Illinois residents. Defendants, however, were more ambitious and implemented that same illegal scheme across the country, thereby harming residents outside of Illinois. Because Defendants allegedly entered into their conspiracy, and harmed individuals through that conspiracy, in Illinois, this Court's exercise

14

of personal jurisdiction will not violate constitutional due process requirements if Plaintiffs establish that each Defendant has sufficient suit-related contacts with Illinois—either directly or through others.

Accordingly, this Court respectfully declines to follow *Batton I* regarding the conspiracy theory of personal jurisdiction, as *Ploense* and its progeny establish that such a theory is compatible with the Illinois long-arm statute provided the defendant has minimum contacts with Illinois consistent with due process requirements. Whether personal jurisdiction is present here turns on whether Defendants' contacts with Illinois satisfy due process and sufficiently relate to Plaintiffs' injuries.

### B. Purposeful Availment by Specific Defendants

As an initial matter, Defendants eXp, Weichert, and UREH challenge whether they have sufficient minimum contacts with Illinois. In specific jurisdiction cases, courts must determine if a defendant has "purposefully established minimum contacts within the forum State" and consider whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances. *See Burger King*, 471 U.S. at 476-477. The Seventh Circuit makes clear "that physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state." *Curry*, 949 F.3d at 398. Indeed, the Circuit has noted that the "purposeful-direction inquiry can appear in different guises." *Tamburo*, 601 F.3d at 702 (quotes omitted). "The essential point of the inquiry is to ensure that an out-of-state defendant is not bound to appear to account for merely random, fortuitous, or attenuated contacts with the forum state." *Curry*, 949 F.3d at 398 (quotes omitted).

To ensure that a defendant's contacts with a state are adequate, courts must inquire whether the record demonstrates that the defendant has "'purposefully directed'" their activities at a forum even in the "absence of physical contacts" with a forum. *Burger King*, 471 U.S. at 476 (quoting

15

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774-775 (1984)). "Such 'purposeful direction' may be shown by evidence that the defendant's actions, even if initiated outside of the forum state, nevertheless were directed at the forum state." *Curry*, 949 F.3d at 398. For example, a defendant may cause its product or service to be distributed or carried out in the forum state. *See, e.g., Keeton*, 465 U.S. at 774-775 (finding purposeful direction where defendant published magazines outside the forum state and circulated them in the forum state). In their three separate motions to dismiss, eXp, Weichert, and UREH all argue that they have not purposefully availed themselves in Illinois.

### 1. eXp

eXp argues that its subsidiary, eXp Realty, LLC ("eXp Realty"), conducts business in Illinois, but Defendant eXp does not; therefore, there is no jurisdiction over the parent company, eXp. (Def. eXp's Reply, at 1738-1740). Plaintiffs point out that eXp "does not contradict the allegations that . . . directly tie eXp to [the same] Illinois conduct being carried out under its brand name." (Pls. Opp'n Defs.' Mot., at 1586, Dkt. 131). As such, whether eXp purposefully availed itself in Illinois comes down to whether the record establishes jurisdiction over eXp based on the activities of eXp Realty. The Court finds it does.

"Illinois courts exercise jurisdiction over parents based on the activities of the subsidiary where the corporate veil can be pierced, or perhaps where all the corporate formalities are observed but the subsidiary's only purpose is to conduct the business of the parent." *Central States v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000). There are several factors to consider when determining whether the parent corporation is doing business in Illinois through its subsidiary, including: (1) the control exercised by the parent over the subsidiary; (2) obligations of the subsidiary to service the parent's products; (3) inclusion of the subsidiary's name and address in the parent's advertising; (4) joint sponsorship of promotional activities; (5) interlocking directorships; (6) the sites of meetings of the subsidiary's board of directors; and (7) whether the

16

subsidiary is authorized to prosecute trademark infringement suits in the parent's name. *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, No. 05 C 5415, 2006 WL 140544, at *2 (N.D. Ill. Jan. 13, 2006) (citing *Palen v. Daewoo Motor Co.*, 832 N.E.2d 173, 184 (Ill. App. Ct. 2005)). If the parent company "is primarily a holding company that formed the subsidiary to conduct its business, emblazons its name and corporate logo on the subsidiary's letterhead, and conducts national name-recognition advertising on behalf of its subsidiary, a parent company may be said to be doing business through its subsidiary." *Id.* (collecting cases).

In this case, at least some of the salient factors mentioned by Illinois courts are present. For example, eXp admits in its declaration that it is a holding company which owns eXp Realty, a real estate subsidiary. (Mabery Decl. ¶¶ 4, Dkt. 124-1). Plaintiffs note that eXp does not deny that it offers the bulk of its real estate brokerage services through eXp Realty or that eXp Realty carries out such services under the eXp brand name. (Pls. Opp'n Defs.' Mot., at 1586). Furthermore, nowhere in eXp's declaration does it disavow Plaintiffs' claim that it exercises any day-to-day control over its subsidiary. (*See* 2d Am. Compl. ¶¶ 27, 53, 140, 176) (stating that eXp "offers the bulk of its real estate brokerage services through its subsidiary, eXp Realty, LLC," used its control of the subsidiary to implement NAR rules, and that subsidiary "partially own[s] the MRED MLS" that Plaintiff Ewald's home was listed on when he bought it). Therefore, there is a material question of fact as to whether eXp is a parent corporation doing business through its real estate subsidiary sufficient to subject it to personal jurisdiction in Illinois. Because the Court is required to resolve all factual disputes in favor of Plaintiffs at this stage, the Court finds that eXp has purposefully availed itself in Illinois through its corporate subsidiary, eXp Realty.

### 2. **Weichert**

Weichert argues that its franchises based in Illinois do not establish the prerequisite minimum contacts in this state. (Def. Weichert's Reply., at 1708-1711, Dkt. 143). Plaintiffs

contend that Weichert does not deny that it is a party to agreements with Illinois brokers using the "Weichert" brand name and that it requires those Illinois brokers to comply with NAR's rules. (Pls.' Opp'n Defs.' Mot., at 1585-1586). "[T]he mere fact that a franchisor has franchisees in a particular state does not subject it to that state's jurisdiction." *Santora v. Starwood Hotel & Resorts Worldwide, Inc.*, 580 F. Supp. 2d 694, 700 (N.D. Ill. 2008) (analyzing the franchisor-franchisee relationship under the same paradigm as the parent-subsidiary relationship pursuant to Illinois law). However, like eXp, many of the jurisdictional factors identified by Illinois courts as indicators of a parent company (the franchisor) establishing control of its subsidiary (the franchisee) are present.

First, Weichert has exercised a high degree of control over its franchisees. In support of its motion, Weichert attached its Franchise Disclosure Document that it issued to Weichert franchises located in Illinois and elsewhere on March 15, 2023. (Scavone Decl. ¶ 5, Dkt. 125-2; *see also* Franchise Disclosure Doc., Dkt. 125-3). The document states that any franchisee "must be a licensed real estate broker under the applicable law of your territory." (Franchise Disclosure, at 1140). And, consistent with Plaintiffs' allegations, the document declares that the franchisee "must be and remain a member in good standing of the National Association of Realtors [or "NAR"] . . . [and] must comply with the Code of Ethics of [NAR] at all times." (*Id.*; *see also id.* at 1220). These facts track with Plaintiffs' arguments and the allegations in the complaint.

Weichert's document also states it appoints Weichert franchisees to broker councils that regulate franchisees. (*Id.* at 1166, 1222). Weichert dictates which franchisees are members to the councils. (*Id.* at 1166, 1222). Though technically not a member of any self-created council, Weichert oversees all council activities through its requirement of a Weichert representative's attendance at "all meetings of any franchisee council and of any subgroup of its members," and

giving itself "the right to veto any council action." (*Id.* at 1166, 1222). In short, the governing bodies of the franchisees cannot take collective action without Weichert's supervision and approval.

Second, Weichert also conducts national and regional advertising campaigns on behalf of its Weichert franchises. The Franchise Disclosure licenses the "Weichert" trademark to all franchisees to use in coordination with their business. (*Id.* at 1178). It also requires all franchisees to contribute to the Weichert Marketing Fund, which is a collective fund where half of the funds are used for local advertising and the other half for regional and national marketing "intended to further general public recognition and acceptance of the" Weichert trademarks "for the benefit of the Weichert System."[9] (*Id.* at 1167). Weichert has established a "Weichert Marketing Fund Advisory Council," but the council is just that—advisory. (*Id.*). Weichert mandates that "[t]he functions of the [Marketing Fund Advisory] Council [are] solely advisory, and [gives Weichert] . . . sole control and direction of all marketing, advertising, and promotional programs, the creative concepts, materials and media used in the programs, and the placement and allocation of advertising." (*Id.*).

