**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MYA BATTON, AARON BOLTON, MICHAEL BRACE, DO YEON IRENE KIM, ANNA JAMES, JAMES MULLIS, THEODORE BISBICOS, STEVEN EWALD, JAMES LUTZ, SCOTT DAVIS, NIALL ADAMS, JASON BOOMSMA, THOMAS BRAUN, TIMOTHY CARUSO, SABRINA CLARK, COLLEEN DUVAL, JAMES EDWARDS, RYAN EISNER, CARSON FAIRBOURN, JOHN GARRETT, BRENNON GROVES, DARIN HENDRY, JORDAN KULLMANN, DANIEL PARSONS, JOSHUA PUTT, JOHN SANNAR, ROBERT SAYLES, BEN SHADLE, LISA SHANKUS, BRENT STRINE, CHRISTINE VAN WOERKON, AND SHERRIE WOHL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No. 1:23-cv-15618 <br><br> Hon. LaShonda A. Hunt <br><br> **REDFIN'S ANSWER TO SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| COMPASS, INC.; EXP WORLD HOLDINGS, INC.; REDFIN CORPORATION; WEICHERT REAL ESTATE AFFILIATES, INC. D/B/A WEICHERT, REALTORS; UNITED REAL ESTATE HOLDINGS LLC D/B/A UNITED REAL ESTATE GROUP, | |
| Defendants. | |

1

Defendant Redfin Corporation ("Redfin") files this answer to Plaintiffs' Second Amended Class Action Complaint ("Second Amended Complaint") using corresponding numbered paragraphs. Footnotes have been omitted from the numbered paragraphs. Any allegation in the Second Amended Complaint not specifically admitted is denied.

## NATURE OF THE ACTION

1.      For decades, home buyers across America have been unwittingly paying too much for, and receiving too little from, services offered to them by real estate agent members of National Association of Realtors ("NAR"). Despite agent representations (which NAR permits and encourages) that such services do not cost home buyers anything, home buyers in fact pay a hefty cost for these services — namely, supracompetitive commissions at levels fixed by the Defendants; NAR; and other real estate brokers such as Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.), HomeServices of America, Inc., RE/MAX Holdings, Inc., and Keller Williams Realty, Inc., which in turn lead to higher home prices paid by buyers.

**ANSWER:** Redfin denies the allegations contained in paragraph 1.

2.      Most people purchase and sell homes only a few times in their lives. Consequently, home buyers and sellers often depend on brokers to assist them with the process. Hundreds of thousands of brokers are members of NAR. NAR membership comes with multiple benefits for brokers, including access to the key listing services that contain information about homes for sale. However, as part of their membership, brokers must also agree to follow NAR's rules, practices, and guidelines. These rules, which include a requirement that sellers set aside a portion of the purchase price for buyer-agent commissions, prohibitions on modifying the commission, and permission to filter listings by commission, all enable NAR and its members to maintain buyer-agent commissions at supracompetitive levels unrelated to brokers' experience or the services provided, steer home buyers away from lower commission homes, and drive out discounters — among other harms.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 concerning allegations that "[m]ost people purchase and sell homes only a few times in their lives" or regarding the number of NAR members and on that basis denies those allegations. Redfin admits upon information and belief that NAR membership includes access to listing services that contain information about homes for sale. Redfin denies the remaining allegations contained in paragraph 2.

3.      Brokers use Multiple Listing Services ("MLSs") to share information about homes for sale. An MLS is a database of and the marketplace for properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS. The home

seller's broker (the "seller-broker") lists their client's home on the MLS, and the home buyer's broker (the "buyer-agent") uses the MLS to locate homes for their clients. In order to effectively market properties to buyers, seller-brokers must list their clients' properties on an MLS.

**ANSWER:** Redfin admits the allegations in the first, second, and fourth sentences of paragraph 3. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the other allegations contained in paragraph 3.

4. Plaintiffs and Class Members are home buyers who purchased their homes on MLSs affiliated with and governed by NAR. Plaintiffs bring this action against Defendants for agreeing, combining, and conspiring to impose, implement, and enforce anticompetitive restraints that reduce price competition in the markets for buyer-agent services in violation of federal antitrust law and state antitrust statutes, consumer protection laws, and common law. Defendants' unlawful, anticompetitive conduct causes America's home buyers to pay inflated commissions for broker services they misrepresent as free, to pay inflated prices for the homes they purchase, and to receive reduced quality broker services.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4 that "Plaintiffs and Class Members" are home buyers "who purchased their homes on MLSs affiliated with and governed by NAR." Redfin denies the remaining allegations contained in paragraph 4.

5. NAR is a trade association of real estate professionals with over 1.4 million members. NAR, the Broker Defendants, and their co-conspirators collectively possess market power in the market for buyer-agent services through their control of NAR-affiliated MLSs. The MLSs at issue in this case ("NAR MLSs") are those owned and/or controlled by local NAR associations and/or NAR member brokers. NAR MLSs are the dominant MLSs in the United States. Even some independent MLSs require brokers to be members of NAR to access their database and enforce NAR rules. Over 200,000 real estate professionals across the United States have registered with NAR to access its benefits, including MLSs, which are essential to selling and finding homes for their clients. Pursuant to the conspiracy, however, NAR members may access NAR's benefits, including the right to list their properties on NAR MLSs, only if they adhere to and implement NAR's rules, policies, and practices. NAR and Defendants have adopted a series of rules, policies, and practices that significantly restrain competition.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 concerning the number of NAR members, the identities of the persons who control the MLSs at issue in this case, and whether "independent

MLSs require brokers to be members of NAR to access their database[s]." Redfin denies the remaining allegations contained in paragraph 5.

6.     On November 19, 2020, the Department of Justice ("DOJ") filed an antitrust complaint in the District of Columbia against NAR alleging that NAR's rules, policies, and practices "governing, among other things, the publication and marketing of real estate, real estate broker commissions, as well as real estate broker access to lockboxes" where keys required to gain access to a property are stored were "widely adopted by NAR's members resulting in a lessening of competition among real estate brokers to the detriment of American home buyers." Simultaneously with the complaint, the DOJ announced a proposed settlement with NAR pursuant to which NAR committed to modifying its rules to provide greater transparency to home buyers. Assistant Attorney General Makan Delrahim explained that the settlement "prevents traditional brokers from impeding competition — including by internet-based methods of home buying and selling — by providing greater transparency to consumers about broker fees. This will increase price competition among brokers and lead to better quality of services for American home buyers and sellers.

**ANSWER:** Redfin admits upon information and belief based on public filings that the DOJ filed a civil complaint against NAR and a proposed settlement, and it issued a press release. Redfin otherwise denies the allegations contained in paragraph 6 and refers to those documents for their contents.

7.     On July 1, 2021, the DOJ sought to withdraw its consent to the proposed settlement with NAR. The DOJ wanted to ensure it would be able to conduct a "broader investigation of NAR's rules and conduct to proceed without restriction. The DOJ further explained, "We cannot be bound by a settlement that prevents our ability to protect competition in a market that profoundly affects Americans' financial well-being.

**ANSWER:** Redfin admits upon information and belief based on public filings that the DOJ filed a Notice of Withdrawal of Consent and issued a press release on July 1, 2021. Redfin otherwise denies the allegations contained paragraph 7 and refers to those documents for their contents.

8.     NAR imposes certain anticompetitive rules, policies, and practices on NAR MLSs. NAR also recommends certain rules, policies, and practices that NAR MLSs have widely adopted. NAR's anticompetitive rules, policies, and practices include:

   a.     requiring every seller-broker, when listing a property on an MLS, to make a "blanket unilateral offer[] of compensation" to any buyer-agent who may find a buyer for the home;

   b.     requiring that the offer of compensation to the buyer-agent be a blanket offer – *i.e.*, the exact same compensation terms must be simultaneously offered to

4

every buyer-agent without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer;

c.    prohibiting the disclosure of the total commission — the commission due to the seller-broker and the portion of the commission earmarked for the buyer-agent — for any listing on an NAR MLS;

d.    permitting buyer-agents to misrepresent to buyers that a buyer-agent's services are free;

e.    permitting and enabling buyer-agents to filter MLS listings based on the offered commissions and to exclude lower-commission homes from consideration by prospective home buyers;

f.    severely restricting brokers' ability to modify the buyer-agent commission after the buyer-agent conveys a purchase offer; and

g.    limiting access to the lockboxes that provide physical access to homes to members of NAR.

**ANSWER:** Redfin admits upon information and belief that NAR, from time to time, recommends certain rules, policies, and practices to its members.  Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 concerning whether or to what degree those rules, policies, and practices are adopted by NAR MLSs.  Redfin otherwise denies the allegations contained in paragraph 8 and refers to those documents for their contents.

9.    NAR's rules, policies, and practices have been adopted and enforced by NAR members, including NAR MLSs, and are, therefore, agreements among competing real estate brokers. Defendants' implementation of and adherence to these agreements is manifestly anticompetitive.

**ANSWER:** Redfin denies the allegations contained in paragraph 9.

10.    Because the Defendants are among the leading real estate firms in the United States, their participation in the conspiracy is essential to its success. The Defendants have agreed to participate in, facilitate, and implement the conspiracy. Each of the Defendants play an active role in NAR and has required franchisees, brokerages, and individual realtors to join in and implement NAR's anticompetitive agreements as a condition to receiving the benefits of each Defendant's brand, brokerage infrastructure, and other support. Defendants use their control of the MLSs and their own governing policies to ensure adherence to NAR rules. For example, Defendant Compass's 2022 Form 10-K states that Compass is "subject to a variety of rules promulgated by trade organizations including the NAR, state and local associations of REALTORS, and [MLSs]. Generally, as members of these organizations, we are subject to their policies, bylaws, codes of ethics, and fees

and rules." Defendant Weichert Real Estate Affiliates, Inc. similarly admits that "[i]n order to be called a Realtor®, your Weichert Sales Associate must earn a state license and complete additional training. Realtors® are also required to comply with a code of ethics and professional standards, above and beyond federal and state regulations."

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 concerning the statements attributed to Defendants Compass and Weichert. Redfin denies the remaining allegations contained in paragraph 10.

11. Defendants further implement the conspiracy by reviewing and reissuing NAR's rules at yearly NAR meetings and serving on the boards and committees that enforce compliance with NAR's rules.

**ANSWER:** Redfin denies the allegations contained in paragraph 11.

12. Defendants' conspiracy has substantially reduced competition in the market for buyer-agent services to the detriment of American home buyers. Specifically, Defendants' conspiracy enables brokers to raise, fix, and maintain buyer-agent compensation at artificially high levels that would not exist in a competitive marketplace, which in turn causes home buyers to pay higher prices. The conspiracy also enables brokers to "steer" home buyers away from lower commission homes. As a result, home buyers are harmed in at least the following ways:

    a.    the conspiracy has inflated the cost of buyer-agent services by inflating buyer-agent commissions;

    b.    since buyer-agent commissions are paid out of the price buyers pay for their homes, inflated buyer-agent commissions in turn have inflated home prices; and

    c.    the conspiracy has reduced the quality of services provided by buyer-agents by, for example, facilitating the steering of home buyers by their brokers towards higher-commission homes and away from lower-commission homes, even though such homes may otherwise match buyers' criteria.

**ANSWER:** Redfin denies the allegations contained in paragraph 12.

13. Plaintiffs and the other Class members have each incurred at least thousands of dollars in overcharges as a result of Defendants' conspiracy.