Furthermore, Weichert states that its "business consists solely of serving as a franchisor to Weichert franchises." (Scavone Decl. ¶ 3). Therefore, even though Weichert argues that it is not a member of NAR, (Scavone Decl. ¶ 5), and does not control the day-to-day operations of its franchisees, those arguments are undercut by the fact that Weichert mandates all of its franchisees

---

[9] The "Weichert System" is defined in the Franchise Disclosure as the "systems, techniques, tools, procedures and guidelines for operating a real estate brokerage business; referral programs; marketing systems and materials; standards of interior and exterior design and decor; staff recruiting and training techniques; and, in general, a style, system and technique of business operation and procedure developed through our business experience." (Franchise Disclosure, at 1204). In other words, it is the Weichert business's infrastructure, design, and style. All franchisees are required to comply with the Weichert System. (*Id.* at 1219).

be members in good standing with NAR—an Illinois trade association—and has its talons in every aspect of its franchisees' businesses. The Court finds that, drawing all disputed facts in favor of Plaintiffs, Weichert has formed its franchises, including the Illinois franchises, to conduct its business through them, and thus purposefully availed itself of this forum for that purpose.

Weichert cites two cases in support of its argument that it does not exercise the degree of control over its Illinois franchisees required to establish personal jurisdiction. (Def. Weichert's Reply, at 1708) (citing *Santora*, 580 F. Supp. 2d 694; *Bakhtiari v. Doe*, No. 22 C 2406, 2022 WL 17593027 (N.D. Ill. Dec. 13, 2022)). However, neither supports Weichert's position.

In *Santora*, the plaintiff argued that the mere existence of several of the franchisor-defendant's franchises in Illinois resulted in personal jurisdiction in Illinois. *Santora*, 580 F. Supp. 2d at 700. The court rejected that contention because the plaintiff "made no specific claim that [the franchisor] exercises a greater than average degree of control over its franchises, and the affidavit and deposition testimony . . . confirm[ed] that [the franchisor] d[id] not conduct any business in or possess any contacts with Illinois besides receiving franchise fees." *Id.* Then in *Bakhtiari*, the court similarly found no specific jurisdiction because: (1) the franchisor did not "direct its actions at Illinois"; (2) the franchisor's contacts with Illinois did not relate to the conduct that gave rise to the plaintiff's claims; and (3) allegations that the franchisor "directs, monitors and closely controls" the franchisee did not show that the franchisor exercised a higher than usual degree of control over the franchisee. *Bakhtiari*, 2022 WL 17593027, at *6-7.

In contrast, Plaintiffs made the allegations, among others, that Weichert franchisors "requir[e] their franchisees (and agents employed by those franchisees) to comply with NAR rules . . . and control[] local realtor associations by, for example, participating in the governance and management of those associations and encouraging the adoption of NAR's rules." (2d Am.

20

Compl. ¶ 134). As discussed above, this activity, and others like it, are verified by Weichert's own Franchise Disclosure Document. That is sufficient to demonstrate that Weichert has not merely exercised the usual degree of control of its franchisees. Weichert forces them to adopt an Illinois-based trade organization's rules and controls the management decisions of local and regional councils of its franchisees in Illinois and elsewhere. These facts distinguish Plaintiffs' case against Weichert from the franchisors in *Santora* and *Bakhtiari*.

### 3. UREH

UREH similarly states that it is a holding company but admits that it partially owns a joint venture in Chicago called "URE Chicago, LLC" that does business as "United Real Estate – Chicago," and owns subsidiary brokerages across the country, including in Illinois. (Barnard Aff. ¶¶ 6, 9, 10, Dkt. 122-2). Plaintiffs argue that these facts are determinative. (Pls.' Opp'n Defs.' Mot., at 1586). The Court agrees with Plaintiffs.

"Where two or more companies enter a joint venture, 'the minimum contacts of one co-venturer are attributable to other co-venturers such that personal jurisdiction over one means personal jurisdiction overall.'" *Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1030 (N.D. Ill. 2009) (quoting *Hill v. Shell Oil Co.*, 140 F. Supp. 2d 911, 914 (N.D. Ill. 2001)). Under Illinois law, "a joint venture is an association of two or more entities to carry out a single, specific purpose for a profit." *Wendt*, 613 F. Supp. 2d at 1030 (citing *Daniels v. Corrigan*, 886 N.E.2d 1193, 1208 (Ill. App. Ct. 2008)). URE Chicago is, therefore, a real estate enterprise for profit. Based on its joint real estate venture in Chicago, UREH has the requisite minimum contacts with Illinois for personal jurisdiction to exist in this Court. *See Central States*, 230 F.3d at 946-947 (holding that dismissal is not appropriate where plaintiff has made a colorable or prima facie showing of personal jurisdiction); *see also Hill*, 140 F. Supp. 2d at 915 (finding evidence of

21

defendant's joint venture with an Illinois company sufficient to deny motion attacking personal jurisdiction).

## C.     Defendants' Forum-Related Activities

The Court turns to the second prong which requires that Defendants' minimum contacts with the forum state be "*suit-related*."[10] *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) (quoting *Walden*, 571 U.S. at 284); *see also Curry*, 949 F.3d at 400 (same). Here, Defendants' contact—the promulgation and enforcement of the NAR rules—allegedly occurred in Illinois. (2d Am. Compl. ¶ 17). The question becomes whether Plaintiffs' injuries are sufficiently related to these contacts because in a class action "the named representatives must be able to demonstrate . . . specific personal jurisdiction, but the unnamed class members are not required to do so." *Mussat*, 953 F.3d at 447.

Starting with the Illinois-based Plaintiffs, Ewald and Eisner, both allege that they bought their homes in Illinois. (2d Am. Compl. ¶¶ 27, 37). And before their purchases, the former owners' seller-brokers listed the properties on a NAR MLS, which led to the imposition of the alleged anticompetitive NAR rules on their transaction, and resulting injury of an inflated purchase price. Taking the well-pleaded facts in the complaint as true, Plaintiffs Ewald and Eisner have established personal jurisdiction because there is a direct relation between Defendants' promulgation and enforcement of the NAR rules in Illinois, the imposition of those rules by co-conspirators, and the alleged injuries of Ewald and Eisner when they purchased homes subject to those rules.

---

[10] As discussed above, Defendants eXp, Weichert, and UREH filed individual Rule 12(b)(2) motions arguing that they lacked the requisite minimum contacts with Illinois to establish personal jurisdiction. Defendants' joint motion to dismiss (Dkt. 126), includes those three defendants as well as Defendants Compass and Redfin, and contends only that Plaintiffs cannot meet the second prong of the specific jurisdiction analysis. (Reply J. Mot., at 1686) ("Plaintiffs' [only] fail to meet the second requirement . . . ."). In other words, Defendants Compass and Redfin do not contest that they have established minimum contacts with Illinois, and Defendants eXp, Weichert, and UREH do make joint, but not individualized, arguments that any minimum contacts are not suit-related.

Moving on to the non-Illinois Plaintiffs, Defendants argue that they have not shown that their injuries occurred in Illinois and therefore cannot establish personal jurisdiction. (Reply J. Mot., at 1688). That, however, is not the standard. "In recent years, the Supreme Court has emphasized that the relationship among the defendant, the forum, and the litigation must arise out of contacts that the *defendant* has created with the forum state." *Rogers*, 996 F.3d at 819 (emphasis in original). "The question is not whether the plaintiff experienced a particular injury or effect in the forum state but whether the defendant's conduct connects him with the forum in a meaningful way." *Id.* The Seventh Circuit instructs that the "meaningful way" be identified by allegations or evidence that the defendant has "purposefully directed" his actions at the forum. *Id.* In short, the fact that the non-Illinois Plaintiffs did not purchase their homes in Illinois is not determinative to the personal jurisdiction analysis.

The allegations in the operative complaint suffice to establish that the out-of-state Plaintiffs have demonstrated personal jurisdiction exists for them. Similar to the Illinois Plaintiffs, the out-of-state Plaintiffs all allege that they bought properties listed on NAR MLSs that were subject to the NAR rules that were promulgated and continually enforced by Defendants and their co-conspirators, such as NAR, in Illinois. (2d Am. Compl. ¶¶ 20-26, 28-36, 38-51). In other words, Plaintiffs allege that Defendants, their subsidiaries, NAR, and other co-conspirators entered into a conspiracy in Illinois via the NAR rules, then their subsidiaries and other co-conspirators—under the direction and mandate of Defendants and NAR—implemented their anticompetitive scheme all over the country, including in Illinois. This is enough to allege jurisdiction in Illinois under its long-arm statute. *See Khan*, 61 N.E.3d 107, 144-145 (finding the conspiracy theory of personal jurisdiction valid if "[a] person purposefully make[s] minimum contacts with the forum state

through [themselves or] someone else," but not where a conspirator "never intended, never wanted, and never expected" a co-conspirator to "do anything in [the forum] state").