**ANSWER:** Redfin denies the allegations contained in paragraph 13.

14. Defendants' agreements individually and collectively unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26; state antitrust laws; consumer protection laws; and common law. Plaintiffs, on

6

behalf of themselves and the Classes, sue Defendants for these violations and seek treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

**ANSWER:** The second sentence of paragraph 14 sets forth Plaintiffs' description of their legal claims, to which no response is required. To the extent a response is required, Redfin denies this allegation. Redfin denies the remaining allegations contained in paragraph 14.

## JURISDICTION AND VENUE

15.     The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337. This case arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

**ANSWER:** Following this Court's March 24, 2026 Decision on Defendants' Motion to Dismiss (Dkt. 190), Plaintiffs' federal claims are no longer in this action, so no response is required. Redfin denies the remaining allegations in paragraph 15.

16.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each Class is a citizen of a State different from Defendants.

**ANSWER:** Paragraph 16 asserts legal conclusions to which no response is required. To the extent a response is required, Redfin admits that this Court has jurisdiction over the subject matter of this action at this stage.

17.     This Court has personal jurisdiction over Defendants. Defendants have: (1) transacted business in the United States, including in this District; (2) transacted with members of the Classes throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; (4) purposefully availed themselves of the real estate market in the United States, including the real estate market in this District; (5) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District; and (6) caused injury and reaped benefits from the unlawful scheme in the United States, including in this District. Additionally, NAR, which is the means by which the conspiracy is adopted and enforced, is headquartered in this District.

**ANSWER:** Paragraph 17 asserts legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations in paragraph 17.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d). Each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

7

**ANSWER:** Paragraph 18 asserts legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations in paragraph 18.

## TRADE AND COMMERCE

19.     The NAR's anticompetitive rules apply to and have been implemented and enforced by Defendants and co-conspirators nationwide. These rules govern the conduct of local NAR associations, local brokers, and local realtors across the United States. Defendants' conduct alleged herein has, among other harms, inflated buyer-agent commissions nationwide, including in the areas in which the NAR MLSs operate. Defendant NAR, through its members and other co-conspirators, and Broker Defendants, through their franchisees, brokers, and other co-conspirators, are engaged in interstate commerce and activities affecting interstate commerce.

**ANSWER:** Redfin admits that it is engaged in interstate commerce.  Redfin denies the remaining allegations contained in paragraph 19.

## THE PARTIES

### A.     Plaintiffs

20.     Plaintiff Mya Batton ("Batton") is a resident of Tennessee. In 2020, Batton purchased a home in Mount Juliet, Tennessee using a buyer-agent. The home Batton purchased was listed on the RealTracs multiple listing service ("RealTracs MLS"). Upon information and belief, the RealTracs MLS is run by associations with boards of directors comprised entirely of NAR members who must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20.

21.     Plaintiff Aaron Bolton ("Bolton") is a resident of Florida. In 2021, Bolton purchased a home in Parrish, Florida using a buyer-agent. The home Bolton purchased was listed on the Stellar multiple service (formerly known as the Florida Regional Multiple Listing Service) ("Stellar MLS"). Upon information and belief, the Stellar MLS is owned by an NAR member broker and adheres to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21.

22.     Plaintiff Michael Brace ("Brace") is a resident of Kansas. In 2020, Brace purchased a home in Wichita, Kansas using a buyer-agent. The home Brace purchased was listed on the South Central Kansas multiple listing service ("SCK MLS"). Upon information and belief, the SCK MLS is owned and/or run by realtors of South Central Kansas, an NAR member that must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 22.

23. Plaintiff Do Yeon Irene Kim ("Kim") is a resident of Florida. In 2018, Kim purchased a home in Orlando, Florida using a buyer-agent. The home Kim purchased was listed on the Stellar MLS. Upon information and belief, the Stellar MLS is run by shareholder organizations comprised of NAR members who must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 23.

24. Plaintiff Anna James ("James") is a resident of North Carolina. In 2022, James purchased a home in Greensboro, North Carolina using a buyer-agent. Also in 2022, James purchased a home in High Point, North Carolina using a buyer-agent. Both homes James purchased were listed on the Triad Multiple Listing Service, Inc. ("Triad MLS"). Upon information and belief, the Triad MLS is owned by an NAR member broker and adheres to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 24.

25. Plaintiff James Mullis ("Mullis") is a resident of Nevada. In 2020, Mullis purchased a home in Henderson, Nevada using a buyer-agent. The home Mullis purchased was listed on the Greater Las Vegas Association of REALTORS® multiple listing service ("GLVAR"). Upon information and belief, the GLVAR MLS is owned and/or run by the Greater Las Vegas Association of REALTORS®, an NAR member that must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin states that, pursuant to the Court's December 20, 2024 order (Dkt. 167),

all claims by Plaintiffs James Mullis are stayed pending final resolution of all appeals from

the Final Approval Order, and therefore no response is required. To the extent a response is

deemed required, Redfin lacks knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 25.

26. Plaintiff Theodore Bisbicos ("Bisbicos") is a resident of Massachusetts. In 2021, Bisbicos purchased a home in Chelsea, Massachusetts using a buyer-agent affiliated with Coldwell Banker. The home Bisbicos purchased was listed on the MLS Property Info Network ("MLSPIN"). Upon information and belief, the MLSPIN is run entirely by NAR members who must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 26.

27.     Plaintiff Steven Ewald is a resident of Illinois. In October 2022, Ewald purchased a home in Evanston, Illinois using a buyer-agent affiliated with Berkshire Hathaway HomeServices. The home Ewald purchased was listed on Midwest Real Estate Data ("MRED"). Upon information and belief, MRED is owned and operated by NAR brokers and 13 REALTORS® associations, and its parent is Multiple Listing Service of Northern Illinois, which is itself composed of multiple REALTORS® associations. Upon information and belief, these associations and brokers are NAR members that must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27.

28.     Plaintiff James Lutz is a resident of Colorado. In 2021, Mr. Lutz purchased a home in Key Colony, Florida using a buyer-agent broker that is a franchise of co-conspirator HomeServices and that operates under "Berkshire Hathaway HomeServices" brand name. The home Mr. Lutz purchased was listed on the Florida Keys multiple listing service ("FLKMLS"). Upon information and belief, the FLKMLS is owned and/or run by the Florida Keys Board of REALTORS®, a NAR member that must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 28.

29.     Plaintiff Scott Davis is a resident of North Carolina. In 2022, Mr. Davis purchased a home in Greensboro, North Carolina using a buyer-agent broker from Allen Tate Real Estate, LLC, a subsidiary of co-conspirator Hanna Holdings, Inc. The home Mr. Davis purchased was listed on the Triad Multiple Listing Service. Upon information and belief, the Triad MLS is owned and/or run by the Greensboro Regional REALTORS® Association, a NAR member that must adhere to NAR's guidelines and policies.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29.

30.     Plaintiff Niall Adams is a resident of Maine. In May 2024, Mr. Adams purchased a home in Freeport, Maine using a buyer-agent associated with co-conspirator Keller Williams. The property Mr. Adams purchased was listed on the MLS Maine Listings, which upon information and belief is owned and operated by the Maine Association of REALTORS®, a member of NAR, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30.

31.     Plaintiff Jason Boomsma is a resident of Wisconsin. In March 2022, Mr. Boomsma purchased a home in Mount Horeb, Wisconsin using a buyer-agent affiliated with co-conspirator HomeServices of America, Inc. The property was listed on the MLS Wisconsin Real Estate Exchange, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

10

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31.

32.     Plaintiff Thomas Braun is a resident of North Carolina. In September 2022, Mr. Braun purchased a home in Hendersonville, North Carolina using a buyer-agent. The property was listed on the MLS GRiD, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32.

33.     Plaintiff Timothy Caruso is a resident of New Hampshire. In October 2022, Mr. Caruso purchased real estate in Raymond, New Hampshire using a buyer-agent. The property was listed on PrimeMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33.

34.     Plaintiff Sabrina Clark is a resident of Iowa. In 2021, Ms. Clark purchased a home in West Des Moines, Iowa using a buyer-agent associated with co-conspirator Anywhere. The property was listed on MLS Des Moines Area Association of Realtors, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34.

35.     Plaintiff Colleen Duval is a resident of California. In August 2023 Ms. Duval purchased a home in Rancho Cucamonga, California using a buyer-agent. The property was listed on the California Regional MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35.

36.     Plaintiff James Edwards is a resident of California. In July 2022, Mr. Edwards purchased a home in Palm Springs, California using a buyer-agent. The property was listed on the CDAR MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

11

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 36.

37. Plaintiff Ryan Eisner is a resident of Illinois. In May 2021 he purchased a home in Chicago, Illinois using a buyer-agent. The property was listed on the listed on the MLS Midwest Real Estate Data, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 37.

38. Plaintiff Carson Fairbourn is a resident of Utah. In October 2020, Mr. Fairbourn purchased a home in Sandy, Utah using a buyer-agent. The property was listed on the Wasatch Front Regional MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 38.

39. Plaintiff John Garrett is a resident of West Virginia. In July 2023, Mr. Garrett purchased a home in Lewisburg, West Virginia using a buyer-agent. The property was listed on the MLS Greenbriar Valley MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 39.

40. Plaintiff Brennon Groves is a resident of Maryland. In October 2022, Mr. Groves purchased a home in Waldorf, Maryland using a buyer-agent. The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 40.

41. Plaintiff Darin Hendry is a resident of Missouri. In February 2022, Mr. Hendry purchased a home in St. Peters, Missouri using a buyer-agent. The property was listed on the MLS Maris MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 41.

42. Plaintiff Jordan Kullmann is a resident of Minnesota. In September 2022, Mr. Kullmann purchased a home in Plymouth, MN using a buyer-agent. The property was listed on the MLS Northstar MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42.

43. Plaintiff Daniel Parsons is a resident of New Mexico. In 2021, Mr. Parsons purchased a home in Rio Rancho, New Mexico using a buyer-agent. The property was listed on the MLS SWMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43.

44. Plaintiff Joshua Putt is a resident of Arizona. In September 2020, Mr. Putt purchased a home in Maricopa, Arizona using a buyer-agent. The property was listed on the MLS ARMLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 44.

45. Plaintiff John Sannar is a resident of Virginia. In June 2020, Mr. Sannar purchased a home in Alexandria, Virginia using a buyer-agent. The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45.

46. Plaintiff Robert Sayles is a resident of South Carolina. In May 2019, Mr. Sayles purchased a home in Mount Pleasant, South Carolina using a buyer-agent. The property was listed on the MLS Broker Reciprocity, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46.

47. Plaintiff Benjamin Shadle is a resident of Washington D.C. In March 2021, Mr. Shadle purchased a home in Washington D.C. using a buyer-agent. The property was listed on the MLS Bright MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

13

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 47.

48.     Plaintiff Lisa Shankus is a resident of Michigan. From 2018 to 2021 Ms. Shankus purchased multiple homes in Michigan using a buyer-agent. The properties were listed on several MLSs, which upon information and belief were members of NAR, or owned and operated by NAR members, and they imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 48.

49.     Plaintiff Brent Strine is a resident of Oregon. In May 2019, Mr. Strine purchased a home in Oregon City, Oregon using a buyer-agent. The property was listed on the MLS Oregon Data Share, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 49.

50.     Plaintiff Christine Van Woerkon is a resident of Connecticut. In 2023, Ms. Van Woerkon purchased a home in Sterling, Connecticut using a buyer-agent. The property was listed on the MLS Smart MLS, which upon information and belief is a member of NAR, or owned and operated by NAR members, and it imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 50.

51.     Plaintiff Sherrie Wohl is a resident of New York. In March 2023, Ms. Wohl purchased a home in Roslyn, New York using a buyer-agent. The property was listed on the MLS One Key Realty, which upon information and belief is a member of NAR, or owned and operated by NAR members, and imposed the NAR rules alleged herein to be anticompetitive.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 51.