Taking the well-pleaded facts as true, the Court finds that Plaintiffs have sufficiently pled that Defendants' suit-related conduct occurred in the forum state and that conduct is sufficiently related to the out-of-state Plaintiffs' alleged injuries, such that the exercise of personal jurisdiction over Defendants is appropriate.

### III. Dismissal for Failure to State a Claim

The Court next turns to Defendants' contention that the Plaintiffs have failed to state a claim. To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Defendants make three central arguments for dismissal under Rule 12(b)(6): (1) Plaintiffs' state-antitrust claims do not adequately plead an anticompetitive agreement and rely on impermissible group pleading; (2) Plaintiffs' state-law claims are untimely because the applicable statute of limitations has expired; and (3) Plaintiffs' state-law claims do not allege a cause of action on a state-by-state basis.

24

### A. State Antitrust Claims (Count II)

Section 1 of the Sherman Act[11] makes illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Because "restraint is the very essence of every contract[,] read literally, § 1 would outlaw the entire body of private contract law." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687–688 (1978). That, of course, "is not what the statute means." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189 (2010). Rather, "in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean undue restraint." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quotes omitted). Thus, the Supreme Court has "understood § 1 to outlaw only unreasonable restraints." *Id.* (internal quotation marks omitted). Accordingly, to state a claim under § 1 of the Sherman Act, a plaintiff must allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (internal quotation marks omitted).

Defendants argue that Plaintiffs' state antitrust claims fail because Plaintiffs have not sufficiently alleged an anticompetitive agreement, and their complaint relies upon improper group pleading allegations. (J. Mot., at 1483-1492). Plaintiffs counter that they have "plead a classic horizontal agreement to restrain trade" and do not rely upon group pleading because Defendants— all members of NAR—agreed to be bound by the same anticompetitive conduct. (Opp'n J. Mot., at 1637).

---

[11] Because, as Defendants note, (J. Mot., at 1483 n.3), an anticompetitive agreement is required to allege an antitrust claim under either federal or state antitrust law, the Court utilizes federal antitrust law in assessing Defendants' argument here. *See Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 572 (S.D.N.Y. 2021) ("There is no indication that any state's antitrust laws require proof of elements different from those that must be proved under the Sherman Act with respect to monopolization or restraint-of-trade claims.").

### 1. __Anticompetitive Agreement__

To plead the existence of an antitrust conspiracy, a plaintiff must allege facts showing that "the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Put differently, "the circumstances of the case must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). "While the complaint need not contain detailed 'defendant by defendant' allegations, it must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision to join it." *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (quotes omitted). However, Section 1 of the Sherman Act does not reach independent action that happens to have an anticompetitive effect. *Twombly*, 550 U.S. at 553-54; *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 997 (N.D. Ill. 2011). Factual allegations that are equally as consistent with a wide range of lawful, independent, business conduct as they are with an anticompetitive agreement are insufficient. *See Twombly*, 550 U.S. at 553-557. An antitrust conspiracy may be pleaded with either direct evidence of an anticompetitive agreement or circumstantial evidence "from which the existence of such an agreement can be inferred." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018).

In *Moehrl*, the court found that home-seller plaintiffs successfully alleged an antitrust conspiracy among defendants who participated in NAR. The court relied on three key factors: (1) defendants required their franchisees and realtors to comply with NAR's allegedly anticompetitive rules to access brand benefits and resources; (2) defendants mandated that their franchises and

26

realtors join associations and MLS systems that enforce NAR compliance; and (3) defendants actively participated in NAR's governance and rule enforcement. *See Moehrl*, 492 F. Supp. 3d at 778 (Wood, J.). Based on these allegations, the court concluded that plaintiffs had pleaded more than mere parallel conduct and had adequately alleged a conspiracy among the defendants. *Id.*

Plaintiffs here mirror the allegations in *Moehrl*. They allege that Defendants and their co-conspirators entered into horizontal agreements—codified in NAR's handbook and Defendants' own rules and procedures—to abide by NAR rules. (*See* 2d Am. Compl. ¶¶ 84-88, 133-140). Plaintiffs allege that NAR requires its members, including Defendants, to comply with its allegedly anticompetitive rules to secure the benefits provided by NAR and the NAR MLS. (*Id.* ¶¶ 126-132). In addition, Plaintiffs pled that the executives of Defendants participated in the management and operation of NAR and were part of the committees that are responsible for reviewing and issuing the anticompetitive rules at the crux of this dispute. (*Id.* ¶¶ 133-140). Plaintiffs further allege the purported conspiracy has led to adverse economic impacts on price competition around the country. (*Id.* ¶¶ 141-153). "In short, Plaintiffs' allegations plausibly demonstrate that each . . . Defendant has participated in an agreement that centralizes control over how real estate brokers are compensated with the NAR." *See Moehrl*, 492 F. Supp. 3d at 779. Thus, as pled, Defendants' actions satisfy the conspiracy element because their actions "deprive[d] the marketplace of independent centers of decisionmaking," at least with respect to buyer-broker commissions. *Id.* (citing *Am. Needle*, 560 U.S. at 195).

Conspicuously, Defendants do not attempt to distinguish this case from *Moehrl*. Rather, Defendants, citing *Twombly*, 550 U.S. at 556, argue that Plaintiffs allege "only parallel conduct," among Defendants and NAR. (J. Mot., at 1486). But, "[u]nlike in *Twombly*, where the plaintiffs only set forth parallel business conduct bound together by a conclusory allegation of a secret

27

agreement, the purported anticompetitive restraints here are a product of written rules issued by the NAR that each Corporate Defendant expressly imposes upon their franchisees and realtors." *Moehrl*, 492 F. Supp. 3d at 778 (citations omitted). Put differently, Plaintiffs did not merely plead "a bare assertion of conspiracy," as Defendants suggest, (J. Mot., at 1486) (citing *Twombly*, 550 U.S. at 556), they instead identified with specificity the rules that each Defendant reviewed, implemented, and agreed to enforce, "provid[ing] the 'setting suggesting the agreement necessary to make out a § 1 claim.'" *Moehrl*, 492 F. Supp at 779 (quoting *Twombly*, 550 U.S. at 557). The Court is not swayed by Defendants' parallel conduct argument and denies their motion to dismiss on these grounds.[12]

### 2. <u>Group Pleading</u>

Defendants also argue that Plaintiffs' complaint should be dismissed because they engaged in impermissible group pleading. (*See* Def. UREH's Mot., at 1085-1088; J. Mot., at 1490-1492). Plaintiffs respond that Defendants' argument is misplaced because Plaintiffs have alleged that each Defendant was a member of NAR and agreed to be bound by its rules. (*See* Opp'n J. Mot., at 1642). Plaintiffs have the better argument.

---

[12] While their motions were pending, Defendants also filed a motion for leave to file notice of supplemental authority, (Dkt. 174), which the Court granted. (Dkt. 176). In *Davis v. Hanna Holdings, Inc.*, 787 F. Supp. 3d 42 (E.D. Pa. 2025), the district court held that the plaintiffs failed to plausibly plead a horizontal antitrust conspiracy because they pled the defendant entered into "continuing agreements" separate from the NAR rules in question. *Id.* at 60. In doing so, the district court relied on a Second Circuit decision that created a dichotomy in § 1 cases involving trade organization rules. *Id.* at 57-58 (citing *Relevant Sports, LLC v. United States Soccer Federation, Inc.*, 61 F.4th 299, 308-309 (2d Cir. 2023). The first type of case involves "alleg[ations] that a policy or rule is in service of a plan to restrain competition[;]" when a plaintiff pursues this theory of agreement, "it must allege enough additional facts to show that agreement to such a plan exists." *Relevant Sports*, 61 F.4th at 308. And for the second type where "the plaintiff adequately alleges that the policy or rule is the agreement itself," the plaintiff "need not allege any further agreement." *Id.* The *Davis* court found that the plaintiffs' allegations fell into the first bucket due to their allegations of prior agreements separate from the NAR rules in question. *Davis*, 787 F. Supp. 3d at 58-61. Here, Plaintiffs allege the NAR rules themselves are the problem, therefore, even under the Second Circuit's paradigm, they have pled a plausible horizontal agreement. (2d Am. Compl. ¶¶ 9, 11, 12, 19, 58-62).

A plaintiff who sues multiple defendants must give fair notice to each defendant of the claims that each defendant must defend against. *Twombly*, 550 U.S. at 555 (Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.") (quotes and citation omitted). "There is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations against defendants collectively; 'group pleading' does not violate Fed. R. Civ. P. 8 so long as the complaint provides sufficient detail to put the defendants on notice of the claims." *Robles v. City of Chi.*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019) (quoting *Lattimore v. Vill. of Streamwood*, 2018 WL 2183991, at *4 (N.D. Ill. May 11, 2018)). "The key to satisfying Rule 8 is that [plaintiffs] 'put the defendants on notice of what exactly they might have done to violate [their] rights.'" *Gray v. City of Chi.*, 2019 WL 3554239, at *5 (N.D. Ill. Aug. 1, 2019) (quoting *Kuri v. City of Chi.*, 2014 WL 114283, at *7 (N.D. Ill. Jan. 10, 2014)).