B.     **Defendants**

52.     Compass, Inc. ("Compass") is a publicly-traded company incorporated in Delaware with its principal place of business in New York. Compass's stock began trading on the New York Stock Exchange after its initial public offering in April 2021. Through 2022, Compass represented sellers or buyers in more than 700,000 transactions totaling more than $780 billion in gross transaction value; Compass is the largest independent real estate brokerage by gross transaction value. Compass has more than a dozen offices in this District and transacts business in this District.

14

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 52.

53.    eXp World Holdings, Inc. ("eXp") is a publicly-traded company incorporated in Delaware with its principal place of business in Bellingham, Washington. eXp offers the bulk of its real estate brokerage services through its subsidiary, eXp Realty, LLC. eXp has brokerages in all 50 states in the United States residential real estate market. For the year ended December 31, 2022, eXp's agent count exceeded 86,000 and the company provided brokerage services for over 511,000 transactions. As used herein, the term "eXp" will refer collectively to eXp World Holdings, Inc. and eXp Realty, LLC. eXp has multiple offices and transacts business in this District.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 53.

54.    Redfin Corporation ("Redfin") is a publicly traded company incorporated in Delaware with its principal place of business in Seattle, Washington. Redfin operates in more than 100 markets (including in this District) and has developed partnerships with over 8,700 agents at other brokerages. Redfin has over 2,400 agents of its own, and in 2022 provided brokerage services for over 80,000 residential real estate transactions. Redfin has multiple agents operating in this District and transacts business in this District.

**ANSWER:** Redfin admits the allegations contained in paragraph 54 that it is incorporated in

Delaware with its principal place of business in Seattle, Washington. Redfin further admits

that it operates and provides brokerage services in certain regional markets throughout the

United States, including in the Northern District of Illinois. Redfin further admits that it

employs agents and has developed partnerships with agents at other brokerages. Redfin

denies the remaining allegations contained in paragraph 54.

55.    Weichert Real Estate Affiliates, Inc. d/b/a Weichert Realtors ("Weichert") is a nationwide real estate brokerage company with its principal place of business in New Jersey. As of July 2022, Weichert operates through 375 franchise offices in 43 states and touts itself as "one of the nation's leading providers of real estate and related services." Weichert has offices and transacts business in this District.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 55.

56.    United Real Estate Holdings LLC d/b/a United Real Estate Group is a nationwide real estate brokerage company with its principal place of business in Dallas, Texas. United Real

Estate Group is the sixth largest brokerage in the United States with company-owned brokerages in Dallas, Houston, Chicago, Philadelphia, and Washington, D.C.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 56.

57.     Each Defendant is a member of NAR.

**ANSWER:** Redfin denies the allegation contained in paragraph 57 that Redfin is a member

of NAR and lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in paragraph 57.

### C.     Co-Conspirators

58.     Defendants' co-conspirators include the four largest real estate brokers in the country: Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.), HomeServices of America, Inc., RE/MAX Holdings, Inc., and Keller Williams Realty, Inc. Plaintiffs have brought suit against these co-conspirators, as well as NAR, in a related litigation.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the

Second Amended Complaint. Redfin admits upon information and belief based on public

filings that Plaintiffs have brought suit against certain other entities in another litigation.

Redfin denies the remaining allegations in paragraph 58.

59.     Multiple local realtor associations not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts in furtherance thereof. Specifically, each of the local realtor associations that own and operate the NAR MLSs agreed to, complied with, and implemented the "Buyer-Agent Commission Rule," which requires a seller-broker to specify the blanket, unilateral commission to be paid to the buyer-agent upon sale in terms of a definite dollar amount or percentage of the sale price.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the

Second Amended Complaint. Redfin lacks knowledge or information sufficient to form a

belief as to the truth of the allegations regarding the activities of other entities. Redfin denies

the remaining allegations contained in paragraph 59.

60.     The NAR MLSs, among others, have participated as co-conspirators in the violations alleged herein and performed acts in furtherance thereof, including by adopting the Buyer-Agent Commission Rule in their individual rules and regulations.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the activities of other entities. Redfin denies the remaining allegations contained in paragraph 60.

61. Franchisees and brokers of Defendants also participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Buyer-Agent Commission Rule in the geographic areas where the NAR MLSs operate. In addition, other brokers in these areas have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These other brokers complied with and implemented the Buyer-Agent Commission Rule in these geographic areas.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the activities of other entities. Redfin denies the remaining allegations contained in paragraph 61.

62. Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named as Defendants in this Complaint.

**ANSWER:** Paragraph 62 purports to state legal conclusions as to which no response is required. To the extent a response is required, Redfin denies that it participated in the acts alleged and denies the allegations contained in paragraph 62.

## BACKGROUND ON NAR AND THE REAL ESTATE INDUSTRY

### A.     NAR and Affiliated MLSs

63. NAR is the largest trade association in America, composed of realtors (real estate agents registered with NAR), including residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry across the United States. Members belong to one or more of NAR's approximately 1,200 local associations or boards and/or 54 state and territory associations. NAR's local associations and affiliated MLSs govern the conduct of NAR's 1.4 million member realtors.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 63.

17

64.     Among other activities, NAR establishes and enforces rules, policies, and practices that are adopted by NAR's local associations and their affiliated MLSs and, in turn, must be complied with by realtors. Membership in NAR provides real estate professionals with a number of benefits, including liability insurance, access to MLSs, trainings, and more.

**ANSWER:** Redfin admits upon information and belief that NAR membership comes with certain benefits for brokers. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 64.

65.     Home sellers and buyers are typically represented by brokers, including those registered with NAR. According to NAR, in 2020, 89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer-agent.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65.

66.     State licensing laws regulate who can represent sellers and buyers in the real estate market. Two categories of entities may be licensed under state law: (1) the real estate broker (also known as a "brokerage firm"); and (2) the individual real estate licensee or agent. Real estate brokers are legally responsible for the activities of their licensed agents.

**ANSWER:** Redfin admits that certain states have enacted laws regarding the representation of parties in real estate transactions. The remainder of paragraph 66 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations.

67.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. For that reason, all contracts for real estate services must be with brokers, not agents, and all payments are made to brokers, not agents. Brokerage firms pay their individual agents. For ease of reference, this Complaint generally refers to brokers and agents interchangeably.

**ANSWER:** Paragraph 67 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 67 and refers to applicable state laws for their content.

68.     Brokers typically share and find information about houses for sale on an MLS. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors so long as they comply with the rules of the MLS. MLSs function as joint ventures between real estate brokers to publish and share information about property listings in specified geographic areas.

**ANSWER:** Redfin admits the allegation in paragraph 68 that "[a]n MLS is a database of properties listed for sale." Redfin lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 68.

69.     MLSs also act as the main sources of listings for online websites, such as Zillow, through which many prospective home buyers find homes. However, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 69.

70.     Due to near industry-wide participation and control over important data, brokers offering MLSs possess and exercise power in the markets for the provision of real estate brokerage services to home buyers and sellers throughout the country. If a seller-broker does not list a client's property on an MLS, many buyer-agents will not show that property to prospective buyers.

**ANSWER:** The first sentence in paragraph 70 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70.

71.     NAR controls a substantial number of the MLSs in the United States. The NAR MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR. NAR's map of affiliated MLSs reflects NAR's wide reach.

**<u>Figure 1</u>**



**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71.

72. NAR promulgates rules, policies, and practices that govern the conduct of NAR-affiliated MLSs that are set forth annually in NAR'S Handbook on Multiple Listing Policy ("Handbook"). Under the terms of the Handbook, NAR members and MLSs must conform their policies with those established by NAR's Board of Directors.

**ANSWER:** Redfin admits upon information and belief that from time to time, NAR promulgates rules, policies, and practices. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 72.

### B. Broker Compensation

73. The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions are paid when the home sells.

**ANSWER:** Redfin admits upon information and belief that brokers and agents sometimes receive commissions in connection with the sale of residential real estate, which can be calculated as a percentage of the home's sale price. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 73.

74. The seller-broker's compensation is specified in a listing agreement, a contract between the seller and the seller-broker that details the terms of the seller-broker services, such as requiring that property be listed on an MLS. The listing agreement specifies the total commission that a home seller will pay to the seller-broker, often with a portion of that amount earmarked to be paid to the buyer-agent in the event the buyer has a broker.

**ANSWER:** Redfin admits upon information and belief that brokers may enter into listing agreements with sellers, which may contain the terms of the listing and which may disclose how the buyer broker may be compensated, including possibly by receiving payment from the seller broker. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 74.

**75.** The buyer-agent is typically compensated with a portion of the total commission paid to the seller-broker, which the buyer-agent receives if her client purchases the seller's home. When a buyer retains a broker, the buyer enters into a contract with that broker, which typically discloses that the buyer-agent will be compensated out of the total commission.

**ANSWER:** Redfin admits upon information and belief that when a buyer retains a broker, the buyer may enter into a contract with that broker and that the contract between a buyer's broker and the buyer may disclose how the buyer's broker may be compensated, including possibly by receiving payment from the seller broker. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 75.

**76.** The following example illustrates how this process typically works:

- A homeowner enters into a contract with a seller-broker, in which the seller agrees to pay the seller-broker 6% in total commissions in exchange for marketing and facilitating the sale of the home.

- The seller-broker then makes a blanket, unilateral offer of a 3% commission to every buyer-agent when it lists the home on the MLS.

- A buyer-agent shows the property to a buyer client, who buys the home for $500,000.

- The buyer pays the $500,000 purchase price into an escrow account. The escrow company then simultaneously transmits the seller-broker's commission (3% of the sales price or $15,000) to the seller-broker, the buyer-agent commission (3% of the sales price or $15,000) to the buyer-agent, and the net amount due to the seller.

**ANSWER:** Redfin states that paragraph 76 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 76.

**77.** Buyer-agent fees are paid out of the funds from the purchase price of the house — a price the home buyer pays. But, because the buyer-agent commission is ostensibly paid by the seller, buyers do not necessarily realize that the broker commission is added to the purchase price of the home such that buyers are sharing the cost of the commission with the seller. This fact is obscured further by NAR's Code of Ethics, which permits and encourages buyer-agents to tell their clients

that their services are free. In fact, home buyers pay a high price for these "free" services in the form of supracompetitive purchase prices and buyer-agent commission rates as well as reduced quality of buyer-agent services.

**ANSWER:** Redfin states that paragraph 77 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 77. Redfin denies the remaining allegations contained in paragraph 77.

## DEFENDANTS POSSESS MARKET POWER IN THE MARKET FOR THE PROVISION OF BUYER-AGENT SERVICES

78. The relevant service market for the claims asserted herein is the market for buyer-agent services. The relevant geographic markets for the claims asserted herein are the geographic areas in which NAR MLSs operate. This market comprises the bundle of services provided to home buyers by residential real estate brokers with access to the NAR MLSs. Defendants' and their co-conspirators' control of the NAR MLSs gives Defendants the ability to impose the Buyer-Agent Commission Rule and other anticompetitive NAR rules on class members and other market participants. Access to NAR MLSs is critical for brokers to compete and to assist home buyers where those MLSs operate.

**ANSWER:** The first three sentences of paragraph 78 purport to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations. Redfin denies the remaining allegations contained in paragraph 78.

79. Upon information and belief, NAR and the Defendants, through their co-conspirator franchisees and other conspiring brokers where the NAR MLSs operate, collectively provide the majority of the residential real estate broker services in these areas.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the activities of other entities. Redfin denies the remaining allegations contained in paragraph 79.

80. Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint. The terms "market power," "relevant market," and "dominant

share," are legal conclusions to which no response is required. To the extent a response is required, Redfin denies such allegations. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 as they pertain to each of the other Defendants. Redfin denies the remaining allegations contained in paragraph 80.

81. Any buyer-agents in the areas in which the NAR MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the NAR MLSs through themselves and their co-conspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-agent who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

**ANSWER:** Redfin states that paragraph 81 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or information sufficient to form a belief as to the truth of the hypothetical allegations contained in paragraph 81. Redfin denies the remaining allegations contained in paragraph 81.

82. For an alternative listing service to compete effectively with one of the NAR MLSs, the alternative would require listings as comprehensive as the NAR MLS. Brokers and their individual realtors who currently profit from inflated buyer-agent commissions have minimal incentives to participate in an alternative listing service that would generate lower buyer-agent commissions and lower total commissions. Further, many buyers would be very reluctant to retain a buyer-agent operating on an alternative listing service that required them to pay the buyer-agent commission when other buyer-agents operating on the NAR MLSs represent that they are entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-agents and their buyer clients. And buyer-agents would be reluctant to use a listing service with limited properties. Accordingly, a listing service attempting to compete with any of the NAR MLSs would likely fail to attract enough property listings to operate profitably and act as a competitive constraint on the incumbent MLSs. The absence of listing services that effectively compete with the NAR MLSs (or other MLSs) reflects substantial barriers to entry.

**ANSWER:** Redfin states that paragraph 82 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or

information sufficient to form a belief as to the truth of the hypothetical allegations contained in paragraph 82. Redfin denies the remaining allegations contained in paragraph 82.

83. NAR also advises MLSs that non-compete agreements are a "critical component" of any agreement between MLSs and third-party websites, such as Zillow, that may wish to access the MLSs data. NAR's checklist of "critical components" states that any non-compete should include provisions that the third-party website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." Further, NAR advises that the non-compete agreement should require the third-party website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." Thus, NAR, in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 83 as they pertain to entities other than Redfin. Redfin denies the remaining allegations contained in paragraph 83.

## THE ANTICOMPETITIVE AGREEMENTS

84. NAR's Handbook, Code of Ethics, and Standards of Practice, among other policies, impose rules, policies, and practices on all NAR members, including NAR MLSs. Certain of these rules, practices, and policies significantly restrain competition for the provision of buyer-agent services and harm home buyers across the United States.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 84 as they pertain to entities other than Redfin. The second sentence purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations. Redfin otherwise denies the allegations contained in paragraph 84 and refers to the documents cited therein for their content.

85. Compliance with NAR's rules is mandatory for NAR membership. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

**ANSWER:** Redfin refers to the document referenced in paragraph 85 for its contents. Redfin otherwise denies the allegations contained in paragraph 85.

86. Additionally, NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the

mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

**ANSWER:** Redfin refers to the document referenced in paragraph 86 for its contents. Redfin otherwise denies the allegations contained in paragraph 86.

87. NAR's rules and policies include: (i) the Buyer-Agent Commission Rule; (ii) a prohibition on disclosing to buyers the total commissions paid to brokers upon the sale of a house ("Concealment Rule"); (iii) rules permitting and encouraging buyer-agents to represent to home buyers that their services are free ("Free-Service Rule"); (iv) rules allowing and making it easy for buyer-agents to filter MLS listings to only those with high commissions ("Filter Rules"); (v) rules restricting sellers and seller-brokers' ability to modify the commissions offered to buyer-agents after an offer to purchase the listed home has been made ("Commission Modification Rules"); and (v) the restriction of access to lockboxes, which hold the keys to houses for sale, to only NAR members ("Lockbox Policy").

**ANSWER:** Redfin refers to the documents referenced in paragraph 87 for their contents. Redfin otherwise denies the allegations contained in paragraph 87.

88. NAR and its affiliates have a clear agreement: NAR members can participate in the MLS, and gain the benefits provided by NAR and the NAR MLS, as long as they agree to adhere to and enforce the anticompetitive restraints set forth in NAR's rules, practices, and policies. Thus, NAR and the NAR MLSs' adoption and enforcement of these rules, policies, and practices reflect concerted action between horizontal competitors and constitute agreements among competing real estate brokers that reduce price competition among brokers and lead to higher prices and lower quality service for American home buyers and others.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the activities of other entities. The second sentence purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations. Redfin denies the remaining allegations contained in paragraph 88.

## A. The Buyer-Agent Commission Rule

89. The Handbook sets forth the Buyer-Agent Commission Rule as follows: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."

**ANSWER:** Redfin refers to the document referenced in paragraph 89 for its contents. Redfin otherwise denies the allegations contained in paragraph 89.

90. The Handbook further states that "multiple listing services shall not publish listings that do not include an offer of compensation *expressed as a percentage of the gross selling price or as a definite dollar amount*, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

**ANSWER:** Redfin refers to the documents referenced in paragraph 90 for its contents. Redfin otherwise denies the allegations contained in paragraph 90.

91. This practice is virtually universally adopted. Indeed, nearly every MLS in the U.S. requires that listing brokers offer compensation to buyer-agents.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 91.

92. As a result of the Rule, seller-brokers must make blanket unilateral unconditional offers of compensation to their adversarial buyer-agents. These blanket offers relieve buyer-agents of the need to compete on things like price and quality of services. Thus, the Buyer-Agent Commission Rule reduces competition in the market for buyer-agent services and harms home buyers in a number of ways.

**ANSWER:** The third sentence of paragraph 92 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 92.

93. First, through the Buyer-Agent Commission Rule, Defendants act to sustain high commission rates for broker services. This commission rate is then baked into the price of the house, artificially raising home prices.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 93 as they pertain to entities other than Redfin. Redfin denies the remaining allegations contained in paragraph 93.

94. The Consumer Federation of America has explained, "[t]ypically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases." The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. As a result,

26

'a listing broker lists a split below' the standard industry level 'at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property . . . . This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices." As co-conspirator Keller Williams has acknowledged in its instructions to seller-brokers regarding what to tell home sellers: "[y]ou're putting yourself at a disadvantage competitively when you reduce your commission."

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 94 as they pertain to parties other than Redfin.

Redfin denies the remaining allegations contained in paragraph 94.

95. Additionally, because NAR and its members offer blanket, unilateral, unconditional commissions, brokers need not compete with respect to the quality of services in order to obtain higher commissions. For example, novice brokers who have just received their licenses can charge the same prices as highly skilled, long-practicing brokers. Similarly, to the extent a broker commission is calculated as a "percentage of the gross selling price," a buyer-agent who facilitates the purchase of an $800,000 home will receive potentially two times as much as a buyer-agent who facilitates the purchase of a $400,000 home, regardless of whether the higher compensation is commensurate with the amount and type of services provided.

**ANSWER:** Redfin states that paragraph 95 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or information sufficient to form a belief as to the truth of the hypothetical allegations contained in paragraph 95. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 95 as they pertain to entities other than Redfin.

Redfin denies the remaining allegations contained in paragraph 95.

96. Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive." But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."

**ANSWER:** Redfin refers to the document cited in paragraph 96 for its contents. Redfin otherwise denies the allegations contained in paragraph 96.

97. Second, buyer-agents "steer" home buyers to residential properties that offer higher commissions. Steering of home buyers to high commission homes reinforces high commission rates. It also reduces the quality of buyer-agent services by incentivizing buyer-agents to limit the homes they show prospective buyers to those that offer high commissions. Home buyers are therefore both more likely to pay a higher price for their home (since the buyer-agent commission is baked into the

27

sale price), and less likely to be matched with the optimal home — the exact task the buyer-agent is paid to do.

**ANSWER:** Redfin states that paragraph 97 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 97 as they pertain to entities other than Redfin. Redfin denies the remaining allegations contained in paragraph 97.

98.     Fear of having buyers steered away from a property is also a strong deterrent to sellers who would otherwise offer lower buyer-agent commissions, which further contributes to higher prices for buyer-agent services.

**ANSWER:** Redfin states that paragraph 98 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 98. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 98 as they pertain to persons other than Redfin. Redfin denies the remaining allegations contained in paragraph 98.

99.     The prevalence of such steering has been widely reported in government reports, economic research, and the trade press. For example, three researchers published what they describe as "systematic, nationwide evidence that buyer agents do in fact steer clients away from properties that offer low buyer commissions." Their findings are based on data they scraped from Defendant Redfin's website over several months.

**ANSWER:** Redfin denies the allegations contained in paragraph 99.

100.    Steering is made easy for buyer-agents by the fact that the blanket commission offer must be made available to every buyer-agent using the MLS. NAR's requirement that offers of compensation be expressed in specific dollar or percentage terms enables buyer-agents to easily compare the financial compensation offered to them by home sellers and steer their clients to higher commission homes.

**ANSWER:** Redfin denies the allegations contained in paragraph 100.

101.    Thus, the Rule is designed to create tremendous pressure on sellers to offer the high, standard commission and to act as a powerful deterrent to anyone who may attempt to offer a discounted commission. As one commentator explained: "[e]ssentially, the MLS listing acts as a

tool which competing brokers can use to help enforce a near uniform commission rate and drive out discounters."

**ANSWER:** Redfin refers to the document cited in paragraph 101 for its contents. Redfin otherwise denies the allegations contained in paragraph 101.

102. The Defendants' franchisees, agents, and other co-conspirators have also utilized software technology to help facilitate steering based on MLS commission data and to impede buyers from learning about properties that offer discount buyer-agent commissions. For example, NAR's affiliate, the Greater Las Vegas Association of REALTORS ("GLVAR") uses for its MLS a software program called Matrix, which was designed and sold by CoreLogic. CoreLogic provides software and data services to most, if not all, of the NAR MLSs. Matrix allows brokers to provide tailored electronic listings to their buyer clients. Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria. When brokers set up the Matrix program for their buyer clients, one of the fields in the software allows the brokers to filter listings according to the value of the buyer-agent commission being offered. In other words, brokers can program the software to only send property listings to buyers that promise buyer-agent commissions above a specified value.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the activities of other entities. Redfin denies the remaining allegations contained in paragraph 102.

103. GLVAR elected to adopt a version of the Matrix software that permitted brokers to exclude properties offering discount buyer-agent commissions from Matrix-generated emails to buyer clients. A number of franchisees and broker agents, including Defendant Compass, in at least the area covered by Greater Las Vegas have trained their realtors to insert 2.5% or higher as the minimum permissible buyer-agent commission when using the Matrix system to send property listings to buyer clients. As a consequence, unbeknownst to them, buyer clients of those realtors often do not receive Matrix-generated emails that include properties offering a buyer-agent commission of less than 2.5%, even if that property perfectly matches the buyers' search criteria.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 as they pertain to entities other than Redfin. Redfin denies the remaining allegations contained in paragraph 103.

104. As part of the DOJ's investigation into NAR and anticompetitive practices in the real estate industry, the DOJ served a Civil Investigative Demand ("CID") on CoreLogic directing it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of

29

compensation offered by listing brokers to buyer-agents; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer-agents."

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 104.

105.    By encouraging and facilitating steering, and adhering to the "standard real estate commission," the Buyer-Agent Commission Rule deters downward departures from the standard commission and enables brokers to avoid doing business with, or otherwise retaliate against, buyer-agents who try to compete by offering significant discounts.

**ANSWER:** Redfin denies the allegations contained in paragraph 105.

106.    There is no pro-competitive justification for the Buyer-Agent Commission Rule. Until the early 1990s, all brokers were seller-brokers or subagents of seller-brokers. Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers." Because "nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing [*i.e.*, seller's] broker," the seller's broker was paid by the seller and would then compensate the subagent working with the buyer.

**ANSWER:** The first sentence of paragraph 106 purports to state a legal conclusion to which

no response is required. To the extent a response is required, Redfin denies that allegation.

Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of

the allegations contained in paragraph 106.

107.    With the emergence of brokers who were no longer sub-agents of the seller's broker but were instead working for the buyer, there was no justification for requiring buyer-agents' commissions to be paid as a portion of the total commission. One industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep interbroker compensation . . . . It does not make sense for listing brokers to pay buyers' brokers for the services the latter provides to buyers." As another commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an attempt to fix market prices. . . . There is no longer any reason to permit listing brokers [*i.e.*, seller-brokers] to set the default prices that these competing buyers' brokers charge to serve their own customers. . . . The elimination of interbroker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a dramatic fall in broker revenues."

**ANSWER:** Redfin denies the allegations contained in paragraph 107.

108.    The reason for the Buyer-Agent Commission Rule is clear: to maintain high broker commissions for NAR members at the expense of home buyers. In the absence of the Rule, buyers

rather than sellers would negotiate buyer-agent commissions, and brokers would compete with each other by offering lower commission rates and/or higher quality services.

**ANSWER:** Redfin states that paragraph 108 contains hypothetical statements to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 108.

### B. The Commission Concealment Rule

109. The anticompetitive effects of NAR's Buyer-Agent Commission Rule are magnified by additional rules adopted and enforced by Defendants. NAR's Commission Concealment Rule prohibits disclosing to prospective buyers the total commissions offered to buyer-agents. So, while buyer-agents can see the commission they will earn if their client purchases a property, NAR MLSs conceal this fee from the home buyers who will actually pay the commission through the home purchase price.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 109 as they pertain to entities other than Redfin. Redfin denies the remaining allegations contained in paragraph 109.

110. NAR has instituted a series of rules ensuring commission concealment from buyers. These rules are laid out in several places in NAR's Handbook, including Policy Statement 7.23, which states "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 110 as they pertain to entities other than Redfin. Redfin refers to the cited documents for their contents. Redfin otherwise denies the allegations contained in paragraph 110.

111. Simultaneously, the NAR rules mandate price information sharing among brokers through its MLS rules. This type of one-way information exchange agreement eliminates the need for buyer-agents to compete on price by offering rebates or accepting lower commissions. It also encourages and enables brokers to set persistently high commission offers, leading to higher prices for buyer-agent services. Additionally, since buyers cannot see commission offers, they cannot detect or resist steering. As explained above, steering results in higher prices and reduces the quality of buyer-agent services for home buyers.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 111 as they pertain to entities other than Redfin. Redfin denies the remaining allegations contained in paragraph 111.

### C. NAR's Free-Service Rule

112. NAR's Free-Service Rule, which has been widely adopted by NAR MLSs, encourages buyer-agents to mislead buyers into thinking that the buyer-agent's services are free when they are not.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 112 as they pertain to entities other than Redfin. Redfin denies the remaining allegations contained in paragraph 112.

113. Until January 2021, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents governed by NAR are technically paid through the seller-broker, those buyer-agents can always tell their buyer clients that their services are free. As a result, buyers think they are paying nothing for buyer-agent services.

**ANSWER:** Redfin refers to the cited document for its contents. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 113 as they pertain to persons other than Redfin.

114. Because buyers do not believe they are paying anything for brokerage services, they are unlikely to (1) attempt to negotiate a lower buyer-agent commission and/or (2) search for or find attractive buyer-agent rebate offers or other discounts. In these ways, NAR's Free-Service Rule leads to higher prices for services provided by buyer-agents.

**ANSWER:** Redfin states that paragraph 114 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 114 as they pertain to persons other than Redfin. Redfin denies the remaining allegations contained in paragraph 114.

### D. NAR's Commission Filter Rules

115. NAR's Commission Filter Rules allow buyer-agents to filter MLS listings that will be shown to buyers based on the level of buyer-agent commissions offered. Some MLSs further permit buyer-agents not to show certain homes to potential home buyers if the buyer-agent will make less money because of lower commissions, even though those homes otherwise meet the buyer's search criteria.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 115. Redfin refers to the cited document for its content and otherwise denies the allegations of paragraph 115.

116. For example, according to Policy Statement 7.58 of NAR's Handbook "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."

**ANSWER:** Redfin refers to the cited document for its content. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 116.

117. These Filter Rules, which have been widely adopted by NAR MLSs, facilitate steering by helping buyer-agents selectively conceal from potential home buyers any property listings offering lower buyer-agent commissions. This reduces the quality of buyer-agent services and raises prices for buyer-agent services for home buyers.

**ANSWER:** Redfin states that paragraph 117 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 117.

### E. Commission Modification Rules

118. Even if a home buyer were to obtain enough information to negotiate a lower buyer-agent commission, NAR's ethics rules expressly prohibit buyer-agents from attempting to reduce buyer-agent commissions offered on MLSs through the submission of purchase offers. While NAR claims that brokers can negotiate their compensation at any time during the transaction, NAR's Standard of Practice 16-16 states:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[30]

In other words, it is an unequivocal violation of NAR's ethics rules for a buyer-agent to even present an offer to a seller that is conditional on the seller reducing the buyer-agent commission.

**ANSWER:** Redfin states that paragraph 118 contains a hypothetical example to which no response is required. Redfin further refers to the cited documents for their contents. Redfin otherwise denies the allegations contained in paragraph 118.

119. To the extent buyer-agents do seek to modify buyer-agent commissions, NAR illogically instructs buyer-agents to attempt those modifications before even showing the property to any potential buyers. By requiring buyer-agents willing to reduce buyer-agent commissions to request those reductions prior to even showing the property to a potential buyer, NAR forecloses virtually all negotiation over the buyer-agent commission. To comply, a buyer-agent would effectively need to contact a seller-broker on his own to negotiate a reduction to his own commission before his client has even seen the potential home.

**ANSWER:** Redfin states that paragraph 119 contains a hypothetical example to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 119.

120. NAR's rules also restrain negotiation of the buyer-agent commission by providing that after the seller has received purchase offers, the seller-broker is prohibited from attempting to unilaterally modify the buyer-agent commission that was offered on the MLS. NAR Standard of Practice 3-2 states:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.

**ANSWER:** Redfin refers to the documents cited for their contents. Redfin otherwise denies the allegations contained in paragraph 120.

121. Consistent with NAR's rule, the New Jersey MLS Rules and Regulations, for example, state that a listing broker may only offer a buyer-agent compensation that differs from the compensation indicated on the listing if the seller-broker "informs the other broker in writing in advance of submitting an offer to purchase." As another example, MLSListings Inc., one of the largest MLSs in Northern California, states the following on its website to help explain the governing NAR rules:

> **Can I change my offer of compensation that I had offered to the cooperating agent in the MLS after the agent produces an offer signed by the buyer?**

34

No. In no event shall the listing broker revoke or modify the offer of compensation later than the time the cooperating broker produces a prospective buyer who has signed an offer to purchase the property for which the compensation has been offered through the MLS (7.1.6).

**ANSWER:** Redfin refers to the documents cited for their contents. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 121.

122.    NAR imposes yet another restraint on negotiation by making it unethical for a buyer-agent to urge the buyer to negotiate directly with the seller to reduce commissions. Since the vast majority of home buyers have limited or no familiarity with this market and believe that the buyer-agent's services to them are "free," this restriction further restrains negotiations regarding buyer-agent commissions.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 122 as they pertain to entities and persons other than Redfin. Redfin denies the remaining allegations contained in paragraph 122.

## F.    NAR's Lockbox Policy

123.    NAR and its members have further reduced competition for buyer-agent services by limiting access to lockboxes to only those real estate brokers who are members of an NAR MLS. Real estate brokers keep, with permission from the sellers, keys to the houses for sale in lockboxes. This allows brokers to provide potential buyers with access to the homes while keeping the homes secure. The lockboxes are accessed by a real estate broker using a numerical code or digital Bluetooth® 'key.'

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 123 as they pertain to entities and persons other than Redfin. Redfin denies the remaining allegations contained in paragraph 123.

124.    NAR and NAR MLSs have adopted a series of rules (set forth in the NAR Handbook, Policy Statement 7.31) that limit access to lockboxes only to those real estate brokers that are members of NAR and subscribe to the NAR MLS. Brokers that are not affiliated with NAR cannot access the lockboxes and cannot show their clients the homes listed for sale, thereby lessening competition for buyer-agent services.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 124 as they pertain to persons other than Redfin. Redfin denies the remaining allegations contained in paragraph 124.

125.    As described in more detail below, each of these rules and practices have operated to maintain high commission rates and degrade the quality of the services that home buyers retain buyer-agents to receive. The rules have imposed higher buyer-agent commissions, maintained (and even increased) those overcharges over time notwithstanding technology and other changes that should have substantially reduced commissions, and significantly impeded the ability of lower-cost alternatives to create a more competitive marketplace.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 125 as they pertain to entities other than Redfin.

Redfin denies the remaining allegations contained in paragraph 125.

## NAR REQUIRES LOCAL ASSOCIATIONS TO PARTICIPATE IN THE CONSPIRACY

126.    NAR requires its members, including state and local realtor associations, as well as non-member brokers and agents operating in areas with NAR MLSs, to comply with the above anti-competitive rules, and with other rules contained in NAR's rules, practices and policies, including the NAR Handbook and the NAR Code of Ethics.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 126 as they pertain to entities other than Redfin.

Redfin denies the remaining allegations contained in paragraph 126.

127.    NAR requires NAR members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics and . . . the intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

**ANSWER:** Redfin refers to the documents cited in paragraph 127 for their content. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 127.

128.    NAR threatens its individual and association members with expulsion if they fail to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

**ANSWER:** Redfin refers to the document cited in paragraph 128 for its content. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 128 as they pertain to entities other than Redfin.

129. A local realtor association and/or NAR member brokers own and/or control each of the NAR MLSs. Realtor associations owning MLSs are required by NAR to ensure that their MLSs and the MLSs' participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Because access to the NAR MLSs and other MLSs is commercially necessary, brokers and agents must comply with the mandatory provisions in NAR's Handbook. Without access to a local MLS, including the NAR MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 129 because they concern entities other than Redfin.

130. The role of a local realtor association is particularly important for home buyers as the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings. Listing brokers will use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those brokers and agents, to potential home buyers.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 130 as they pertain to persons other than Redfin.

131. Further, one of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these insurance benefits from realtor associations and MLSs that do not comply with NAR's mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation." [Footnote omitted.]

**ANSWER:** Redfin refers to the document cited in paragraph 131 for its contents. Redfin otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 131 as they pertain to entities other than Redfin.

132. NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR also requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 132 as they pertain to entities other than Redfin.

## DEFENDANTS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY

133.    As alleged above herein, NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. NAR and its affiliated associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 133 as they pertain to entities other than Redfin.

Redfin denies the remaining allegations contained in paragraph 133.

134.    Defendants orchestrated and participated in the conspiracy alleged herein by at least: (1) requiring their franchisees (and the agents employed by those franchisees) to comply with NAR rules including the Buyer-Agent Commission Rule; (2) supervising, through their executives, NAR's operations including NAR's adoption, maintenance, and enforcement of rules like the Buyer-Agent Commission Rule; and (3) controlling local realtor associations by, for example, participating in the governance and management of those associations and encouraging the adoption of NAR's rules, including the Buyer-Agent Commission Rule.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint.  Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the activities of other entities.  Redfin denies the remaining allegations contained in paragraph 134.

135.    Defendants' rules and policies require their franchises and agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the Second Amended Complaint.  Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the activities of other entities.  Redfin denies the remaining allegations contained in paragraph 135.