In relation to Plaintiffs' antitrust claims, the second amended complaint contains allegations that each Defendant was a member of NAR and agreed to be bound by its rules, like the Commission Rule and rules related to limiting price competition. (2d Am. Compl. ¶¶ 10, 57-62, 132). This is indeed a situation where defendants are on notice of which actions they were alleged to have committed. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 744 n.2 (N.D. Ill. 2019) (finding plaintiffs' allegations that the defendants "worked together, through various lines of business, to effectuate the" antitrust conspiracy did not amount to impermissible group pleading sufficient at the pleading stage); *but see Lattimore*, 2018 WL 2183991, at *4 (plaintiffs repeatedly grouped the defendants together and stated they took certain actions and identified specific acts by one defendant, but "fail[ed] to identify what the other [defendants] did or did not do in relation to their constitutional claims."); *Liera v. City of Chi.*,

29

2014 WL 3921359, at *3 (N.D. Ill. Aug. 5, 2014) (plaintiffs alleged specific conduct by three defendants but brought the complaint "against an additional thirty-five [defendants] without alleging which officers were at which location or which [defendants] participated in the alleged wrongful conduct").

Defendants cite *Knight* for the proposition that "when a plaintiff alleges that a defendant conspired, it is 'essential to show that [the] particular defendant joined the conspiracy and knew of its scope.'" (J. Mot., at 1490) (quoting *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013)). In *Knight*, however, the plaintiff alleged that "'the defendants looted the corporation'— without any details about who did what." 725 F.3d at 818. The details of the alleged looting were involved and complex, *id.* at 819, which made the plaintiff's failure to give any indication of which defendants engaged in which acts problematic. Here, the specific details in the complaint shine light on the alleged conspiracy, which is not complex. The conspiracy involves each Defendants' association with NAR and an agreement to be bound, and to bind their subsidiaries and agents, by its rules related to limited price competition. "This is not a case where the allegations of the complaint leave the defendants in the dark about what they are alleged to have done." *Robles*, 354 F. Supp. 3d at 875.

It may come out in discovery that there are insufficient facts to support claims against the different Defendants. "But at this stage, the court accepts [P]laintiffs' allegations that the [Defendant] entities worked together, through," implementation and enforcement of the NAR rules and procedures, and have provided the Defendants with sufficient notice of the claims against them. *See Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d at 743 n.2 (finding that the defendants group pleading argument unpersuasive where the second amended complaint contained various allegations of the roles of the defendants to effectuate an alleged antitrust conspiracy).

30

### B. **Statute of Limitations**

Defendants seek to dismiss all the state-law claims as time-barred. (J. Mot., at 1492). They maintain that Plaintiffs have pled that the alleged conspiracy to engage in anticompetitive conduct started in 1996, and because "[n]one of Plaintiffs' claims have a twenty-seven-year statute of limitations," all are now untimely. (*Id.*). Plaintiffs contend that Defendants are attempting to impose a statute of repose on their claims by ignoring when their causes of action began to accrue. (Opp'n J. Mot., at 1643). They contend that the "continuing violation" doctrine is proper, and each state-law claim began to run on the date a plaintiff suffers an injury (*i.e.*, when they purchased a home), not when the conspiracy allegedly began. (*Id.* at 1643-1644).

As a general rule, it is "irregular to dismiss a claim as untimely under Rule 12(b)(6)." *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006) (quotes omitted). "Dismissal on statute of limitations grounds at the pleading stage may be warranted, however, when a plaintiff pleads facts that effectively establish the defense." *Batton I*, 2024 WL 689989 at *10 (citing *Hollander*, 457 F.3d at 691 n.1).

To determine a given statute of limitations, the Supreme Court instructs that the most helpful canon is "the 'standard rule.'" *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409, 418 (2005). Ordinarily, a "'limitations period commences when the plaintiff has a complete and present cause of action.'" *Id.* (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). "[A] cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Bay Area Laundry*, 522 U.S. at 201. "Although the standard rule can be displaced such that the limitations period begins to run before a plaintiff can file a suit," such an "odd result" should not be inferred "in the absence of any such indication in the text of the limitations period." *Green v. Brennan*, 578 U.S. 547, 554 (2006) (quotes omitted).

31

Plaintiffs allege that Defendants' conspiracy began in 1996 and caused injury to them and other indirect purchasers who received lower quality services and paid inflated prices for homes and buyer-agent commissions. (2d Am. Compl. ¶¶ 184-200). As such, Plaintiffs pled an injury under the "standard rule," meaning that each time a Plaintiff or class member purchased a home since December 1, 1996, they may have suffered an injury. Defendants have not pointed the Court to any legal authority that shows the standard rule should not be applied to Plaintiffs' state-law claims. Consequently, the Court finds that the standard rule is proper, and each injury began to accrue on the date of home purchase, not when the conspiracy commenced.

To be clear, this does not mean that every claim since the conspiracy's purported commencement will survive. If a given claim had already expired by this suit's origination on November 2, 2023, the statute of limitations still poses an insurmountable obstacle to the state-law claims of Plaintiffs. Anticipating this issue, Plaintiffs allege and argue that two tolling exceptions to the standard rule apply because: (1) some class members' claims are tolled under the "continuing violation" theory; and/or (2) the doctrine of "fraudulent concealment" tolled the statute of limitations of Plaintiffs' claims until at least November 19, 2020, *i.e.*, when the DOJ announced settlement of related antitrust claims against NAR. (Opp'n J. Mot., at 1643-1648; 2d Am. Compl. ¶¶ 156-162, 184-200).

### 1. <u>Continuing Violation Doctrine</u>

In the antitrust context, the Supreme Court states that:

> [I]n the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quotes omitted); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) ("In the context of a continuing conspiracy to

violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."). "An overt act that restarts the statute of limitations is characterized by two elements: (1) it must 'be a new and independent act that is not merely a reaffirmation of a previous act'; and (2) it must 'inflict new and accumulating injury on the plaintiff.'" *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)); *accord Lehman v. Lucom*, 727 F.3d 1326, 1331 (11th Cir. 2013); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004); *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004). Consistent with the Supreme Court's instruction, federal courts analyzing federal antitrust claims regularly apply the "continuing violation" doctrine when tolling the statute of limitations. *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 725 (N.D. Ill. 2016). The Court must determine whether it is proper to apply the continuing violation doctrine when tolling *state* antitrust claims.

The Court notes that neither party engaged in the state-by-state (or territory-by-territory) analysis that is necessary to fully resolve this question. Nonetheless, Defendants do not dispute that seventeen of the twenty-five states and territories where Plaintiffs bring their antitrust claims recognize the continuing violation doctrine.[13] (*See* J. Mot., at 1493). Defendants, however, argue

---

[13] Although Defendants claim to be making their continued-violation-doctrine argument concerning *all* of Plaintiffs' state-law claims, Defendants have not provided the requisite case law or legal arguments for the Court to properly examine whether each state's consumer protection statute or unjust enrichment law allows the doctrine. And because in their reply brief, Defendants indicate that their arguments concern the "continuing violation doctrine in antitrust cases," the Court limits the doctrine's application to the state antitrust claims only. (Reply J. Mot., at 1693).

that eight[14] "of the states [and territories] on whose laws Plaintiffs base their claims have not recognized the continuing violation doctrine . . ." therefore it is inapplicable to Plaintiffs' claims based on those states' law. (*Id.*) (stating that the District of Columbia, Florida, Kansas, Nebraska, New Hampshire, New York, Vermont, and Wisconsin have not recognized the continuing violations doctrine in the antitrust context).

The question then becomes, does the jurisprudence of these states and territories prohibit the Court from applying the continuing violation doctrine?[15] If so, then seemingly untimely home purchases beginning in 1996, could be revived under the "continuing violation" doctrine if another injury does fall within the applicable statute of limitations. If not, claims from those states and territories are strictly limited to those that accrued within the applicable statute of limitations.

"When interpreting state law, a federal court's task is to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). "In the absence of guiding decisions by the state's highest court, [courts] consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). "So while a state supreme court's rule would control, a state appellate court's decision can provide controlling guidance as well." *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517-518 (7th Cir. 2021). At bottom, a federal court "must interpret the law as [it] think[s] [the state]'s courts

---

[14] The Court acknowledges that Defendants' brief identifies eleven states and territories rather than eight. (J. Mot., at 1493). However, in their opposition brief, Plaintiffs affirmatively forfeit their antitrust (and consumer protection) arguments under Tennessee law. (*See* Opp'n J. Mot., at 1648). And Plaintiffs do not bring antitrust claims under Massachusetts or Mississippi law. (*See* 2d Am. Compl. ¶ 187). Accordingly, only eight of the eleven states and territories mentioned by Defendants remain.