38

136.     Executives from Defendants have also actively participated in the management and operation of NAR. NAR's board of directors promulgated the rules in NAR's Handbook and Code of Ethics, including the Buyer-Agent Commission Rule, and many of those rules were developed and drafted by NAR's Professional Standards Committee. Senior executives of Broker Defendants have served on NAR's governing board of directors. For example, Steve Wagner, United Real Estate Group's Executive Vice President of Training, Education, and Development, along with Jason Gesing, Chief Industry Officer at eXp, have all served as NAR Large Board Representatives. Jim Weichert, CEO/President of Weichert, served on NAR's Board of Directors. Both NAR's Handbook and its Code of Ethics (and thus the Mandatory Offer of Compensation Rule) were drafted, developed, and promulgated by NAR's board of directors or NAR's Professional Standards Committee.

**ANSWER:** Redfin denies that it participated in any unlawful conduct as alleged in the

Second Amended Complaint.  Redfin lacks knowledge or information sufficient to form a

belief as to the truth of the allegations regarding the activities of other entities.  Redfin denies

the remaining allegations contained in paragraph 136.

137.     Executives from Weichert served on and participated in NAR-affiliated committees related to MLSs and their governance.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 137.

138.     Further, representatives from Defendants or their franchisees participated in the NAR Multiple Listing Issues and Policies Committee, responsible for reviewing and reissuing the Handbook.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 138 as they pertain to other entities. Redfin denies

the allegations contained in paragraph 138 as they pertain to Redfin.

139.     Executives of franchisees of Defendants have participated in and implemented the conspiracy through the governance of the local realtor associations that own and operate the NAR MLSs. Those executives and local realtor associations required compliance with the NAR rules, including the Buyer-Agent Commission Rule, and adopted standard form contracts implementing the NAR rules.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 139 as they pertain to other persons. Redfin denies

the remaining allegations contained in paragraph 139.

140.    For example, the following Defendants and co-conspirators each have franchisees that partially own the MRED MLS: Berkshire Hathaway HomeServices; Compass; eXp; RE/MAX; Redfin; United Real Estate; and Keller Williams.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 140 as they pertain to other entities. Redfin denies the allegations contained in paragraph 140 as they pertain to Redfin.

## EFFECTS OF THE CONSPIRACY

141.    Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which a NAR MLS operates, and nationwide:

- Home buyers have paid, through the purchase price of their homes, inflated buyer-agent commissions and inflated total commissions;

- Inflated total commissions are incorporated into the home purchase price, thereby causing buyers to pay higher prices for homes;

- The retention of a buyer-agent has been severed from the setting of the broker's commission; the home buyer retains the buyer-agent, while the home seller sets the buyer-agent's compensation;

- Price competition among brokers to be retained by home buyers has been restrained;

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-agent commission; and

- The quality of buyer-agent services has been reduced, as buyer-agents are incentivized to steer their clients to higher commission homes;

- The quality of buyer-agent services has also been reduced through barriers that prevent buyer-agents from presenting and receiving purchase proposals that reduce the buyer-agent commission, thus making the proposals more attractive to and more likely to be accepted by sellers; and

- Broker Defendants have increased their profits substantially by receiving inflated buyer-agent commissions and inflated total commissions.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 141 as they pertain to other entities. Redfin denies the remaining allegations contained in paragraph 141.

40

142.    There is no pro-competitive benefit to Defendants' conspiracy. Defendants have successfully stabilized buyer-agent commissions and significantly increased the dollar cost charged despite the diminishing role of buyer-agents. According to data from NAR, many home buyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer-agents increasingly have been retained after their client has already found the home the client wishes to buy. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees." Despite their diminishing role, buyer-agents continue to receive the same artificially elevated commission, due to Defendants' conspiracy.

**ANSWER:** The first sentence of paragraph 142 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 142 as they pertain to other persons. Redfin denies the remaining allegations contained in paragraph 142.

143.    Defendants' success in maintaining (and, in inflation-adjusted dollar terms, substantially increasing) the charge imposed by buyer-agents despite the advent of new technologies stands in stark contrast to other industries. "[I]n almost every other consumer industry — booksellers, retailers, home appliances, insurance, banking, stock brokers — the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. . . . Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market." Despite technological advances that have lessened the role of brokers and widespread fluctuations in housing prices, brokerage fees have failed to reflect these changes.

**ANSWER:** Redfin refers to the document cited in paragraph 143 for its contents. Redfin otherwise denies the allegations contained in paragraph 143.

144.    Moreover, there is a disconnect between buyer-agent costs and buyer-agent commissions. Competition normally pushes firms to adopt fee structures that approximate their costs, but this trend is absent real estate brokerage fees. For example, buyer-agent costs are similar regardless of the price of the home. As the Wall Street Journal has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises." Instead, broker commissions remain divorced from the quantity, quality, and value of the services.

**ANSWER:** Redfin refers to the document cited in paragraph 144 for its contents. Redfin otherwise denies the allegations contained in paragraph 144.

41

**145.** Even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

**ANSWER:** Redfin denies the allegations contained in paragraph 145.

**146.** There is substantial economic evidence that Defendants' conspiracy has resulted in buyer-agent commissions and total commissions that are inflated well above a competitive level nationwide.

**ANSWER:** Redfin denies the allegations contained in paragraph 146.

**147.** Defendants' conspiracy has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the internet and the diminishing role of buyer-agents. Between 2000 and 2017, the average commission nationally has been stable at a supracompetitive rate of between 5% and 5.4%, regardless of changing market conditions.

**ANSWER:** Redfin denies the allegations contained in paragraph 147.

**148.** Moreover, because housing prices have increased substantially in recent years (at a rate significantly exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions have become even higher. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics." As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."

**ANSWER:** Redfin refers to the documents cited in paragraph 148 for their contents. Redfin

otherwise denies the allegations contained in paragraph 148.

**149.** The standard total broker commissions (*i.e.*, the aggregate commission paid to the seller-broker and buyer-agent) in areas where the NAR MLSs operate is between 5% and 6%, substantially higher than in countries with competitive markets for residential real estate brokerage services. In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%." They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%." Ultimately, the economists concluded that, "[b]ased on global data . . . [total] US residential brokerage fees should equal something closer to 3.0%."

**ANSWER:** Redfin refers to the documents cited in paragraph 149 for their contents. Redfin

otherwise denies the allegations contained in paragraph 149.

150.     The adverse economic impact of the conspiracy's restraints on price competition have been severe. The Consumer Federation of America indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."

**ANSWER:** Redfin refers to the document cited in paragraph 150 for its contents. Redfin

otherwise denies the allegations contained in paragraph 150.

151. Brian Larson, an attorney who has represented many MLSs, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation." According to Larson, "[g]etting rid of interbroker compensation" [*i.e.*, payments from seller-brokers to buyer-agents] would improve the market in several areas, including:

- "Buyer broker fees can be commensurate with the skill and experience of the broker and with the buyer's needs."

- "The market benefits from price competition for buyer-broker services."

- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed. Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"

**ANSWER:** Redfin refers to the document cited in paragraph 151 for its contents. Redfin

otherwise denies the allegations contained in paragraph 151.

152. Because of the scope and magnitude of the overcharges at issue here, the economic cost to the plaintiff classes and other consumers is enormous. Experts have suggested that the amount of "annual broker fees consumers might save if there was effective price competition is as much as $30 billion or more annually."

**ANSWER:** Redfin refers to the document cited in paragraph 152 for its contents. Redfin

otherwise denies the allegations contained in paragraph 152.

153. Economists Chang-Tai Hsieh and Enrico Moretti have suggested that more than half of current commissions might be eliminated by competition. And as noted above, Natalya Delcoure and Norm Miller found that U.S. broker fees should equal something closer to 3%.

**ANSWER:** Redfin refers to the document cited in paragraph 153 for its contents. Redfin

otherwise denies the allegations contained in paragraph 153.

43

## CONTINUOUS ACCRUAL

**154.** During the years preceding the filing of this complaint, Defendant NAR and Broker Defendants in NAR MLSs repeatedly engaged in anticompetitive conduct, including implementing and enforcing the Buyer-Agent Commission Rule and other anticompetitive NAR rules nationwide. The Defendants continue to do so.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 154 as they pertain to entities other than Redfin.

Redfin denies the remaining allegations contained in paragraph 154.

**155.** As a result of their conspiracy, Defendants repeatedly charged and received, and continue to charge and receive, inflated buyer-agent commissions and total commissions that were paid by Plaintiffs and the Classes in connection with the purchase of residential real estate listed on one of the NAR MLSs. Each payment of these inflated commissions by Plaintiffs and Class Members during the class period injured them and gave rise to a new cause of action.

**ANSWER:** Redfin lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 155 as they pertain to entities other than Redfin.

Redfin denies the remaining allegations contained in paragraph 155.

## STATUTE OF LIMITATIONS

**156.** The running of the statute of limitations begins when the Plaintiffs discovers the existence of a cause of action.

**ANSWER:** Paragraph 156 purports to state legal conclusions to which no response is

required. To the extent a response is required, Redfin denies the allegations contained in

paragraph 156.

**157.** Plaintiffs and the Classes had no knowledge of Defendants' unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against NAR.

**ANSWER:** Paragraph 157 purports to state legal conclusions to which no response is

required. To the extent a response is required, Redfin denies the allegations contained in

paragraph 157.

**158.** Moreover, it was reasonable for Plaintiffs and Class Members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior. Plaintiffs and Class Members are unsuspecting home buyers who do not have in-depth knowledge or information about the real

44

estate industry and are not well-versed with NAR's framework. Additionally, as alleged herein, NAR's policies, rules and practices specifically prohibit the disclosure of total broker commissions to home buyers and encourage buyer-agents to represent to their clients that they are receiving the brokers' services for free. As a result, the average home buyer does not appreciate that buyer-agent services cost them anything, let alone that Defendants actively conspire together to maintain supracompetitive broker commissions.

**ANSWER:** Paragraph 158 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies those allegations. Redfin lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 158 as they pertain to persons other than Redfin. Redfin denies the remaining allegations contained in paragraph 158.

159. For these reasons, the statutes of limitation applicable to Plaintiffs' and Class Members' claims have been tolled with respect to the claims asserted herein.

**ANSWER:** Paragraph 159 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 159.

160. Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitation on Plaintiffs' and the Class Members' claims until at least November 19, 2020.

**ANSWER:** Paragraph 160 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 160.

161. Defendants actively concealed their conspiracy by, for example, prohibiting the disclosure of total commissions to home buyers and encouraging brokers to represent to home buyers that their services are free of charge.

**ANSWER:** Redfin denies the allegations contained in Paragraph 161.

162. Moreover, Defendants' anticompetitive conduct was inherently self-concealing because NAR tightly controls its regulated MLSs, agents, and brokers, and a reasonable buyer under the circumstances would not have had reason to suspect that they were being subjected to anticompetitive conduct. The conduct prohibiting NAR MLSs from disclosing to prospective buyers the amount of commission that the buyer-agent will earn if the buyer purchases a home listed on the MLS is inherently self-concealing, as is the conduct allowing buyer-agents to misrepresent to buyers that a buyer-agent's services are free. Likewise, conduct by the Defendants to filter MLS listings

45

based on the level of buyer-agent commissions and to exclude homes with lower commissions is inherently self-concealing.

**ANSWER:** Redfin denies the allegations contained in paragraph 162. Redfin further states that it lacks information sufficient to form a belief as to activities allegedly performed by entities other than Redfin.

## CLASS ACTION ALLEGATIONS

163. Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

**Nationwide Class:** All persons who, since December 1, 1996 through the present, purchased in the United States residential real estate that was listed on an NAR MLS.