[15] The disputed territories and states in the antitrust context are District of Columbia, Florida, Kansas, Nebraska, New Hampshire, New York, Vermont, and Wisconsin.

would." *Id.* at 518 (quoting *Winebow, Inc. v. Capitol-Husting Co. Inc.*, 867 F.3d 862, 868 (7th Cir. 2017)).

"While most states model their antitrust statutes and jurisprudence on federal law, they are under no obligation to do so." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) (citing *California v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989)). "Still, many states have harmonization provisions—which can either be statutory or derived from common law—that provide that the state's antitrust laws are to be read in harmony with federal antitrust laws." *In re Dealer Mgmt. Sys. Antitrust Litig.*, MDL 2817, 362 F. Supp. 3d 510, 540 (N.D. Ill. 2019).

The antitrust statutes of seven of the eight states and territories in question—District of Columbia, Florida, Kansas, Nebraska, New Hampshire, New York, and Vermont—all either contain harmonization provisions or have been interpreted in such a way that supports construing the statute conterminously with federal antitrust statutes. *See* D.C. Code § 28-4515 ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."); Fla. Stat. § 542.32 ("It is the intent of the Legislature that . . . due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes."); Kan. Stat. Ann. § 50-163(b) ("[T]he Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court."); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 38 (Neb. 2004) ("We do not interpret § 59-829 as a delegation of state authority to the federal government, but, rather, as having the purpose to achieve uniform application of the state and federal laws regarding monopolistic practices."); *Kenneth E. Curran, Inc. v. Auclair Transp.*, 128 N.H. 743, 748-749 (N.H. 1986)

35

(construing New Hampshire antitrust law consistently with the Sherman antitrust act); *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994) (explaining that the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such result"); Vt. Stat. Ann. tit. 9, § 2453a(c) ("It is the intent of the General Assembly that in construing this section and subdivision 2451a(8) of this title, the courts of this State shall be guided by the construction of federal antitrust law and the Sherman Act, as amended, as interpreted by the courts of the United States."). Accordingly, the Court finds that the continuing violations doctrine applies to the antitrust claims under the laws of District of Columbia, Florida, Kansas, Nebraska, New Hampshire, New York, and Vermont. *See also In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-6549 (CM) (RWL), 2021 WL 2403727, at \*40-41 (S.D.N.Y. June 11, 2021) (finding the same regarding antitrust claims under the laws of Kansas, Mississippi, and Tennessee).

It is less clear whether the continuing violation doctrine applies to antitrust claims in Wisconsin. In *E-Z Roll Off, LLC v. Cty. of Oneida*, 800 N.W.2d 421 (Wis. 2011), the Wisconsin Supreme Court rejected the doctrine in the antitrust context as applied to the statutorily required notice when suing a governmental entity. *Id.* at 433-434. But that ruling was not a wholesale rejection of the continuing violation doctrine in antitrust law. As later examined, the Wisconsin Supreme Court found that allowing the continuing doctrine when suing the government would subvert the purpose of Wisconsin's notice-claim statute, Wisc. Stat. § 893.80,[16] which "is to afford governmental entities the opportunity to compromise and budget for potential settlement or litigation." *Yacht Club at Sister Bay Condo. Ass'n v. Vill. of Sister Bay*, 922 N.W.2d 95, 101 (Wis.

---

[16] Wisconsin's notice-claim statute requires, as a prerequisite to filing a lawsuit, a plaintiff to serve notice on a governmental entity "[w]ithin 120 days after the happening of the event giving rise to the claim . . . ." Wis. Stat. § 893.80.

2019) (quoting *E-Z Roll*, 800 N.W.2d at 434). Put differently, the *E-Z Roll* holding appears to be limited to the context of antitrust suits against the government.

Alternatively, the Wisconsin Supreme Court has stated that its antitrust act "is Wisconsin's mini-Sherman Act." *Grams v. Boss*, 294 N.W.2d 473, 477 (Wis. 1980) (overruled on other grounds by 2007 WI 99, 303 Wis. 2d 295, 735 N.W.2d 448). And that Wis. Stat. § 133.01 was intended as a reenactment of the first two sections of the Sherman Act. *Id.* at 480. Moreover, the Wisconsin Supreme Court has also explained that it adheres to federal-court interpretations of antitrust law when construing state antitrust law. *See Prentice v. Title Ins. Co. of Minn.*, 500 N.W.2d 658, 662 (Wis. 1993) (quoting *Wisconsin v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147, 153 n.12 (Wis. 1978)) ("We have stated many times that construction of sec. 133.01(1)[, now Wis. Stat. § 133.03(1),] is controlled by federal decisions under the Sherman Act."). Based on the narrowness of the *E-Z Roll* decision and the Wisconsin courts' repeated embrace of federal antitrust law, the Court finds that the Wisconsin Supreme Court would recognize the continuing violations doctrine, as stated in *Klehr*, when construing Wisconsin Antitrust Act claims. As such, the Court finds that the continuing violation doctrine applies to the antitrust claims from all eight states and territories in question.

Defendants' reliance upon *In re Opana ER Antitrust Litig.*, for the proposition that where a state has not yet recognized the continuing violation doctrine for antitrust claims that doctrine does not apply, is misplaced. (J. Mot., at 1493). In *Opana*, the district court declined to apply the continuing violation doctrine to state antitrust claims, noting that while federal courts routinely apply this doctrine to federal antitrust law, "the doctrine has received mixed treatment by state courts deciding state antitrust claims." *Opana*, 162 F. Supp. 3d at 725. The court supported this observation by citing a single case where Maine's Supreme Judicial Court declined to extend the

37

federal continuing violation doctrine to a Maine antitrust claim. *See id.* (citing *McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 425 (Me. 2009)). *McKinnon* involved antitrust and unfair trade practices claims under Maine law based on the plaintiff's 1986 Maine purchase and 2001 New Hampshire purchase of defendant's product from retail stores. *McKinnon*, 977 A.2d at 423-425. The Maine court found only the Maine purchase was relevant to the Maine law claims, so both claims accrued in 1986, and, with a six-year statute of limitations, both claims expired in 1992. *Id.* at 425. The plaintiff argued that the continuing violation doctrine should revive his claims based on the 2001 New Hampshire purchase, but the court refused to extend Maine's statute of limitations based on an out-of-state injury that was inapplicable to Maine law. *Id.*

The *Opana* court's reliance on *McKinnon* provides an inadequate basis for broadly rejecting the continuing violation doctrine in state antitrust cases. The Maine court declined to apply the doctrine where it was factually inapplicable—not as a matter of legal principle. *See also Tourangeau v. Nappi Distributors*, 648 F. Supp. 3d 133, 218 n.259 (D. Me. 2022) (stating that the Maine Supreme Judicial Court has "not definitively resolved whether the continuing violation doctrine is cognizable under Maine law"). Notably, *McKinnon* followed the standard rule that indirect purchaser antitrust claims under state law accrue at the time of injury, which is the rule this Court applies today.

Defendants also cite *In re Pre-FilledPropane Tank Antirust Litig.*, MDL No. 2567, 2019 WL 4796528 (W.D. Mo. Aug. 21, 2019), for the same proposition. In that case, the district court found that many states with harmonization provisions would not apply the continued violations doctrine to antitrust claims where the state's highest court had not spoken on the issue. *See id* at *9-12. For example, when discussing Kansas antitrust law, the *Propane Tank* court acknowledged that while Kansas has a harmonization provision, it would not follow the Supreme Court's

instruction in *Klehr* because its discussion of the continuing violation doctrine is dicta, and the Kansas Supreme Court has stated that "[n]obody is bound by dictum." *See id* at *9 (quoting *Law v. Law Co. Bldg. Assocs.*, 289 P.3d 1066, 1074 (Kan. 2012)). However, the Kansas Supreme Court stated four years later that "[w]hile not binding as a decision, judicial dictum is entitled to greater weight than obiter dictum and should not be lightly disregarded." *Jamerson v. Heimgartner*, 372 P.3d 1236, 1241 (Kan. 2016). To put it simply, the Court disagrees with the soundness of the *Propane Tank* court's view of *Klehr*, finding instead that greater weight should be given to each state's harmonization provision and the Supreme Court's *Klehr* opinion.

### 2. Fraudulent Concealment

Although subject to variation depending on the governing state law, where applicable, the discovery rule generally operates to start the statute of limitations running "only when the plaintiff learns that he's been injured, and by whom." *United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010). The doctrine of fraudulent concealment applies to toll the running of the statute of limitations when the defendants "take affirmative steps after the original wrongdoing to divert attention, mislead, or prevent discovery" of their misconduct. *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 854 (N.D. Ill. 2010).