**ANSWER:** Paragraph 163 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 163.

164. Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a) and (b)(3) seeking damages pursuant to antitrust, unfair competition, consumer protection, and unjust enrichment laws, on behalf of the following class (the "Damages Class"):

**Damages Class:** All persons who, since December 1, 1996 through the present, purchased in the Indirect Purchaser States residential real estate that was listed on an NAR MLS.

**ANSWER:** Paragraph 164 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 164.

165. Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

46

**ANSWER:** Paragraph 165 sets forth Plaintiffs' description of their legal claims, to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 165.

166. **Ascertainability**: Membership of the Classes is defined based on objective criteria, and individual members will be identifiable from Defendants' and public records.

**ANSWER:** Paragraph 166 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 166.

167. **Numerosity**: The exact number of members of the Classes is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Classes likely consist of at least thousands of individuals, and the members can be identified through Defendants' and public records.

**ANSWER:** Paragraph 167 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 167.

168. **Predominant Common Questions:** The Classes' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Classes include, but are not limited to, the following:

a. Whether Defendants conspired as alleged herein;

b. Whether the conspiracy was implemented in the areas in which the NAR MLSs operate;

c. Whether the conspiracy harmed competition as alleged herein;

d. Whether home buyers were harmed as a result of Defendants' anticompetitive conduct as alleged herein;

e. Whether buyer-agent commissions were inflated as a result of the conspiracy;

f. Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

g. Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits; and

47

> h. The appropriate class-wide measures of damages.

**ANSWER:** Paragraph 168 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 168.

169. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the proposed Classes. Defendants' conduct that gave rise to Plaintiffs' claims is the same for all members of the Classes.

**ANSWER:** Paragraph 169 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 169.

170. **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including antitrust violations. Plaintiffs have no interest that is antagonistic to those of the Classes. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

**ANSWER:** Paragraph 170 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 170.

171. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

**ANSWER:** Paragraph 171 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 171.

172. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**ANSWER:** Paragraph 172 sets forth Plaintiffs' description of their legal claims, to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 172.

## CLAIMS FOR RELIEF

## CLAIM I

### Section 1 of the Sherman Act, 15 U.S.C § 1
### (On Behalf of the Nationwide Class for Injunctive and Equitable Relief)

173. Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

**ANSWER:** Paragraph 173 does not require a response because it merely incorporates the prior allegations in the Second Complaint without setting forth any specific allegation to either admit or deny. To the extent a response is required, Redfin repeats its responses to the prior allegations in the Second Amended Complaint as if set forth in full herein.

174. Beginning in at least 1996, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required. To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 174.

175. The misrepresentation as to the payment of brokerage commissions and the value of houses sold is an actual and proximate cause of harm to home buyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendants and their co-conspirators to set, raise, and maintain the level of broker commissions.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required. To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 175.

**176.** In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

    a.    participated in the establishment, maintenance, and implementation of the Buyer-Agent Commission Rule and other anticompetitive NAR rules;

    b.    participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that implemented the Buyer-Agent Commission Rule and other anticompetitive NAR rules; and

    c.    used their control over the NAR MLSs to force affiliated brokers, members, and franchisees of Broker Defendants to implement and adhere to the Buyer-Agent Commission and other anticompetitive NAR rules in the areas in which the NAR MLSs operate.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required. To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 176.

**177.** Defendants' conspiracy has caused buyer-agents to conceal total commissions, to misrepresent to buyers that buyer-agents' services are free, to steer home buyers towards high commission listings, and to diminish the value of buyer-agent services by restraining competition on buyer-agent commission fees in the home buying process. Defendants' conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer-agent services by restricting access to lockboxes, which is required in order for buyer-agents to show houses for sale to their clients.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required. To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 177.

**178.** Defendants' conspiracy has also reduced competition among buyer-agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer-agent commissions. Reduced price competition among buyer-agents has also reduced the quality of broker services provided to home buyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required.

To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 178.

179.    Plaintiffs and Class Members paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendants' conspiracy, Plaintiffs and the other class members would have paid lower prices for their homes and lower commissions.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required.

To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 179.

180.    Plaintiffs and Class Members also received diminished services from buyer-agents as a result of the conspiracy. Absent this conspiracy, Plaintiffs would have received improved services in negotiating and reducing the purchase prices of their homes.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required.

To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 180.

181.    As a direct and proximate result of Defendants' past and continuing violations, Plaintiffs and Class Members have been injured in their business and property.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required.

To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 181.

182.    Plaintiffs and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** Redfin states that the Court dismissed the claim asserted in this paragraph pursuant to its Order dated March 24, 2026 (Dkt. 190), and therefore no response is required.

To the extent a response is deemed required, Redfin denies the allegations contained in paragraph 182.

## CLAIM II

### Violation of State Antitrust Statutes
### (On Behalf of the Damages Class)

183.   Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

**ANSWER:** Paragraph 183 does not require a response because it merely incorporates the prior allegations in the Second Amended Complaint without setting forth any specific allegation to either admit or deny. To the extent a response is required, Redfin repeats its responses to the prior allegations in the Second Amended Complaint as if set forth in full herein.

184.   Beginning at least in 1996, Defendants engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in each of the Indirect Purchaser States. Defendants conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in each of the Indirect Purchaser States.

**ANSWER:** Paragraph 184 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in Paragraph 184.

185.   Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services.

**ANSWER:** Paragraph 185 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 185.

186.   As a result of Defendants' unlawful conduct, Plaintiffs and other Indirect Purchasers in the Damages Class have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in each of the Indirect Purchaser States.

**ANSWER:** Paragraph 186 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 186.

187. By engaging in the aforementioned conduct Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a) Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*, with respect to home purchases in Arizona by Class members and/or home purchases by Arizona residents;

b) Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to home purchases in California by Class members and/or home purchases by California residents;

c) Conn. Gen. Stat. § 35-24, *et seq.*, with respect to home purchases in Connecticut by Class members and/or home purchases by Connecticut residents;

d) D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to home purchases in District of Columbia by Class members and/or home purchases by District of Columbia residents;

e) Haw. Rev. Stat. § 480, *et seq.*, with respect to home purchases in Hawaii by Class members and/or home purchases by Hawaii residents;

f) 740 Ill. Comp. Stat. Ann. 10/3, *et seq.*, with respect to home purchases in Illinois by Class members and/or home purchases by Illinois residents;

g) Iowa Code §§ 553, *et seq.*, with respect to home purchases in Iowa by Class members and/or home purchases by Iowa residents;

h) Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to home purchases in Kansas by Class members and/or home purchases by Kansas residents;

i) Md. Com'l Law Code Ann. § 11-204, *et seq.*, with respect to purchases in Maryland by Class Members and/or purchases by Maryland residents;

j) Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to home purchases in Maine by Class members and/or home purchases by Maine residents;

k) Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to home purchases in Michigan by Class members and/or home purchases by Michigan residents;

l) Minn. Stat. §§ 325D.49, *et seq.*, with respect to home purchases in Minnesota by Class members and/or home purchases by Minnesota residents;

m) Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to home purchases in Nebraska by Class members and/or home purchases by Nebraska residents;

n)     Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to home purchases in Nevada by Class members and/or home purchases by Nevada residents;

o)     N.H. Rev. Stat. § 356:1, *et seq.*, with respect to home purchases in New Hampshire by Class Members and/or home purchases by New Hampshire residents;

p)     N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to home purchases in New Mexico by Class members and/or home purchases by New Mexico residents;

q)     N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to home purchases in New York by Class members and/or home purchases by New York residents;

r)     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to home purchases in North Carolina by Class members and/or home purchases by North Carolina residents;

s)     N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to home purchases in North Dakota by Class members and/or home purchases by North Dakota residents;

t)     Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to home purchases in Oregon by Class members and/or home purchases by Oregon residents;

u)     R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to home purchases in Rhode Island by Class members and/or purchases by Rhode Island residents after July 15, 2013;

v)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to home purchases in Utah by Class members and/or home purchases by Utah residents;

w)     Vt. Stat. Ann. tit. 9, § 2453 et *seq.*, with respect to home purchases in Vermont by Class Members and/or home purchases by Vermont residents;

x)     W. Va. Code §§ 47-18-3, *et seq.*, with respect to home purchases in West Virginia by Class members and/or home purchases by West Virginia residents; and

y)     Wis. Stat. §§ 133.03, *et seq.*, with respect to home purchases in Wisconsin by Class members and/or home purchases by Wisconsin residents.

**ANSWER:** Redfin states that the Court dismissed the claims asserted in paragraph 187 brought under the antitrust laws of Connecticut, Maryland, New Hampshire, and Utah, insofar as those claims precede the effective dates of those statues, and further dismissed the claims asserted in this paragraph brought under the antitrust laws of Florida, Missouri, and Tennessee pursuant to its Order dated March 24, 2026  (Dkt. 190), so no response is required

with respect to those claims. Paragraph 187 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in Paragraph 187.

188. Plaintiffs and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

**ANSWER:** Paragraph 188 sets forth Plaintiffs' description of their legal claims, to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 188.

189. Defendants are jointly and severally liable for all damages suffered by Plaintiffs and the Damages Class Members.

**ANSWER:** Paragraph 189 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 189.

## CLAIM III

### Violation of State Consumer Protection Statutes
### (On Behalf of Plaintiffs and the Damages Class)

190. Plaintiffs reallege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully stated herein.

**ANSWER:** Paragraph 190 does not require a response because it merely incorporates the prior allegations in the Second Amended Complaint without setting forth any specific allegation to either admit or deny. To the extent a response is required, Redfin repeats its responses to the prior allegations in the Second Amended Complaint as if set forth in full herein.

191. Beginning at least in 1996, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in the states pleaded below.

**ANSWER:** Paragraph 191 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 191.

192.    As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the Damages Class Members have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services in each of the Indirect Purchaser States.

**ANSWER:** Redfin denies the allegations contained in paragraph 192.

193.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

a)    Ariz. Rev. Stat. §§ 44-1521, *et seq.*, with respect to home purchases in Arizona by Class Members and/or purchases by Arizona residents;

b)    Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to home purchases in California by Class members and/or purchases by California residents;

c)    Colo. Rev. Stat §§ 6-1-105, *et seq.*, with respect to purchases in Colorado by Class Members and/or purchases by Colorado residents;

d)    Conn. Gen. Stat. §§ 42-110A, *et seq.*, with respect to purchases in Connecticut by Class Members and/or purchases by Connecticut residents;

e)    D.C. Code §§ 28-3901, *et seq.*; with respect to purchases in the District of Columbia by Class Members and/or purchases by District of Columbia residents;

f)    Fla. Stat. §§ 501.201, *et seq.*, with respect to home purchases in Florida by Class members and/or purchases by Florida residents;

g)    Iowa Code §§ 714H.1, *et seq.*; with respect to purchases in Iowa by Class Members and/or purchases by Iowa residents;

h)    Kan. Stat. Ann. §§ 50-623, *et seq.*, with respect to home purchases in Kansas by Class members and/or purchases by Kansas residents;

i)    Mass. Gen. Laws, ch. 93A, § 2, with respect to home purchases in Massachusetts by Class members and/or purchases by Massachusetts residents;

j)    Mich. Comp. Laws Ann. § 445.901, *et seq.*, with respect to home purchases in Michigan by Class Members and/or purchases by Michigan residents;

k) Mo. Rev. Stat. §§ 407.010, et seq., with respect to home purchases in Missouri by Class members and/or purchases by Missouri residents;

l) Mont. Code Ann. § 30-14-101, *et seq.*, with respect to home purchases in Montana by Class Members and/or purchases by Montana residents;

m) Neb. Rev. Stat. § 59-1601, *et seq.*, with respect to home purchases in Nebraska by Class Members and/or purchases by Nebraska residents;

n) Nev. Rev. Stat. §§ 598.0903, *et seq.*, with respect to home purchases in Nevada by Class Members and/or purchases by Nevada residents;

o) N.H. Rev. Stat. § 358:1, *et seq.*, with respect to home purchases in New Hampshire by Class Members and/or home purchases by New Hampshire residents;

p) N.J. Stat. Ann. § 56:8-1, *et seq.*, with respect to home purchases in New Jersey by Class Members and/or home purchases by New Jersey residents;

q) N.Y. Gen. Bus. Law § 349, *et seq.*, with respect to home purchases in New York by Class Members and/or purchases by New York residents;

r) N.C. Gen. Stat. §§ 75-1.1, *et seq.*, with respect to home purchases in North Carolina by Class members and/or purchases by North Carolina residents;

s) Or. Rev. Stat. §§ 646.605, *et seq.*, with respect to homes purchases in Oregon by Class members and/or purchases by Oregon residents;

t) 73 Pa. Stat. Ann. §§ 201–1 *et seq.*, with respect to homes purchases in Pennsylvania by Class Members and/or purchases by Pennsylvania residents;

u) R.I. Gen Laws § 6-13.1-1, *et seq.*, with respect to homes purchases in Rhode Island by Class Members and/or purchases by Rhode Island residents;

v) S.C. Code Ann. § 39-5-140(a), *et seq.*, with respect to home purchases in South Carolina by Class members and/or purchases by South Carolina residents;

w) Va. Code Ann. §§ 59.1-196, *et seq.*, with respect to home purchases in Virginia by Class members and/or purchases by Virginia residents;

x) Wisconsin - Wisc. Stat. § 100.18, *et seq.*, with respect to homes purchases in Wisconsin by Class Members and/or purchases by Wisconsin residents.