Defendants argue that Plaintiffs' complaint and incorporated documents demonstrate that a reasonable person would have discovered their claims no later than 2007. (J. Mot., at 1498). Notwithstanding the fact that Defendants' argument presupposes that each Plaintiffs' injury began in 1996 rather than when they purchased a home as the Court found here, at the pleading stage, Plaintiffs need only allege a set of facts that is "plausible on its face." *Iqbal*, 556 U.S. at 678. Plaintiffs have pled that Defendants permitted the misrepresentation of buyer-agent services as "free," and that Defendants' conduct was self-concealing because the NAR MLSs are "prohibit[ed] . . . from disclosing to prospective buyers the amount of commission that the buyer-

39

agent will earn if the buyer purchases a home listed on the MLS." (2d Am. Compl. ¶¶ 4, 8, 77, 162). Taking these allegations as true, as the Court must at this stage, Plaintiffs have adequately pled that the doctrine of fraudulent concealment applies. Whether each Plaintiff was "reasonably diligent" requires factual determinations that are better assessed at a later stage of the litigation.

### C. Merits of State-Law Claims

Defendants argue also argue that Plaintiffs have failed to state a claim under a myriad of state antitrust, consumer protection, and unjust enrichment laws.

#### 1. Claims under Tennessee Law

Because Plaintiffs voluntarily dismiss their Tennessee antitrust and consumer protection claims, the only remaining claim under Tennessee law is an unjust enrichment claim. (*See* Opp'n J. Mot., at 1648). Defendants do not argue that Plaintiffs have not pled the essential elements of an unjust enrichment claim under Tennessee law. Instead, Defendants contend that Plaintiffs' claim should be dismissed because Plaintiffs did not exhaust their legal remedies against the person with whom Plaintiffs enjoyed privity of contract.[17] (J. Mot., at 1506-1507). Plaintiffs argue that futility is "self-evident" because they do not allege that the persons "with whom plaintiffs directly dealt with were involved in the conspiracy." (Opp'n J. Mot., at 1648). The Court agrees with Plaintiffs.

The Supreme Court of Tennessee has recognized that "[c]ourts may impose a contract implied in law where no contract exists under various quasi contractual theories, including unjust enrichment." *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524-525 (Tenn. 2005).

---

[17] Defendants also argue that permitting such an unjust enrichment claim when the Tennessee antitrust and consumer protection claims fail would "'create rights outside [legal] boundaries,'" which is prohibited. (J. Mot., at 1506-1507) (quoting *Craft v. Forklift Sys., Inc.*, 2003 WL 21642767, at *3 (Tenn. Ct. App. July 14, 2003)). However, in *Batton I*, the court found that Plaintiffs "may bring a standalone unjust enrichment claim under Tennessee law." *Batton I*, 2024 WL 689989, at *8 (citing *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 506 (E.D. Pa. 2006)). Defendants have provided the Court with no persuasive argument to deviate from that decision.

The elements of a Tennessee unjust enrichment claim are: 1) "[a] benefit conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Id.* at 172 S.W.3d at 525. The most significant requirement of an unjust enrichment claim is that the benefit to the defendant is unjust. *Id.* The plaintiff must further demonstrate that he or she has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract. *Id.* "However, a plaintiff need not be in privity with a defendant to recover under a claim of unjust enrichment." *Id.*

"[A] plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile." *Id.* at 526. In *Freeman*, the Supreme Court of Tennessee held that, at the summary judgment stage, an affidavit from plaintiffs' counsel averring that he was "unaware of any viable claims" against the party with which the plaintiff had been in privity, without any further factual basis, was insufficient to show that he was entitled to recover in unjust enrichment. *Id.*

This action is at the motion-to-dismiss stage. And while Plaintiffs do not allege in their complaint that they have exhausted all remedies against the home sellers or their buyer-agents, they do not allege that these persons were involved in the conspiracy. As such, the Court finds that under the facts in the complaint, futility is evident. *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1193 (N.D. Cal. 2009) (denying dismissal of a Tennessee unjust enrichment claim where "futility is self-evident . . . where the alleged price-fixing was done by the defendants" and there are no allegations that third parties with whom plaintiff enjoyed privity "were involved in the conspiracy"); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1027 (E.D. Mich. 2014) (same); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 919-20 (E.D. Pa. 2012) (same);

41

*In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 242 (M.D. Pa. 2010) (same). The Court therefore denies Defendants' motion to dismiss the Tennessee unjust enrichment claim on these grounds. Plaintiffs will still need to establish—consistent with Tennessee law—exhaustion, or futility of said exhaustion (or another applicable exception to the exhaustion requirement) at a later stage in the litigation.

### 2. Claims under Illinois, Montana, and South Carolina Law

Defendants argue that Plaintiffs' claims under the Illinois Antitrust Act ("IAA"), the Montana Consumer Protection Act ("MCPA"), and the South Carolina Unfair Trade Practices Act ("SCUTPA") are all barred because those states do not allow indirect purchaser class actions. Plaintiffs rely on *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), in asserting that Illinois, Montana, and South Carolina cannot limit Rule 23's class action procedure. (*See* Opp'n J. Mot., at 1649-1650). The Court finds Defendants' arguments premature.

Starting with Illinois, the IAA authorizes indirect purchasers to sue but provides that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae." 740 ILCS § 10/7(2). Plaintiffs' argument—that Fed. R. Civ. P. 23 trumps the Illinois statute—has been rejected by several courts. *See, e.g., In re Wellbutrin XL Antitrust Litig.*, 756 F.Supp.2d 670, 677 (E.D. Pa. 2010) ("The Illinois restrictions on indirect purchaser actions are intertwined with Illinois substantive rights and remedies . . . [such that] application of Rule 23 would 'abridge, enlarge or modify' Illinois' substantive rights, and therefore Illinois' restrictions on indirect purchaser actions must be applied in federal court."); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 626 (N.D. Cal. 2020) (same); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 418 (D.N.J. 2018) (same); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 723 (same); *United Food & Commer. Workers Local 1776 & Participating*

42

*Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1084 (N.D. Cal. 2014) (same). Courts have made similar findings regarding Plaintiffs' claims under the MCPA and SCUTPA. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2017 WL 4621777, at *20 (D. Mass. Oct. 16, 2017) (dismissing MCPA class action claim and concluding that "Montana's class action prohibition is similar to Illinois law on the matter and is, therefore, not preempted by Rule 23"); *Stalvey v. Am. Bank Holdings, Inc.*, Civil Action No. 4:13-cv-714, 2013 WL 6019320, *3-4 (D.S.C. Nov. 13, 2013) (rejecting the plaintiff's contention that *Shady Grove* saves SCUTPA class action claims and finding that SCUTPA claims cannot be brought in a representative capacity under S.C. Code Ann. § 39-5-140(a) and South Carolina Supreme Court precedent).

Nonetheless, Plaintiffs' claims survive on a technicality as the Court finds Defendants' position premature. Defendants seek to dismiss the IAA, MCPA, and SCUTPA claims on the grounds that they cannot be bundled in a class action. This lawsuit, however, is in the precertification phase. Any ruling the Court makes on Defendants' Rule 12(b)(6) motion does not have any binding effect on the proposed class before certification. *McKenzie v. City of Chi.*, 118 F.3d 552, 555 (7th Cir. 1997) ("Because a class has not been certified, the only interests at stake are those of the named plaintiffs."); *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("Neither a proposed class action nor a rejected class action may bind nonparties."); *Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1, 96 S. Ct. 1551, 1554 (1976) ("Without such certification and identification of the class [under Rule 23], the action is not properly a class action."). The Court therefore denies Defendants' motion to dismiss on these grounds, but notes that if Plaintiffs proceed with their IAA, MCPA, and SCUTPA claims on a classwide basis, the relevant statutory provisions and case law will likely present an obstacle.

43

### 3. <u>Certain State Law Claims and *Illinois Brick*</u>

Defendants argue that the Court should impose a temporal limit on Plaintiffs' antitrust claims under the laws of Connecticut, Maryland, and Utah because their *Illinois Brick* repealer statutes are not retroactive.[18] (J. Mot., at 1508-1509). Plaintiffs argue that those claims should apply retroactively, but agree, in the alternative, to limit their Maryland and Utah antitrust claims to the effective date of the applicable statutes.[19] (Opp'n J. Mot., at 1651-1652).