**ANSWER:** Redfin states that the Court dismissed the claims asserted in paragraph 193 brought under the consumer protection laws of Colorado, Kansas, Pennsylvania, and Tennessee pursuant to its Order dated March 24, 2026 (Dkt. 190), so no response is required

with respect to those claims. Paragraph 193 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 193.

**194.** Plaintiffs and members of the Damages Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for buyer-agent services than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct. On behalf of themselves and the Damages Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

**ANSWER:** Redfin denies the allegations contained in paragraph 194.

### CLAIM IV

**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Damages Class)**

**195.** Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

**ANSWER:** Paragraph 195 does not require a response because it merely incorporates the prior allegations in the Second Amended Complaint without setting forth any specific allegation to either admit or deny. To the extent a response is required, Redfin repeats its responses to the prior allegations in the Second Amended Complaint as if set forth in full herein.

**196.** Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense. For example, Plaintiffs and Class Members paid supracompetitive commissions to agents employed by Defendants or their co-conspirators. Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for buyer-agent commissions by Plaintiffs and Class members.

**ANSWER:** Paragraph 196 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 196.

**197.** Additionally, Defendants promulgated and enforced anticompetitive rules, including the Buyer-Agent Commission Rule, Concealment Rules, Free-Service Rule, Commission

Modification Rule, Filter Rule and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer-agent services for their own gain, providing Defendants with economic, intangible, and other benefits.

**ANSWER:** Redfin denies the allegations contained in paragraph 197

198. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and the Classes.

**ANSWER:** Paragraph 198 purports to state legal conclusions to which no response is required.

To the extent a response is required, Redfin denies the allegations contained in paragraph 198.

199. The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in the Complaint.

**ANSWER:** Paragraph 199 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 199.

200. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

**ANSWER:** Paragraph 200 purports to state legal conclusions to which no response is required. To the extent a response is required, Redfin denies the allegations contained in paragraph 200.

## REQUESTED RELIEF

Plaintiffs request relief as follows:

A. That the Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to members of the Class;

B. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

C. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the state antitrust and unfair competition and consumer protection laws as set forth herein;

D. That the Court award Plaintiffs and the other members of the Damages Class damages and/or restitution in an amount to be determined at trial;

E.      That the Court award Plaintiffs pre- and post-judgment interest;

F.      That the Court award Plaintiffs their costs of suit, including reasonable attorney's fees and expenses;

G.      That the Court award Plaintiffs and the Class a permanent injunction to permanently enjoin and restrain Defendants from establishing the same or similar rules, policies, or practices as those challenged in this action in the future; and

H.      That the Court award such other relief as the Court may deem just and proper.

**ANSWER:**    Redfin denies that these requests for relief are appropriate.

## AFFIRMATIVE DEFENSES

To preserve its rights, Redfin raises the following affirmative defenses at this time, and reserves the right to amend these defenses and assert other available defenses as information becomes available in discovery:

1.      Plaintiffs' claims and the claims of any putative class members should be dismissed because the Second Amended Class Action Complaint fails to state a claim upon which relief may be granted.

2.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs lack standing to bring this action against Redfin.

3.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because they did not suffer any damages, nor antitrust injury of the type that the antitrust laws are intended to remedy.

4.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Redfin and/or were caused, if at all, solely and proximately by the conduct of Plaintiffs themselves or by third parties.

5.      Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of waiver, including (but not limited to) because they expressly

agreed with their buyer brokers and agents that the brokers and agents could accept any and all compensation offered to them by the seller and/or listing broker.

6. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of estoppel, including (but not limited to) because they expressly agreed with their buyer brokers and agents that the brokers and agents could accept any and all compensation offered to them by the seller and/or listing broker.

7. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of laches.

8. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, due to the ratification of, and consent to, the challenged conduct by Redfin.

9. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because Plaintiffs failed to mitigate any damages they may have suffered.

10. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part by the applicable statute(s) of limitations or repose.

11. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the applicable limitations period set out in contracts and/or agreements executed by Plaintiffs and/or putative class members.

12. Plaintiff's claims are barred, in whole or in part, by the statute of limitations, including but not limited to the four-year statute of limitations applicable to federal antitrust claims and any applicable state statutes of limitations. To the extent Plaintiffs' seek to bring claims outside of those statutory periods or rely on information made public prior to the applicable statutory period, Plaintiffs' claims are time-barred.

13. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent that they have agreed to arbitration or chosen a different forum for the resolution of their claims.

14. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of unclean hands and/or *in pari delecto*.

15. Some or all of Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of accord and satisfaction to the extent that any Plaintiffs have released, settled, entered into an accord and satisfaction or otherwise compromised their claims, whether through the settlements approved in *Gibson v. National Association of Realtors, et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.), or otherwise.

16. If and to the extent that a named Plaintiff or any member of a purported plaintiff class has been damaged, which Redfin denies, any judgment to a certified plaintiff class must be reduced to the extent that a named Plaintiff or a purported class member opts out of any such class, releases any claims, and/or receives payments in settlement of any claims, whether through the settlements approved in *Gibson v. National Association of Realtors, et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.), or otherwise.

17. Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by Redfin's right to set off any amounts paid to Plaintiffs by any Defendants other than Redfin that have settled, or do settle, Plaintiffs' claims against them, whether through the settlements approved in *Gibson v. National Association of Realtors, et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.), or otherwise.

18. Plaintiffs fail to define a legally cognizable relevant market.

19. The injuries and damages alleged by Plaintiffs do not constitute legally cognizable antitrust injuries within a relevant, properly defined market.

20. Plaintiffs have failed to allege fraudulent concealment with the particularity required by the Federal Rules.

21. Plaintiff's claims are barred, in whole or in part, because Plaintiffs cannot prove fraudulent concealment.

22. Plaintiffs' claims and the claims of any putative class members are barred on the ground that the acts complained of, to the extent they occurred, were procompetitive in nature, were done for the purpose or had the effect of promoting, encouraging, and/or increasing competition, and/or resulted in procompetitive benefits that outweighed any harm.

23. Plaintiffs' claims and the claims of any putative class members should be dismissed because the damages sought are too speculative and uncertain, and cannot be practically ascertained or allocated.

24. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, because any claimed injury or damage has been offset by benefits Plaintiffs and putative class members received with respect to the challenged conduct.

25. Plaintiffs' request for class certification is barred because Plaintiffs cannot meet the requirements for class certification under Federal Rule of Civil Procedure 23.

26. Plaintiffs' damages and damages to a putative class, if any, resulted from the acts or omissions of third parties over whom Redfin had no control or responsibility. The acts of such third parties constitute intervening or superseding causes of harm, if any, suffered by Plaintiffs and/or any members of the putative class.

27. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the single entity doctrine, pursuant to which an antitrust conspiracy cannot be found among a corporation, its wholly-owned subsidiary(ies) and/or its officers and directors.

28. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the voluntary payment doctrine.

29. The conduct challenged by Plaintiffs is permitted under the laws and/or regulations of the states delineated in Claims II, III, and IV (the latter implicitly), including but not limited to those that expressly permit agreements between brokers and their buyer or seller clients and between listing and buyer brokers, providing for the sharing of compensation that they receive in conjunction with the provision of residential real estate services.

30. The state laws under which Plaintiffs are pursuing their claims contain statutory or other defenses that preclude Plaintiffs' claims.

31. Plaintiffs' claims and the claims of putative class members should be dismissed to the extent that plaintiffs seek remedies that are unconstitutional, contrary to public policy, and/or are otherwise unauthorized.

32. Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the direct-purchase requirement of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

33. Plaintiffs' claims and the claims of any putative class members are barred to the extent that the challenged conduct was committed by individuals acting *ultra vires*.

34. To the extent any conspiracy existed (which Redfin denies), Redfin did not participate in any such alleged conspiracy and cannot be held liable for any conduct of others.

35.     To the extent any conspiracy existed (which Redfin denies), Redfin withdrew from and ceased any participation in such alleged conspiracy prior to the acts or damages alleged in the Second Amended Complaint and therefore cannot be held liable for any subsequent conduct of others.

36.     Redfin adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Redfin. Redfin further hereby gives notice that it intends to assert and rely upon any and all such other defenses and affirmative defenses that may become available or apparent as this action proceeds, and thus reserves the right to amend this Answer to assert such defenses.

37.     The Second Amended Complaint is ambiguous as to whether the alleged state law violations are intended to be asserted on behalf of a purported nationwide class of indirect purchasers or just on behalf of the residents of those states whose laws were cited. To the extent that the Second Amended Complaint asserts alleged violations on behalf of indirect purchasers located outside of the jurisdictions governed by those laws, those claims are barred as improper assertions of extraterritorial jurisdiction and any effort to enforce those laws as to residents of other states would violate Defendants' right to due process under the United States and various state laws and constitutions.

38.     To the extent there is a finding of an illegal overcharge, Plaintiffs' claims are barred, in whole or in part, to the extent that such overcharge was not passed through, in whole or in part, to Plaintiffs, but was instead absorbed by the sellers.

39.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs failed to comply with notice requirements under particular state laws.

## JURY DEMAND

Redfin demands a trial by jury for all issues so triable.

WHEREFORE, Redfin prays as follows:

A.      Plaintiffs' Second Amended Complaint be dismissed with prejudice;

B.      Awarding Redfin its reasonable costs incurred in defending against the Second Amended Complaint, including any allowable interest; and

C.      For such further relief as provided by the court.

DATED this 28th day of April, 2026.

*Counsel for Defendant Redfin Corporation*

 s/ *Robert Maguire*_____

DAVIS WRIGHT TREMAINE LLP
Robert Maguire (pro hac vice)
MaryAnn Almeida (pro hac vice)
Emily Parsons (pro hac vice)
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
Tel: 206.622.3150
RobMaguire@dwt.com
MaryAnnAlmeida@dwt.com
EmilyParsons@dwt.com

Gerald A. Stein (pro hac vice)
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Tel: 212.402.4095
GeraldStein@dwt.com