All three states passed *Illinois Brick* repealer statutes at various times throughout the last two decades. *See* Conn. Gen. Stat. Ann. § 35-46a (effective date of October 1, 2018); Md. Code Ann. Com. Law § 11-209(b)(2)(i) (*Illinois Brick* repealer language added on October 1, 2017, via 2017 Md. Laws Ch. 842 (S.B. 858)); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2014 WL 2993753, at *14 (E.D. Mich. July 3, 2014) (finding that Utah's *Illinois Brick* repealer statute, Utah Code Ann. § 76-10-3109 (formerly Utah Code Ann. § 76-10-918), took effect on May 1, 2006). Courts have interpreted all three of these statutes to apply only prospectively and not retroactively. *See Spinner Consulting LLC v. Stone Point Capital LLC*, 623 B.R. 671, 677 (D. Conn. 2020) (finding that Conn. Gen. Stat. Ann. § 35-46a does not apply retroactively from its effective date of October 1, 2018); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918-MMC, 2021 WL 4306018, *7 (N.D. Cal. Sep. 22, 2021) (finding that Md. Code Ann. Com. Law § 11-209(b)(2)(i) does not apply retroactively); *In re Static Random Access Memory Antitrust Litig.*, No. 07-md-01819 CW, 2010 WL 5094289, at *6 (N.D. Cal. Dec. 8, 2010)

---

[18] Defendants also argue that Plaintiffs' indirect purchaser claims under Florida and Missouri antitrust law are not viable because those states have not passed an *Illinois Brick* repealer statute. (J. Mot., at 1508-1509). Acknowledging this reality, Plaintiffs withdraw their claim under the Florida and Missouri antitrust statutes. (*See* Opp'n J. Mot., at 1652). Those claims are therefore dismissed.

[19] Defendants argue that Plaintiffs' New Hampshire antitrust claim does not apply retroactively from its effective date of January 1, 2008. (J. Mot., at 1510). Plaintiffs agree with Defendants, (Opp'n J. Mot., at 1652); therefore, the Court dismisses all New Hampshire antitrust claims that accrued prior to January 1, 2008.

44

(dismissing Utah indirect purchaser claims before the effective of the *Illinois Brick* repealer statute on May 1, 2006).

Plaintiffs have not pointed the Court to any legal authority that says otherwise. Accordingly, Plaintiffs' Connecticut, Maryland, and Utah antitrust claims, insofar as they precede the effective date of the relevant statutes, are dismissed. All claims that accrued after those dates, however, are still viable.

### 4. <u>Consumer Protection Claims under Kansas, Colorado, and Pennsylvania Law</u>

Next, Defendants argue that the Court should dismiss Plaintiffs' claims under the Kansas Consumer Protection Act ("KCPA"), Colorado Consumer Protection Act ("CCPA"), and Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("PUTPCPL") because Plaintiffs only pled Defendants engaged in anticompetitive conduct and failed to plead fraud or deception as required by those laws. (J. Mot., at 1510-1511).

### a. <u>The KCPA</u>

Regarding the KCPA claim, Defendants argue that the Court should dismiss Plaintiffs' claim as it did in *Batton I* because Plaintiffs did not adequately allege Defendants engaged in fraud or deception. (J. Mot., at 1510). Plaintiffs stand on their *Batton I* arguments to "preserve this issue." (Opp'n Mot., at 1652).

In *Batton I*, the plaintiffs asserted that the KCPA applied to anticompetitive conduct that involved a form of fraud or deception. *Batton I*, 2024 WL 689989 at \*9. The plaintiffs pled that buyer-brokers were deceptive because the NAR rules allowed them to represent their services as free, when, in reality, their commissions are passed through to buyers by being incorporated into their home prices. *Id.* Judge Wood found that because the plaintiffs "d[id] not allege that such a representation [of free services] was made to any" plaintiff, the plaintiffs merely "allege[d] the

type of standard anticompetitive conduct that does not separately give rise to a claim under the KCPA." *Id.* (Wood, J.). The court therefore granted the defendants' motion to dismiss the KCPA claim as applying to consumer harms and inapplicable to price-fixing claims. *Id.*

Because Plaintiffs do not distinguish their claims here from their claims in *Batton I*, the Court follows that ruling and dismisses the KCPA claim consistent with *Batton I*.

### b.   The CCPA and the PUTPCPL

The CCPA addresses what constitutes "unfair or deceptive trade practices," in Col. Rev. Stat. § 6-1-105(1), which lists various conduct that is prohibited by the CCPA. Similarly, the PUTPCPL makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices." 73 P.S. § 201–3(a). Regarding the CCPA "[t]he majority of the conduct explicitly concerns deceptive conduct. Furthermore, anticompetitive conduct is not expressly included in the list." *In re HIV Antitrust Litig.*, No. 19-cv-02573-EMC, 2023 WL 3006572, at *1 (N.D. Cal. Apr. 18, 2023). The PUTPCPL is no different. *Id.* at *3 ("The law lists 21 specific qualifying practices, none of which involves anticompetitive conduct."). Plaintiffs assert that they have pled claims covered by the "catch-all" provisions of both acts—Col. Rev. Stat. § 6-1-105(1)(rrr)—which proscribes "knowingly or recklessly engag[ing] in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice," and 73 P.S. § 201–2(4)(xxi), which prohibits defendants from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." (Opp'n J. Mot., at 1652-1654). The Court disagrees.

The *HIV Antitrust* case is illustrative. There, the court dismissed the plaintiffs' CCPA and PUTPCPL claims that were based on anticompetitive conduct. *HIV Antitrust*, 2023 WL 3006572, at *2-4. The court held that both statutes do not cover purely anticompetitive behavior absent deceptive conduct or misrepresentation. *Id.* at *2-4. The court reasoned that neither of the statutes'

provisions specifically mention anticompetitive conduct, and nearly all address deceptive practices. *Id.* at *1-4. The court also noted that other federal courts have declined to broaden the scope of both acts to include anticompetitive conduct, *Id.* at *2-4, and emphasized that section 6-1-105(3) of the CCPA indicates that nondeceptive unfair trade practices are actionable only under other statutory or common law causes of action, such as the Colorado Antitrust Act. *Id.* at *4. In addition, the court distinguished cases cited by the plaintiffs, including *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. CV 16-MD-2687 (JLL), 2017 WL 3131977 (D.N.J. July 20, 2017) which Plaintiffs relied upon here, and *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51, 60 (Pa. Commw. Ct. 2019), finding they either involved deceptive conduct in addition to anticompetitive behavior or, when discussing the CCPA, did not directly address whether the act covers purely anticompetitive conduct. *HIV Antitrust*, 2023 WL 3006572, at *2-4.

Consistent with *Batton I* and *HIV Antitrust*, the Court finds that Plaintiffs' CCPA and PUTPCPL claims fail. Like *Batton I*, Plaintiffs allege that the buyer-broker "***may*** represent their services as 'free' or without cost" because they are "technically paid through the seller-broker." (2d Am. Compl. ¶ 113). It therefore "does not follow from the fact that buyer-brokers were permitted to make this arguable misrepresentation that such misrepresentation must have been made to Plaintiffs here." *Batton I*, 2024 WL 689989 at *9. Plaintiffs' CCPA and PUTPCPL claims are therefore dismissed because they amount to anticompetitive conduct that does not give rise to a claim under those acts.

### c. <u>Consumer Protection Claims under Florida, Iowa, and Virginia Law</u>

Defendants argue that the consumer protection laws of Florida, Iowa, and Virginia should be dismissed because they "exempt transactions involving real estate licensees" and thus do not apply to Plaintiffs' injuries. (J. Mot., at 1511). Specifically, Defendants contend that Plaintiffs'

claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is exempt because the FDUTPA does not apply to "[a]n act or practice involving the sale lease, rental or appraisal of real estate by a person licensed, certified or registered pursuant to chapter 475, which act or practice violates s. 475.42 or s. 475.626." Fla. Stat. § 501.212(6). Defendants make similar arguments, (*see* J. Mot., at 1511-1512), under the laws of Iowa and Virginia. *See* Iowa Code Ann. § 714H.4(1)(a)(4) (exempting transactions involving "[p]ersons . . . licensed . . . under chapter[] . . . 543B[,]" governing "Real Estate Brokers and Salespersons"); Va. Code Ann. § 59.1-199(6) ("Nothing in this [Virginia Consumer Protection Act] chapter shall apply to: Real estate licensees who are licensed under Chapter 21 (§ 54.1-2100 et seq.) of Title 54.1"—governing "Regulation of Real Estate Brokers, Salespersons and Rental Location Agents").

However, Plaintiffs have not expressly pled an injury by a person licensed, certified or registered pursuant to chapter 475, as exempted under FDUTPA. Nor have they pled an injury by a person licensed under the relevant Iowa or Virginia statues. Such an injury "is a question of fact, which is inappropriate for this Court to resolve in considering a motion to dismiss." *Begualg Inv. Mgmt. v. Four Seasons Hotel Ltd.*, No. 10-22153-CIV-, 2011 U.S. Dist. LEXIS 108720, at *21 (S.D. Fla. Sep. 23, 2011) (finding that application of the same Florida real estate exception is a question of fact inappropriate for a motion to dismiss). "If discovery reveals that [Plaintiffs' brokers are] indeed registered as a broker in these states, the exemptions might then apply—but for now, Plaintiffs' pleadings control." *Davis*, 787 F. Supp. 3d at 70. Because Defendants cannot point to any allegation in the complaint that indicates Plaintiffs' FDUTPA claim fits into these exceptions, the Court denies Defendants' request to dismiss the claim.

48

IV.     **Motion to Strike**

Remixing their other arguments, Defendants move to strike class allegations concerning Plaintiffs' proposed damages class as defective. (Mot. to Strike, at 1536-1544, Dkt. 127-1). Defendants' contention centers on its analysis of Illinois' choice-of-law principles as applied to the claims of the proposed class. (*Id.* at 1536). They argue that because Plaintiffs' damages class includes causes of action under the antitrust, consumer protection, and unjust enrichment laws of many states, they cannot meet Rule 23's commonality and superiority requirements and thus should be stricken. (*Id.* at 1537). Plaintiffs dispute Defendants' choice of law analysis and argue that it would be premature to conduct a Rule 23 analysis and a choice of law analysis at the pleading stage. (Opp'n Mot. to Strike, at 1606, Dkt. 132) (citing *Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 409 (N.D. Ill. 2021)). The Court agrees with Plaintiffs.

Although class certification typically occurs "at a later stage in the proceedings," *Guzman v. N. Illinois Gas Co.*, No. 09-cv-1358, 2009 WL 3762202, at *2 (N.D. Ill. Nov. 6, 2009), a defendant is not precluded from filing a preemptive motion to strike or deny class allegations. The interplay of Rules 23(c)(1)(A), 23(d)(1)(D), and 12(f) empowers the Court to dismiss or strike class allegations at the pleading stage. *See, e.g. Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim[.]"); *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) (stating that, under Rule 23(c)(1)(A), a court "may deny class certification even before the plaintiff files a motion requesting certification"); *Wright v. Family Dollar, Inc.*, No. 10-cv-4410, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010) ("[A] motion to strike class allegations, made pursuant to [Rules 23(c)(1)(A) and 23(d)(1)(D)], is an appropriate device to determine whether the

49

case will proceed as a class action."). Pursuant to Rule 23(c)(1)(A), at "an early practicable time" after a person sues as a class representative, "the court must determine by order whether to certify the action as a class action." In addition, under Rule 23(d)(1)(D), a court conducting a class action may issue orders that "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." And Rule 12(f) permits a court, either on motion or *sua sponte*, to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

The decision to strike material "is within the discretion of the court." *Cannata v. Forest Pres. Dist. of Du Page Cty.*, No. 06-cv-2196, 2006 WL 2927604, at *6 (N.D. Ill. Oct. 11, 2006). But "the general rule is that motions to strike are disfavored." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (involving motion to strike affirmative defenses); *Cannata*, 2006 WL 2927604, at *6 (applying general rule to motion to strike class allegations); *Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008) ("Motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle for the arguments [the defendant] advances[.]"). This is, in part, "because plaintiffs generally have the burden of demonstrating that they meet the requirements of Rule 23. Class action defendants, however, are often in control of the information plaintiffs need to meet that burden. Thus, discovery is often appropriate, even necessary." *Guzman*, 2009 WL 3762202, at *2 (internal citation omitted).

Given the general aversion to early motions to strike, a court should address class allegations at the pleading stage only "when the pleadings are facially defective and definitively establish that a class action cannot be maintained." *Wright*, 2010 WL 4962838, at *1; *Kasalo*, 656 F.3d at 563 ("[A court] need not delay a ruling on certification if it thinks that additional discovery

would not be useful in resolving the class determination."); *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014) ("If the plaintiff's class allegations are facially and inherently deficient . . . 'a motion to strike class allegations . . . can be an appropriate device to determine whether [the] case will proceed as a class action.'"). On the other hand, "where the dispute is factual and discovery is needed to determine whether a class should be certified," *Wright*, 2010 WL 4962838, at *1, "a motion to strike the class allegations at the pleading stage is premature." *Buonomo*, 301 F.R.D. at 295; *Santiago v. RadioShack Corp.*, No. 11-cv-3508, 2012 U.S. Dist. LEXIS 46389, 2012 WL 934524, at *4 (N.D. Ill. Feb. 10, 2012) (same). Because class certification "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," striking class allegations at the pleading stage is generally inappropriate. *Boatwright v. Walgreen Co.*, No. 10-cv-3902, 2011 U.S. Dist. LEXIS 22102, 2011 WL 843898, at *2 (N.D. Ill. Mar. 4, 2011).

Defendants' analysis of Illinois' choice-of-law principles as applied to the claims of the proposed class are improper for two reasons. First, Defendants' choice-of-law analysis relies on an incorrect standard. "Federal courts hearing state law claims . . . apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). Defendants advocate for application of the so-called "place-of-injury rule," by citing an over fifty-five-year-old case for the proposition that "the laws of the states where each plaintiff (and putative class member) resides and purchased residential real estate govern the state law claims." (Mot. to Strike, at 1536) (citing See *Ingersoll v. Klein*, 262 N.E.2d 593, 595 (Ill. 1970)).

In *Ingersoll*, after a resident of Illinois died in Iowa, the administrator of his estate filed a complaint for damages under Iowa law because the injury occurred there. *Ingersoll*, 262 N.E.2d at

51

594. After the trial court dismissed the case because it found Iowa law was inapplicable, the plaintiff appealed their way to the Supreme Court of Illinois. *Id.* Rejecting the "wooden application" of the place-of-injury rule, the Supreme Court of Illinois found that the correct rule was to apply the law of the jurisdiction with the most substantial relationship to the cause of action. *Id.* at 595. As such, the court affirmed the district court's dismissal of the plaintiff's complaint because it found that Illinois law, rather than Iowa law, was applicable. *Id.*

Importantly, in *Ingersoll*, which is the singular case Defendants cite to support the place-of-injury rule, the Supreme Court of Illinois denounced the place-of-injury rule. *See Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 920 (Ill. 2007) ("[In *Ingersoll*, w]e . . . jettisoned the *lex loci delicti* rule—also termed the place-of-the-injury rule—and do not merely count contacts, recognizing that other jurisdictions may have an interest in the controversy that are not adequately reflected by a simple tally.") (citations omitted). In its stead, Illinois courts apply the most significant relationship test to address conflicting laws. *Zurbriggen v. Twin Hill Acquisition Co.*, 338 F. Supp. 3d 875, 883 (N.D. Ill. 2018). In determining what state has the most significant relationship to an issue, Illinois courts observe: "(1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Id.* at 903 (citing *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 901-902 (Ill. 2007)).

Defendants' choice-of-law analysis is therefore lacking because it focuses on the first element and concludes in a cursory fashion that Plaintiffs and each class member's claim accrued under the state law claims where they "reside" and "purchased residential real estate." (Mot. to Strike, at 1536). No filing sheds any light concerning how elements two through four might

52

ultimately apply to class members. "Because the ongoing discovery could significantly affect the choice of law analysis, conducting one now would be premature." *Tex. Hill*, 522 F. Supp. at 511.

Second, even if Defendants are correct and the choice-of-law analysis is as they say, they have not shown that the conflicts of law are material enough to defeat certification at the pleading stage. Illinois courts apply forum Illinois law "unless an actual conflict with another state's law is shown." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020) (citing *Bridgeview Health Care Ctr. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014)). Defendants identify differences between the antitrust, consumer protection, and unjust enrichment laws of various states at a high level of generality. (*See* Mot. to Strike, at 1538-1544). Because a choice of law analysis is premature, the court cannot rule out the possibility that there will be no material conflicts of laws or that, if there are, state-specific subclasses may be a manageable alternative in the event that certifying a national class proves unworkable. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801-802 (7th Cir. 2013).

Accordingly, Defendants' motion to strike is denied. The alleged class certification issues raised by Defendants must be resolved following discovery pertaining to class certification.

## CONCLUSION

For all the foregoing reasons, the motions to dismiss of Defendants eXp World Holdings, Inc., Weichert Real Estate Affiliates, Inc., and United Real Estate Holdings LLC d/b/a United Real Estate Group [122] [123] [125] are denied. Defendants' joint motion to dismiss [126] is granted in part and denied in part. The Court dismisses without prejudice Plaintiffs' claim for injunctive relief under § 1 of the Sherman Act, as well as Plaintiffs' claims under the antitrust laws of Florida, Missouri, and Tennessee, and the consumer protection laws of Colorado, Kansas, Pennsylvania, and Tennessee. In addition, Plaintiffs' claims under the antitrust laws of Connecticut, Maryland,

New Hampshire, and Utah are dismissed without prejudice, insofar as those claims precede the effective dates of those statues. The joint motion to dismiss is denied in all other respects. Defendants' joint motion to strike [127] is also denied.

**DATED**: March 24, 2026                    **ENTERED**:

LaShonda A. Hunt
_____
LaSHONDA A. HUNT
United States District Judge